AO 243 (Rev. 09/17)

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
### SENTENCE BY A PERSON IN FEDERAL CUSTODY

| **United States District Court** | District  Southern District of New York | |
|---|---|---|
| Name *(under which you were convicted)*:<br>Michael Paschal | | Docket or Case No.:<br>24-968 |
| Place of Confinement:<br>FCI Fort Dix | | Prisoner No.:<br>40846-509 |
| UNITED STATES OF AMERICA<br><br>V. | | Movant *(include name under which convicted)*<br>MICHAEL PASCHAL |

### MOTION

1.  (a) Name and location of court which entered the judgment of conviction you are challenging:
United States District Court for the Southern District of New York

(b) Criminal docket or case number (if you know):  21-cr-331 (VSB)

2.  (a) Date of the judgment of conviction (if you know):  March 14, 2024
(b) Date of sentencing: April 8, 2024

3.  Length of sentence:  132 Months

4.  Nature of crime (all counts):  18 USC § 1594(C), 18 USC § 1591(a), 18 USC § 2423(a)(e),
18 USC § 2422(a)

5.  (a) What was your plea? (Check one)
(1) Not guilty  X          (2) Guilty ☐          (3) Nolo contendere (no contest) ☐

6.  (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment,
what did you plead guilty to and what did you plead not guilty to?

6.  If you went to trial, what kind of trial did you have? (Check one)          Jury  X          Judge only ☐

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?          Yes ☐          No  X

AO 243 (Rev. 09/17)

8. Did you appeal from the judgment of conviction?    Yes [X]    No [ ]

9. If you did appeal, answer the following:

(a) Name of court:  United States Court of Appeals for the Second Circuit

(b) Docket or case number (if you know):  24-968

(c) Result:  Denied

(d) Date of result (if you know):  November 3, 2025

(e) Citation to the case (if you know):  N/A

(f) Grounds raised: (1) Whether the allowance and use of a deposition instead of live testimony, where the important witness could have easily been available for trial, violated Defendant's confrontation rights; (2) Whether the statutory presumption of knowledge of an underage victim's age from mere observation fails to flow naturally from the predicate viewing, and hence violates the Constitution.

(g) Did you file a petition for certiorari in the United States Supreme Court?    Yes [ ]    No [X]

If "Yes," answer the following:

(1) Docket or case number (if you know):

(2) Result:

(3) Date of result (if you know):

(4) Citation to the case (if you know):

(5) Grounds raised:

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?
Yes [ ]    No [X]

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court:  N/A

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

AO 243 (Rev. 09/17)

    (4)  Nature of the proceeding: _____

    (5)  Grounds raised:

    (6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

          Yes ☐      No ☐

    (7)  Result: _____

    (8)  Date of result (if you know): _____

(b) If you filed any second motion, petition, or application, give the same information:

    (1)  Name of court: _____

    (2)  Docket of case number (if you know): _____

    (3)  Date of filing (if you know): _____

    (4)  Nature of the proceeding: _____

    (5)  Grounds raised:

    (6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

          Yes ☐      No ☐

    (7)  Result: _____

    (8)  Date of result (if you know): _____

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

    (1)  First petition:    Yes ☐    No ☐

    (2)  Second petition:  Yes ☐    No ☐

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

AO 243 (Rev. 09/17)

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**GROUND ONE:** A 6th Amendment Violation Claim Concerning Ineffective Assistance of Both Court Appointed Trial Counsel as Well as Appellate Counsel's 6th USCA Failure to Timely Raise 4th Amendment Illegal Search, Seizure, Due Process 5th Amendment Violations.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(1) Outrageous conduct claims. (2) Vindictive prosecution claims. (3) Unreasonable search and seizure claims. (4) Selective prosecution prompted by Homeland Security Lead Investigator Kevin Kuntz for the government. (5) Cumulative errors claims on the part of both trial counsel, appellate counsel, and the government. See Memorandum of Law.

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐    No ☐

(2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐    No ☐

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐    No ☐

AO 243 (Rev. 09/17)

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐     No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐     No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TWO:** 5th Amendment Due Process Violation Caused When the Trial Court Accepted a Guilty Verdict for a Conspiracy Where Only a Sole Defendant was Prosecuted as Charged and Found Guilty Before a Jury as Trier of Fact. There Can Be No Judge-Made Offenses Against The United States; Prosecution Must Be Sustained by Statutory Authority

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Every criminal partnership or conspiracy embraces within it's purposes the avoidance of prosecution and punishment for the crime which is the primary purpose of the conspiracy. There is an understanding, implicit or otherwise, that the collaboration of the conspirators extends to the preventing the detection of the crime and it's successful prosecution. Thus, implicit in a conspiracy to violate the law is an agreement among two or more conspirators to conceal the violation after as well as before the illegal plan is consummated. In this case, Michael Paschal could not be the only charged defendant as the only alleged conspirator. See Memorandum of Law.

_____

(b) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐     No ☐

AO 243 (Rev. 09/17)

(2) If you did not raise this issue in your direct appeal, explain why:

**(c) Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐    No ☐

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐    No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐    No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐    No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

AO 243 (Rev. 09/17)

**GROUND THREE:** _____

    (a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

 

 

 

 

(b)  **Direct Appeal of Ground Three:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐     No ☐

    (2)  If you did not raise this issue in your direct appeal, explain why:

 

(c)  **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐     No ☐

    (2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

 

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐     No ☐

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐     No ☐

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐     No ☐

AO 243 (Rev. 09/17)

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

_____

**GROUND FOUR:** _____

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

(b)  **Direct Appeal of Ground Four:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐     No ☐

    (2)  If you did not raise this issue in your direct appeal, explain why:

(c)  **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐     No ☐

    (2)  If you answer to Question (c)(1) is "Yes," state:

AO 243 (Rev. 09/17)

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(3)  Did you receive a hearing on your motion, petition, or application?

Yes [ ]      No [ ]

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes [ ]      No [ ]

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes [ ]      No [ ]

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13.  Is there any ground in this motion that you have not previously presented in some federal court?  If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

AO 243 (Rev. 09/17)

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the you are challenging?       Yes ☐       No ☐

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At the preliminary hearing:

(b) At the arraignment and plea:

(c) At the trial:

(d) At sentencing:

(e) On appeal:

(f) In any post-conviction proceeding:

(g) On appeal from any ruling against you in a post-conviction proceeding:

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?       Yes ☐       No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?       Yes ☐       No ☐

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?       Yes ☐       No ☐

AO 243 (Rev. 09/17)

18.  TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of –

(1)  the date on which the judgment of conviction became final;

(2)  the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3)  the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)  the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

AO 243 (Rev. 09/17)

Therefore, movant asks that the Court grant the following relief:

_____

or any other relief to which movant may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on _____ .

(month, date, year)

Executed (signed) on *Michael Paschal* (date)

*1-13-26*

*Michael Paschal*
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

CASE NO. 1:21-cr-00331-VSB


UNITED STATES OF AMERICA,
        Plaintiff,


    v


MICHAEL PASCHAL,
    Defendant,


MEMORANDUM OF LAW 28 USC § 2255(a) MOTION
TO VACATE, SET ASIDE, OR CORRECT SENTENCE


COMES NOW, Michael Paschal, the above named, Pro Se litigant, moves this Honorable Court to review pursuant to 28 USC §§ 2255 motion to vacate, set aside, or correct sentence, allowing for a hearing in the alternative based upon the government's outrageous conduct and disregard for the truth in order to gain a conviction.


PRO SE
Michael Paschal
Reg # 40846-509
FCI Fort Dix
PO Box 2000
Joint Base MDL
NJ 08640

## STATEMENT OF PREFERENCE

I, Michael Paschal, am a Pro Se litigant presently incarcerated during the filing of this instant legal proceeding moving this Court to vacate, set aside, or correct this sentence, requesting this Honorable Court allow this Pro Se litigant a liberal review of this pleading in light of the Supreme Court's precedent in Haines v Kerner, 404 US 519 (1972), holding:

> "Pro Se litigants are to be held to a less stringent standard of review than those pleadings drafted by attorney's at law."

STATEMENT OF JURISDICTION

(1) The District Court's jurisdiction in this matter is pursuant to 18 USC § 3231, <u>Lynch v Dolce</u>, 789 F 3d 303, 311 (2nd Cir 2015).


(2) United States District Judge sentenced March 14, 2024, in the United States District Court for the Southern District of New York. This 28 USC § 2255 motion is timely.

## BACKROUND/HISTORY

The government accused the Defendant, Michael Paschal, of operating a prostitution business out of his residence at 927 Brady Avenue, Bronx NY. It was alleged Paschal and his girlfriend, Tanesia Stokes, who was never charged but still the same alleged co-conspirator, traveled to North Carolina. While staying at a motel there, at the motel pool, it was alleged that the two of them met a girl there whose name was Caitlyn Ponce, AKA Smith, who had run away from home. According to Caitlyn, she told the two that she had no financial resources, and that she was 17, and sexually active in the motel where she met them.

After Caitlyn found out they were from New York and were heading back there, Caitlyn agreed to go to New York with them. During the ride back, she explained to Paschal and Stokes she was already voluntarily engaging in commercial sex acts at the motel where she met them, and she would pay her room and board by engaging in commercial sex while in New York. Caitlyn explained that being the fact she was already very sexually active at the motel in North Carolina, it would be 'no big deal'.

Caitlyn was then taken the hospital and dropped off due to the fact she became physically sick. It was alleged that Michael Paschal dropped her off at the hospital in early August.

The two met Caitlyn towards the end of July of 2020 in North Carolina. It was stated that Caitlyn, AKA Smith, returned back to North Carolina around September 2020, to live with her mother, Tiffany Perez.

While Caitlyn Ponce, AKA Smith, was in the hospital, August 5,

2020, she was interviewed by NYPD Detective Shackel. During the interview, at no time did Caitlyn Ponce accuse Michael Paschal of making her commit sex acts with anyone. At the end of the interview, Detective Shackel stated that he would need a statement from Caitlyn admitting to the sexual trafficking, or some kind of other proof. At that present time, of August 5, 2020, there was no evidence of Michael Paschal committing any kind of sex trafficking offense using a minor in the State of New York.

On December 9, 2020, a search was executed at 927 Brady Avenue, Bronx NY. The search was conducted by the lead investigator, Homeland Security Investigations Special Agent Kevin Kuntz, as reported by Homeland Security Investigator Antonio Bolfo, and approved by Special Agent Charles Eagle. The case was opened 12/9/2020.

The current case 'Operation Tar Heel Trafficking', report title: Ponce Interview 1, pages 1, 2, and 3, subject to a protective order, is in a clear contradiction to a subsequent report by Kevin Kuntz, Special Agent Investigator for Homeland Security, alleging the case opened 12/9/2020, current case, 'Operation Tar Heel Trafficking', date approved December 29, 2020, alleging his report served to document the rescue of a minor victim of sex trafficking, and the execution of a search warrant at 927 Brady Avenue, Bronx NY, on December 14, 2020.

Two separate reports, written by two separate Special Investigators, alleging 2 separate rescues of a minor from 927 Brady Avenue, Bronx NY, on the 9th of December, 2020, and once

4

again on the 14th of December 2020.

Clearly, these reports question the validity of the author's personal knowledge. The report of the 9th of December 2020 clearly describes 5 witnesses having personal knowledge of a rescue of Caitlyn Ponce from 927 Brady Avenue, Bronx NY, from the residence of Michael Paschal, and the alleged victims subsequent interview at the Jacobi Hospital, located in Bronx NY, at approximately 1400 hours, and included the presence of Kevin Kuntz, Antonio Bolfo, Lanora Moore, Interviewer Brodsky, and the alleged victim Caitlyn Ponce AKA Smith, denied the accusations against Michael Paschal. See also Homeland Security Special Agent Charles Eagle

On June 17, 2021, Case No. 21-CR-331, United States v Michael Paschal, United States District Judge ordered a protective order signed and consented to 17 days before the judges order government AUSA Kevin Mead, May 31, 2021, and defense counsel Marisa Kristin Cabrera, counsel for Michael Paschal, signed June 16, 2021. The two consents and agreed protective order signed before the trial court ever agreed to the order. See confidential material order exhibit, subject to protective order, date approved May 17, 2021, Case # NY15HT21NY0001, case opened 12/9/2020, current case title 'Operation Tar Heel Trafficking', report title Ponce Interview 1, 3 pages, reported by Special Agent Antonio Bolfo, approved by Special Agent Charles Eagle, date approved 5/17/2021.

5

STANDARD OF REVIEW

Under Fed. R. Crim. P. 41, the oath or affirmation for a search warrant is required to be in the form of an affidavit or oath in writing. Under the authority of Rule 41(C) of the Fed. R. Crim. P., a search warrant is issuable where the judge is satisfied there is probable cause to believe grounds for the application therefore exist. It is only unreasonable searches that are prohibited. Where probable cause exists, it is proper for a search warrant to be issued, and search pursuant to the warrant is not unreasonable.

Facts relied upon by the affiant for believing the Defendant operated a prostitution business using a (minor) female, a 17 year old (victim), to engage in paid sex with customers located at the 'Brady Avenue address'. The search warrant was executed December 14, 2020, on the Brady Avenue address.

Law enforcement officers located Michael Paschal, the Defendant, the victim, the brother of Paschal, and Female 1.

Special Agent Kevin Kuntz, of the Department of Homeland Security, recklessly disregarded the truth. See Document 1, filed April 13, 2021, page 4 of 14, document case no. 1:21-cr-00331-VSB:M, claiming 'the victim engaged in commercial sex work 7 days a week at the Brady Avenue address until being rescued by 'law enforcement officers' on December 14, 2020. The alleged victim, Caitlyn Ponce, refuted these claims.

See United States v Cerda, 2nd Cir 2023, 2023 US Dist LEXIS 96510. A Defendant seeking to suppress evidence that was gathered pursuant to a search warrant that was based on inaccurate

representations by the government must show (1) That the inaccuracies were the product of a government agent's 'deliberate falsehood' or 'reckless disregard for the truth', rather than an innocent mistake, and (2) That, after setting aside the falsehoods, what remains of the warrant affidavit is insufficient to support a finding of probable cause.

Recently, the Second Circuit has reiterated the procedures employed in resolving such a motion.

## INACCURACIES IN SEARCH WARRANT AFFIDAVITS

Franks v Delware, 438 US 154, 171, 98 S. Ct. 2674, 57 L Ed 2d 667 (1978), established the framework for claims that evidence obtained pursuant to a search warrant should be suppressed, because the warrant affidavit contained misrepresentations. To overcome the 'presumption of validity' that applies to 'the affidavit supporting the search warrant', Lauria, 70 F 4th at 124 (quoting Franks, 438 US at 171) the defendant 'must satisfy both a state of mind requirement and a materiality requirement' with respect to any inaccuracies. Id at 125. He must show 'that (1) The claimed inaccuracies or omissions are the result of the affiant's deliberate falsehoods or reckless disregard for the truth, and; (2) The alleged falsehoods were necessary to the issuing judge's probable cause finding.' Id at 125 (quoting United States v Canfield, 212 F 3d 713, 717-18 (2nd Cir 2000)).

If the alleged misstatement is material, and if the defendant makes 'a substantial preliminary showing that' it 'was included by the affiant in the warrant affidavit', 'knowingly and

7

intentionally, or with a reckless disregard for the truth', then the court must hold a Franks Hearing, where the defendant bears the burden of establishing perjury or reckless disregard for the truth by a preponderance of the evidence. Id at 124 (quoting Franks, 438 US at 155-56).

'Whether [the affiant] acted deliberately or recklessly is a factual question of intent.' United States v Trzaska, 111 F 3d 1019, 1028, (2nd Cir 1997). 'The meaning of an intentional falsehood is self evident.' United States v Kunen, 323 F Supp 2d 390, 395, (E.D.N.Y. 2004). With respect to recklessness, the test is subjective. United States v Rajaratnam, 719 F 3d 139, 153 (2nd Cir 2013). This inquiry examines 'not what a reasonably prudent person would have appreciated given the attendant circumstances, but rather whether the defendant in fact entertained serious doubts as to the truth of the subject statements. United States v Kunen, 323 F Supp 2d 390, 395 (E.D.N.Y. 2004) (quotation marks and citation omitted) (collecting cases). 'Whether an individual had a particular mental state is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.' Rajaratnam, 719 F 3d at 153 (quotation marks and citation omitted).

However, 'courts must not confuse a mental state with the proof of it's existence.' Ibid. (brackets, quotation marks, and citation omitted). The defendant must offer 'credible and probative evidence' that the misrepresentation or omission 'was designed to mislead or was made in reckless disregard of whether it would mislead'. Id at 154 (brackets, quotation marks, and

citation omitted).

To determine if misrepresentations or omissions are material, 'courts "correct" the warrant affidavit and determine whether the affidavit, so corrected, establishes probable cause.' Lauria, 70 F 4th at 125. If so, the misrepresentation or omission is 'immaterial, and suppression is unnecessary.' Ibid.

### MURRAY V CARRIER, 477 US 478, 488 (1986), HOLDING THAT A HABEAS PETITIONER MAY AVOID PROCEDURAL DEFAULT BY SHOWING COUNSEL'S PERFORMANCE WAS CONSTITUTIONALLY INEFFECTIVE

Paschal contends that his appellate counsel's failure to timely raise:

(1) Outrageous conduct claims, 5th and 6th U.S.C.A.

(2) Vindictive prosecution claims, 5th and 6th U.S.C.A.

(3) Unreasonable search and seizure claims, 4th and 6th U.S.C.A.

(4) Selective prosecution prompted by (Homeland Security).

(5) Cumulative errors claims, 5th and 6th U.S.C.A.

was sufficiently egregious to constitute Constitutionally ineffective assistance of counsel under Strickland v Washington, 466 US 668 (1984). Since he was deprived of his 6th Amendment right to counsel, Paschal maintains he is entitled to a decision on each of the above named claims on the merits of their Constitutional violations in his habeas petition. See Murray v Carrier, 477 US 478, 488 (1986) (Holding that a habeas petition may avoid procedural default by showing that counsel's performance was Constitutionally ineffective).

## OUTRAGEOUS CONDUCT

Special Agent Kevin Kuntz, employed by Homeland Security, was the lead investigator in this sex trafficking of a minor, who filed the sealed complaint that initially started 'criminal case no. 1:21-CR-00331-VSB' against Defendant Michael Paschal.

Upon review of the sealed complaint, and personal investigation of Special Agent Kevin Kuntz, clearly relayed his involvement with the victim of this case from the time period of July 2020 until at least on or about December 2020, leading up to the search warrant executed by him December 14, 2020, alleging with reckless disregard for the truth that the victim 'Sunshine' was engaged in commercial sex work 7 days a week at the 'Brady Avenue address' until being rescued by law enforcement officers on or about December 14, 2020. Case No. 1:21-CR-00331-VSB, Doc. 70-12, Filed April 10, 2023, Exhibit A. Government Exhibit - Department of Homeland Security - Report Investigation - Dated 5/17/2021 EDT - Case Opened 12/9/2020, Current Case Title - Operation Tar Heel Trafficking - Report Title Ponce Interview - Reported By: Antonio Bolfo, Special Agent - Approved By: Charles Eagle, Special Agent - Dated Approved: 5/17/2021, ROI Number NY15HT21NY0001-16 - Pages 1, 2, and 3.

A GENUINE ISSUE OF A MATERIAL FACT THAT IS EXCULPATORY EVIDENCE FAVORING THE DEFENSE THAT WAS SUPPRESSED.

A Homeland Security investigative report synopsis ROI detailing the first interview of Caitlyn Ponce, 'Suneshine', dated December 9, 2020, at approximately 1400 hours, Homeland Security Investigations. Forensic Interviewer Brodsky interviewed Caitlyn

10

Ponce at Jacobi Hospital in the Bronx, NY, HSI Special Agents Bolfo and Kuntz, and NYPD detective Moore, observed the interview from an observation room through a live video and audio feed on December 9, 2020, 1400 hours, 2 PM.

Appellate Attorney - Vivian Shevitz - Statement of the Case, that which she alleges the hospital told Caitlyn, i.e., the (alleged victim minor) that they were investigating whether she was being trafficked. On August 1 through August 3, 2020. It was alleged by Appellate's attorney that Caitlyn wrote to Paschal that Social Services was coming to talk to her and that she would not be discharged without someone over 18, and specifically her mother's, consent (T. 201-03, GX 322A).

Had Appellate counsel Vivian Shevitz thoroughly investigated this case, she would have found an investigation report, a detective for NYPD named Detective Shackel (Phone: (917) 853-9062) that which she could have called him and verified the investigation reported personally between Detective Shackel as of August 5, 2020, and Caitlyn Ponce (the victim), which clearly demonstrated exculpatory evidence as alleged by Detective Shackel of the NYPD, that at the present time they did not have any criminal evidence to suggest that the Defendant, Michael Paschal, was involved with having Caitlyn in a sexual trafficking of a minor offense. Paschal's Appellate lawyer was therefore ineffective, for not having using this critical information admitted by law enforcement themselves, against trial counsel, and for not calling NYPD police Detective Shackel to testify to his statement that he did not have the proof that Michael Paschal

11

was involved with the sex trafficking of a minor.

Kevin Kuntz - Sealed Complaint Homeland Security - For an arrest warrant filed April 13, 2021 - See Victim, the Victim # 6, July 31, 2020. This contradicts the NYPD's report, which affirmed there was no proof of sex trafficking as of August 5, 2020, by Detective Shackel. Kevin Kuntz complaint is a blatant and obvious contradictive report. Even Kuntz himself concedes that Caityln Ponce was transferred back to North Carolina in August of 2020. Yet, then in October of 2020, Caitlyn, the victim, is alleged to be back in New York, and Kuntz alleges she was residing back at the Brady Avenue address.

It is clear upon the face of it, that this is not a true statement. The Appellant in fact has exculpatory evidence that is Brady Material, that which the government suppressed. It is a clear prima facie showing of proof that Kevin Kuntz himself falsified several documented investigation reports, all of which should have been before a jury in the first instance, involving his 5th and 6th United States Constitutional Amendment Rights, all violations of a serious magnitude, including a sealed complaint filed April 13, 2021, for the arrest of Michael Paschal based upon a search that took place at 927 Brady Avenue, Bronx NY, on December 14, 2020, yet another contradiction, this time involving his whereabouts on December 9, 2020, and an alleged search on the date of which Caitlyn was taken from 927 Brady Avenue by Detective Kuntz, of which he observed this interview in person later subsequent to Caitlyn's removal from the Brady Avenue address.

Both of these statements cannot be true, and is evidence of Kevin Kuntz deceptive practices that have occurred over the course of this case.

Based upon Paschal's court appointed attorney's negligence in not moving to strike down the search warrant for lack of probable cause, in that the search warrant was invalid, i.e., there was no probable cause afoot as to any criminal activity taking place at the time the warrant was executed. The Defendant was not arrested nor charged with illegally harboring a minor at the Brady Avenue address, or kidnapping, for the matter. In fact, on December 14, 2020, there was no criminal activity acknowledged at the residence of Michael Paschal that would have justified an arrest at the time the police removed the handcuffs they earlier placed on him.

Kevin Kuntz was on a witch hunt, searching for evidence of sex trafficking of a minor, of which was not located on December 14, 2020. At the time the search warrant affidavit convinced the judge to grant it at it's review, the affidavit was signed and sworn by Kevin Kuntz.

Computer Forensics Analyst Kevin Tillman was present at the search December 14, 2020, of Paschal's residence with the intent to find evidence of sex trafficking, and to rescue ('Sunshine') Caitlyn. The evidence custodian at the time of the search stated that 'there was no evidence that reflected Caitlyn's age at that time.' The alleged statements of Stokes and Johnson, evidence of co-conspirators, who are uncharged, is hearsay. This hearsay is clear, because neither of the two were ever charged, Fed. R. of

Evidence 801(d)(2)(E). See <u>United States v Gigante</u>, 166 F 3d 75, 82 (2nd Cir 1999). If in fact Stokes and Johnson were never charged in the conspiracy with Paschal, their statements could not be contained during or in furtherance of a conspiracy. Count 1 of the Defendant's indictment is conspiracy to commit sex trafficking. See Exhibit 1. The government asserted both Stokes and Johnson assisted the Defendant in trafficking 'Sunshine'.

This false statement was necessary to the finding of probable cause for arrest. Each time the Special Agent claimed 'Sunshine' was rescued by the hospital staff in late July / early August 2020; but then, alleging she (Sunshine) was rescued from the Brady Avenue address, December 14, 2020.

Both of these statements clearly cannot be true - and it gives proof to the fact that no criminal evidence was shown or charged Michael Paschal at his residence December 14, 2020, while law enforcement held him in handcuffs during the search warrant's execution. They released him after the search.

Upon that point, any statements made by Paschal while he was handcuffed should have been suppressed. The Computer Forensic Analyst Kevin Tillman, who was present with Agent Kuntz, said he did not hear any statements from the Defendant Paschal that he knew (Sunshine) was under the age of 18 years old. The evidence custodian at that time of this search themselves stated there was no evidence found in the residence located at Brady Avenue in the Bronx, NY, that reflected Caitlyn's true age on December 14, 2020.

It is clear that December 14, 2020, the search of the Brady

14

Avenue residence was all based upon a government intrusion that hinged on the mere suspicion that criminal activity might be taken place - not actual probable cause of such occurring. Accordingly, the seizure inside Paschal's residence while he was handcuffed by those very officers broke into his home, obtained illegal evidence.

Paschal had an objectively reasonable basis to believe he was in custody. Officers forced their way into his residence, handcuffed him, and once his Miranda right warnings were triggered, Paschal made it clear he wanted a lawyer. A person who has been taking into custody or otherwise deprived of his freedom of action in any significant way must first be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, 'either retained or appointed.'

Statements elicited in non-compliance with this rule may not be admitted for certain purposes in a criminal trial. Stansbury v California, 511 US 318, 322, 114 S. Ct. 1526 (1994).

Paschal asked for an attorney. Special Agent Kevin Kuntz for Homeland Security ignored the clear Miranda rule [the interrogation must cease until an attorney is present] stating Paschal gave a spontaneous statement that 'so happened' to corroborate an essential element of 18 USC § 1591(a). This is a reckless disregard for the truth, a false statement made with the intent to attempt to prove Defendant knew Caitlyn's (Sunshine's) age.

NYPD Moore [Direct Testimony], T.T. 31 L. 17-25 through T.T. 43

15

L. 1-7. In a very important respect, made even more revealing upon detective More's trial testimony, direct examination by the government, T.T. 31 L. 21-25, Moore testified that she has been an NYPD police detective for 10 years, and that she joined Homeland Security in a joint task force to which she has been participating in for the last 3 years. Her testimony began at T.T. 31 L. 17-25, and lasted through pages 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, Lines 1-25 and T.T. 43 L. 1-7, Detective Moore further explained that her responsibility relied upon the task force was for investigating tips of human trafficking or concerns and complaints received on such acts. She testified to her involvement of over 50 cases of human trafficking.

Detective Moore was questioned on her personal engagement of a search warrant executed at 927 Brady Avenue, Bronx NY, during December 2020. The government never asked Detective Moore a specific date that which she was personally involved with such a search warrant executed at 927 Brady Avenue, located in the Bronx, NY. She just gave a general answer that the search took place during December of 2020. The government offered Exhibit 803 that showed the residence of 927 Brady Avenue located in the Bronx, NY, and that was the located which Michael Paschal resided on the first floor. Detective Moore was questioned a second time if she could identify Michael Paschal as being the suspect of interest at the 927 Brady Avenue address and whether he was identified during December of 2020 as being at that specific address. Again, Detective Moore was not asked the specific date for the month of December 2020 that Paschal was at the 927 Brady

Avenue address, Exhibit 811, was the personal alleged by Detective Moore to be Michael Paschal. A stipulated identification was reached T.T. 35 L. 14-25 by the parties.

Appellate counsel Vivian Shevitz for Michael Paschal, Defendant. In the United States Court of Appeals for the Second Circuit, Case No 24-968. See <u>Strickland v Washington</u>, 466 US 668 (1984), holds:

> "A defendant who claims ineffective assistance of counsel must prove (1) That counsels representation fell below an objective standard of reasonableness, and, (2) That any such deficiency was prejudicial to the defense."

A presumption of prejudice applies whenever 'the accused is denied counsel at a critical stage'. It makes greater sense to presume prejudice when counsel's deficiency forfeits a trial counsel's suppression hearing use of discovery evidence that falls under Brady evidence. See <u>Brady v Maryland</u>. Exculpatory evidence is of such importance, because it conflicts with the same witness testimony and personal knowledge of the same, and the very government operatives prosecuting the case against Michael Paschal being the sex trafficking of a 17 year old minor. Paschal retained a 6th Amendment right to have a fair trial in all respects. The 5th Amendment United States Constitutional Right to [Due Process] and Equal Protection guarantees him this Constitutional protection. He was denied that right because of his trial counsel's ignorance as to the discovery materials that was, and is, clearly and most straight forwardly exculpatory material evidence that questions the very truth of the government's prosecution of him, and to the fact that both Homeland Security Investigations, as well as the NYPD Detective Moore, turned a blind eye to proper procedures. Instead, they falsified any and all evidence they needed to bring a criminal case against Michael Paschal. This resulted in a reckless

disregard for prosecutions's outrageous conduct to gain a conviction against him.

This exculpatory evidence Exhibited was ignored by Appellate counsel Vivian Shevitz, the attorney for Appellate, who chose not to point out trial counsel's and pre-trial counsel's ineffectiveness as relevant to Paschal's motion to suppress due to a 4th, 5th, and 14th United States Constitutional Amendments violations of illegal search and seizure and due process violations.

Findings of fact and conclusions of law, and for a Franks hearing, the Defendant's reconsideration of the earlier pre-Franks hearing. Clearly, discovery information of the Homeland Security Investigations Case No. NY15HT21NY0001, Report Title Ponce Interview, reported by Special agent Antonio Bolfo, approved by Special Agent Charles Eagle, date approved May 17, 2021. Personal knowledge of this interview on December 9, 2020, at approximately 1400 hours, Homeland Security Investigations Forensic Interviewer Brodsky interviewed Caitlyn Ponce at Jacobi Hospital in Bronx, NY. Homeland Security Investigators Special Agent Bolfo and Kevin Kuntz and NYPD Detective Moore observed the interview from an observation room through live video and audio feed.

Ponce stated that she did not want to be 'rescued' by law enforcement, referring to the search warrant executed by HSI and US Marshals at 927 Brady Avenue, Bronx NY, on the morning of December 9, 2020, 1400 hours, 2:00 PM.

Detective Moore testified during the trial of Michael Paschal.

She was never asked on direct examination or cross examination the exact date she had personal knowledge of when the search warrant was executed at Paschal's residence, December 2020. She was never asked on direct if she was one of the law enforcement members who executed the search warrant at 927 Brady Avenue, Bronx NY, December 9 or December 14 of 2020.

Kevin Kuntz was very conveniently out of the country in Ukraine acting as a medical aid. Kevin Kuntz sealed complaint file April 13, 2021, accusing Paschal, Case No. 1:21-cr-00331-VSB, Doc. 1, P. 1-12, shows forth a sworn disposition, filed and submitted by Homeland Security Investigator Kevin Kuntz (HSI). He is a Special Agent Investigator with Homeland Security. He filed a sealed complaint against Michael Paschal April 13, 2021, accusing Paschal of committing violations using a minor 17 years of age, 18 USC §§ 1594(c), 1591(a), (b)(2) and (2). A Federal Court granted the seizure and arrest of Michael Paschal based upon the evidence Special Agent Kuntz claimed under sworn oath and affirmation of which he, Kevin Kuntz, executed a search warrant at 927 Brady Avenue on December 14, 2020, that which he rescued a minor 17 years of age, committing sex trafficking violations under the guidance of Michael Paschal. See Exhibited sealed complaint filed and submitted April 13,. 2021, United States of America v Michael Paschal, in particular page 4, (a)(b)(c).

Based upon Special Agent Kevin Kuntz's sworn accusations, the Honorable Ona T Wang, United States Magistrate Judge for the Southern District of New York, granted said arrest warant. Clearly, that sealed complaint signed and sworn by HSI Kevin

Kuntz's personal knowledge of what he did December 14, 2020, contradicts the December 9, 2020 Investigative Report interview that HSI Brodsky reported, when in truth HSI Kuntz, HSI Bolfo, and NYPD Officer Detective Moore, observed from an observation room a live video and audio feed located at Jacobi Hospital in the Bronx, and listened to Caitlyn Ponce's statements that she did not want to be 'rescued' that morning from 927 Brady Avenue, the residence of Michael Paschal. She alleged at that time, approximately 1400 hours on December 9, 2020, that she was not being forced to commit any sexual acts.

The lead investigator of this case, Kevin Kuntz, a Homeland Security Investigator, alleged by the Appellate counsel, that the court should not have authorized a Rule 15 deposition for Agent Kuntz, who was the only agent [out of 20 present] who claimed to have heard Defendant Michael Paschal make a statement about the victim's age, when Kuntz left the country for voluntary service in Ukraine just before trial occurred, holding in her argument that Kuntz, the witness, did not in fact have to go to Ukraine, and could have remained to testify.

The spontaneous statement that was alleged to have been said by the Defendant that he knew Caitlyn was under 18 years of age, with Kuntz the only person out of 20 other present agents to have heard, is simply too ludicrous to be believed. It was stated by Appellate counsel, Kuntz testified [GX802, T. 501] that 20 agents with drawn guns forced open the Defendants door, located the minor, the Defendant, his mother, brother, and two adult females, and another adult male, and handcuffed all the adults [including

the Defendant] on the ground floor. Kuntz stated that Paschal was sitting in his living room on a couch and stated something along the lines of 'I don't know why this is such a big deal, she's about to turn 18'; Yet, with 20 other agents present, Kuntz appears to be the only agent who heard this statement supposedly made by Paschal.

All other agents present have reiterated that they heard no such statement from the Defendant. Agent Cote and Analyst Tillman, who were also present in the same room, testified that if they had heard such a statement, they would have remembered it if it happened. They did not hear it - because it was never said.

It was alleged by Appellate counsel the Court denied Defendants Rule 29 motion, ruling that there was sufficient evidence that the Defendant knew Caitlyn was under the age of 18. See United States v Adams, 348 F.R.D. 408 (2nd Cir 2025), holds:

> "Normally, courts are aided in their decision making through our system of adversarial testing, which can be particularly helped in cases presenting unusual fact patterns or in cases of great public importance. Our legal system assumes that adversarial testing will ultimately advance the public interest in truth and fairness."

See Polk Cuty v Dodson, 454 US 312, 318 (1981):

> "In particular, the unique strength of our system of 'criminal justice' is that it is premised on the belief that truth... is best discovered by powerful statements on both sides of the equation."

United States v Cronic, 466 US 655 (1984). See also Young v United States, 315 US 257, 259 (1942) (The public interest that a result be reached which promotes a well ordered society is foremost in every criminal proceeding... our judgements are precedents, and the proper administration of the criminal law

cannot be left merely to the stipulation of the parties.)

Here, this Pro Se litigant for the first time has proof that clarifies the parties respective positions do not perform any adversarial testing of the governments evidence, for fear that all the parties involved committed the crime of obstruction of justice in the prosecution against Michael Paschal, including trial and Appellate counsel's representation of this Defendant. The governments conduct is demonstratably outrageous. In this respect, Paschal also argues that his right to have counsel present at critical stages of trial, as per the right to the effective assistance of counsel, United States v Cronic, 466 US 648, 659 (1984). Special Agents Eagle, Bolfo, Kuntz, as well as NYPD Detectives Shackel and Moore, should have been compelled to appear in their physical persons based upon the Homeland Security Investigations report detailed December 9, 2020, interview with Caitlyn Ponce AKA Smith, at Jacobi Hospital in the Bronx, NY at approximately 1400 hours, 2:00 PM, interviewed by Brodsky, while HSI Special Agents Bolfo and Kuntz, and NYPD Detective Moore, observed from the interview room through a live video and audio feed.

The sum and substance of the interview was that Ponce stated she did not want to be 'rescued' by HSI and US Marshals law enforcement, referring to the search warrant that was executed by them at the 927 Brady Avenue, Bronx NY address on the morning of December 9, 2020. Ponce made a clear statement that she was not being sex trafficked. See Exhibit.

This subsequent evidence contradicts [Agent Kuntz] sealed

complaint filed April 13, 2021, in which he based his information and belief upon a sworn oath and testimony, for a search warrant executed on 927 Brady Avenue, December 14, 2020. With this false statement exposed, this clearly questions any and all investigative reports written and requested by Homeland Security and NYPD, as well as the federal government of the Southern District of New Yorks prosecution of December 10, 2020, up until Paschal's conviction. See United States v Bagley, 473 US 667 (1985):

> "Prosecutions failure to disclose requested impeachment evidence is held to constitute constitutional error, only if there is a reasonable probability that had the evidence been disclosed to the defendant, the result of the proceeding would have been different."

In this instance, the pretrial suppression hearing. See Giglio v United States, 405 US 150 (1972). Due process, known false evidence, deliberate deception of a court and jurors in a criminal case by the governments use of known false evidence presented during the jury trial of Michael Paschal, is incompatible with the rudimentary demands of justice. A conviction secured by the use of false evidence as with this instant case at bar must fall under the 'Due Process' clause of the 5th Amendment of the United States Constitution, where the government has allowed this to go forth uncorrected.

The Defendant shows forth prima facie, a substantial preliminary showing with respect to both Franks elements to warrant a hearing. In Franks v Delaware, 438 US 154, 155-56, the Supreme Court determined that a criminal defendant has the right to challenge the truthfulness of factual statements made in an

affidavit of probable cause supporting a warrant, if the defendant can make a preliminary showing. The warrant clause of the 4th Amendment of the United States Constitution provides in pertinent part that 'no warrants shall issue but upon probable cause, supported by oath or affirmation'. United States Constitution Amendment IV. It has been referred to as the 'Bulwark' of the 4th Amendments protections. Franks v Delaware SUPRA (1978). See also Wong Sun v United States, 3 See also Wong Sun v United States, 371 US 471 (1963), Supreme Court precedent # 3. An arrest with or without a warrant must stand upon firmer ground than mere suspicion, though the arresting officer need not have in hand evidence which would suffice to convict. The quantum of information which constitutes probable cause evidence which would warrant a man of reasonable caution in the belief that a felony has been committed, must be measured by the facts of the particular case.

Clearly, the facts in this instant case at bar was based upon Brady material which was suppressed by the government and ignored by both trial and Appellate counsel. Reports and testimony in this case by law enforcement do not add up into a single, accurate account of what allegedly occurred, which can be seen in the evidence itself. The interview that took place December 9, 2020, at Jacobi Hospital, in Bronx NY, at approximately 1400 hours by Homeland Security Investigations Forensic Interviewer Brodsky, who interviewed the minor Caitlyn Ponce, an interview witness by Homeland Security Investigators Kevin Kuntz, Bolfo,

and NYPD Detective Moore. This interview was taped on a live video and audio feed, that which Caitlyn stated she did not want to be 'rescued' by law enforcement, and that which she said she was not being sex trafficked by Michael Paschal. When the victim herself has made a statement in such stark contrast to to Kevin Kuntz statements, who was the lead investigator in this case, only one conclusion can be drawn: That Kevin Kuntz has been making false statements and presenting deliberately falsified evidence to prosecute Michael Paschal, and has committed obstruction of justice against Michael Paschal. The interview on December 9, 2020, is a true and correct date, that which Kevin Kuntz removed Caitlyn Ponce from 927 Brady Avenue, and from that date up until Paschal's conviction, was evidence tainted by Kevin Kuntz, and the governments, outrageous conduct, which cannot be permitted as evidence as a result, pursuant to Wong Sun. All evidence subsequent to December 9, 2020, is fruit of the poisonous tree.

Under Giglio SUPRA, # 3, under the Due Process clause, the prosecution's suppression of material evidence justifies a new trial, irrespective of the prosecutors good faith. When the reliability of a given witness may well be the determiner of guilt or innocence, the prosecutions non-disclosure of evidence affecting the credibility justifies a new trial under the Due Process clause, irrespective of the prosecutions good faith or bad faith.

Under the Due Process clause, a new trial is required in a criminal case if the false testimony introduced by the state, and

allowed to go uncorrected when it appeared, could in any reasonable likelihood affected the judgment of the jury.

## ABUSE OF POWER - PROBABLE CAUSE

The history and use, and not infrequent abuse of the power to arrest, cautions that a relaxation of the fundamental requirements of probable cause, would leave law abiding citizens at the mercy of an officer's whim or caprice.

A search that is unlawful at its inception is not validated by what it turns up. Evidence seized during an unlawful search cannot constitute proof against the victim of the search: the exclusionary prohibition extends to the indirect, as well the direct, products of such an invasion. The essence of the Constitutional provision prohibiting unreasonable searches and seizures is not merely that evidence so acquired shall not be used before a court, but 'that it shall not be used at all'. While facts thus obtained may be proved like any others, if knowledge of them is gained from an independent source, nevertheless, the knowledge was gained by the governments own wrongs, and cannot be used by it in a criminal prosecution.

The rule excluding evidence obtained by an unlawful search bars from trial not only physical, tangible materials obtained either during or as direct result of an unlawful invasion, but also verbal evidence, such a s declarations made by the accused. The 4th Amendment protects against the overhearing of a verbal statement as well as against the more traditional seizure of papers and effects. It is the law of this Second Circuit that a

27

criminal defendant may raise a Due Process challenge to an indictment against them based on a claim that the government employed outrageous law enforcement investigative techniques.

In Russell v United States, 411 US 423 (1973), the Supreme Court confirmed that Rochin v United States, 342 US 165 (1952), in which the Supreme Court vacated the conviction of a suspected drug dealer whose stomach had been forcibly pumped, so that police could obtain incriminating evidence against him, was neither singular nor limited to its facts. Russell, (1973) held:

> "We may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous, that Due Process principles would absolutely bar the government from invoking a judicial process to obtain a conviction."

This Defendant, Michael Paschal, Case No. 1:21-cr-00331-VSB, is precisely the case United States v Russell SUPRA (1973), is predicated and would come to rest within it's purview.

The ineffective 6th Amendment representation of defense counsel, both pre-trial and trial, Defendant asserts that defense counsel pre-trial and trial, Arlo Brown ESQ, failed to conduct and adequate and meaningful investigation into the facts, laws, and circumstances in this case that was full and complete. The standards require no special amplification in order to define counsel's duty to investigate. However, strategic choices made after a thorough investigation of the law and facts relevant to make plausible options are virtually unchallengable. 'Strategic choices made after a less than complete investigations are reasonable precisely to the extent that reasonable professional judgements support the limitation on investigation.' Strickland v

Washington, 466 US 668 SUPRA.

Defense counsel Arlo Brown ESQ, pre-trial representation and trial representation, should have compelled Homeland Security Investigators Brodsky, Bolfo, Kuntz, and NYPD Detective Moore, to appear and testify to the events that took place at Jacobi Hospital located in Bronx, NY, to testify to their personal knowledge of the interview of Caityln Ponce December 9, 2020. Counsel's failure to do so demonstrates a lack of willingness to fully investigate this case. Kevin Kuntz (HSI) had no evidence of a criminal case against Michael Paschal for the sex trafficking of a minor. The suppressed December 9, 2020 interview of Caitlyn Ponce by the government, and knowing presentation of false and misleading testimony, i.e., the NYPD Detective Moore's clear contradictory testimony of her personal involvement with a search and removal of Caitlyn Ponce December 9, 2020, from 927 Brady Avenue, Bronx NY, was cumulatively material evidence under Brady. See Brady v Maryland, 373 US 83, 87 (1963). See also Napue v Illinois.

A search and seizure incident to an arrest must be incident to a lawful arrest. In this instant, Homeland Security Investigator Kevin Kuntz, page 12, sealed complaint, sworn and authored by him, on an alleged executed search warrant located at 927 Brady Avenue, Bronx NY, December 14, 2020, of which he alleges he rescued Caitlyn Ponce from the residence of Michael Paschal, whom he alleges was sex trafficking her under aged person on December 14, 2020. Had counsel for the Defendant, Michael Paschal, court appointed trial counsel, researched and investigated the

Department of Homeland Security's reported investigation, current case, the 'Operation Tar Heel Trafficking' reports, as well as the NYPD's progress notes of Detective Shackel, Phone # (917) 853-9062, Case Id # 27571826, Stage ID 33188162, dated August 5, 2020, pages 34-80, # 3506-013. Medical Author Danielle Bellinger. See Exhibited.

Section 2255 directs that in some instances, the District Court SHALL hold an evidentiary hearing. The District Court abuses it's discretion if it fails to hold an evidentiary hearing when the files and records show inconclusive proof as to whether the movant is entitled to relief. See Napue v Illinois, 360 US 264 (1959), holds:

> "Where newly found discovery evidence is found, a new trial under federal law is required where such evidence may have the effect of affecting the outcome of the trial, or if it would have affected in any reasonable likelihood the judgement of the jury."

As of August 5, 2020, NYPD Investigator Detective Shackel, alleged that there was no evidence that Michael Paschal was sex trafficking Caitlyn Ponce, testimony supported by Caitlyn Ponce's own additional staements to that same effect that she was not being sex trafficked by Michael Paschal. There was no accusation that Michael Paschal was forcing her as a minor to commit sex trafficking crimes.

When assessing the Homeland Security investigation held by a live interview December 9, 2020, at approximately 1400 hours, located at Jacobi Hospital with Caitlyn Ponce AKA Smith, where during that interview she states that she did not want to be 'rescued' earlier that morning from 927 Brady Avenue, Bronx NY,

and that she was not being forced by Michael Paschal to commit sexual acts from that residence. Kevin Kuntz, the lead HSI investigator, observed this interview and statement himself through a live video and audio feed. HSI Bolfo, as well as HSI/NYPD Detective Moore, along side Kevin Kuntz, watched this interview from a live feed of video and audio, where they heard precisely what Caitlyn Ponce AKA smith had to state about events of December 9, 2020.

Defendant Michael Paschal further asserts that HSI Kevin Kuntz obstructed justice May 18, 2021, before the United States Grand Jury when he gave knowingly false material evidence to the grand jury, in hopes of gaining an indictment of which he in fact gained against Michael Paschal at Grand Jury transcripts T.T. L 6-21. Kevin Kuntz falsely testified that he was involved in a search of Paschal's home in the Bronx on December 14, 2020, the residence located at 927 Brady Avenue, Bronx NY. Homeland Security Investigator Brodsky gave a detailed investigative report that which contradicted Kevin Kuntz's Grand Jury testimony, as well as the matter contained in the record of newly found material evidence that he received after his trial from repeated requests to his Appellate lawyer Vivian Shevitz, attorney for the Appellant Michael Paschal. He contends that the standard has been met to vacate his conviction, and move for a reopening of a suppression hearing, suppressing all evidence of the December 9 through December 14, 2020, of any and all material evidence alleged of Caitlyn Ponce AKA Smith that was plied to the Grand Jury through testimony of Kevin Kuntz and any other

Homeland Security Investigators that both came from the NYPD and the HSI used to gain their conviction against Michael Paschal pursuant to <u>Giglio v United States</u> SUPRA; Using known false evidence and deliberate deceptions used before a court and jurors in a criminal case.

The government's selection of who they called as witnesses, and those that should have been called due to their personal involvement in the investigation, and their involvement with Caitlyn Ponce AKA Smith, the alleged victim of this case titled 'Operation Tar Heel Trafficking', was selective:

(1) Kevin Kuntz, the lead investigator, did not testify.

(2) Scott Cote, did not testify.

(3) Antonio Bolfo, did not testify.

(4) HSI Forensic Interview Brodsky, did not testify.

(5) Lanora Moore, NYPD Detective, did testify.

Her testimony, however, contradicts her personal knowledge of events that took place December 9, 2020, and her personal observation of Caitlyn Ponce on December 9, 2020, at approximately 1400 hours, interview with HSI Brodsky at Jacobi Hospital in Bronx, NY, after her morning rescue from 927 Brady Avenue, Bronx NY. USA v Paschal, 21-cr-331-VSB, 2020R01346, 4/29/2023, meeting with TFO Lanora Moore, NYPD Moore, page 1-3.

NYPD Moore alleges she remembers the search, and that she further remembers Caitlyn Ponce being removed from 927 Brady Avenue, Bronx NY. She remembers meeting with Caitlyn, which would corroborate Special Agent Bolfo's detailed report of Moore being at Jacobi Hospital December 9, 2020, observing her interview with HSI Brodsky at 1400 hours.

Lanora Moore testified at a jury trial and was never asked about the critical events of December 9, 2020, nor was she specifically asked about December 14, 2020. Her questions by both

parties were based upon what she did witness 'December 2020', and was intentionally vague questioning.

Brady material that was exculpatory, proving that HSI lead investigator Kevin Kuntz's conduct was outrageously manipulative and prohibitively unconstitutional, in the 'take down' of Michael Paschal. The NYPD meeting with Moore April 29, 2023, is a clear fabrication of her personal knowledge of what transpired on December 9, 2020, at 927 Brady Avenue, Bronx NY, and her involvement with Caitlyn Ponce the morning and afternoon of December 9, 2020. In fact, HSI Brodsky interviewed Caitlyn Ponce at Jacobi Hospital located in Bronx, NY at approximately 1400 hours, on December 9, 2020. Detective Moore, HSI Kevin Kuntz, and HSI Antonio Bolfo were all together in an observation room at Jacobi Hospital witnessing the interview between Caitlyn and Brodsky on December 9, 2020, at 1400 hours.

There are several reports that give case number NY15HT21NY0001, opened December 9, 2020, current case title 'Operation Tar Heel Trafficking'. The synopsis stated the exact wording in the first paragraph, ending with 'the investigation will be conducted in coordination with the USMS and HSI.' The synopsis alleged by the report by the Special Agent who made the reports initial opening differ in the names of the special agents. In addition, the ROI's differ in the evidence. The special agent who approved the reports is named Charles Engle.

The reported synopsis of Homeland Security investigators:

(1) Kevin Kuntz, dated 12/12/2020 and 12/29/2020.

(2) Antonio Bolfo, dated 5/17/2021, approval of the December 9,

2020 interview with Caitlyn Ponce.

The first report ROI number NY15HT21NY0001-001, date approved 12/12/2020, and states 'this report serves to document the case opening and initial checks on December 9, 2020.'

The second report ROI number NY15HT21NY0001-013, date approved 12/29/2020, states 'this report serves to document the rescue of a minor victim of sex trafficking and the execution of a search warrant at Brady Avenue, Bronx NY, on December 14, 2020.'

The first reported ROI number NY15HT21NY0001-016 pages 1-3, states that 'this ROI details the first interview of Caitlyn Ponce'. In this report, Special Agent Bolfo details his report of December 9, 2020, Caitlyn Ponce, the alleged victim in 'Operation Tar Heel Trafficking' at approximately 1400 hours. Homeland Security Investigation interviewer Brodsky interviewed Caitlyn Ponce at Jacobi Hospital in Bronx NY. Agent Bolfo further details his report, stating himself, HSI Special Agent Kuntz and NYPD Detective Moore observed the interview from an observation room located at Jacobi Hospital December 9, 2020, through a live video and audio feed. During the interview, Caitlyn Ponce stated that she was not being sex trafficked, and did not want to be rescued from 927 Brady Avenue, Bronx NY earlier that day, referring to the search warrant executed by HSI and the Marshals on the morning of December 9, 2020.

Special Agent Bolfo gave a very detailed report of that interview with Caitlyn Ponce that took place after she was removed from 927 Brady Avenue, Bronx NY, against her will, the morning of December 9, 2020. She very explicitly stated, in sum

and substance, that she was not being forced to commit commercial sex acts. This report by Special Agent Bolfo clearly contradicts Special Agent Kevin Kuntz's details of December 9, 2020, case opening of 'Operation Tar Heel Trafficking', as well as the entire investigation by Kevin Kuntz and his personal knowledge of events.

A clear question arises about this false and misleading investigation that took place of Michael Paschal, where violations of Due Process, Equal Protection, as well as violations of the 14th Amendment of the United States Constitution by the NYPD, exposing outrageous conduct by government agents and the suppression of exculpatory evidence, used to take Michael Paschal's liberty away from him through abusive actions by the government. The report drafted by HSI Special Agent Bolfo confirms all of this, report subjected to (protective order), details of investigation pages 1-3.

SELECTIVE CONSPIRACY PROSECUTION THAT ENDED
IN A CONVICTION AGAINST A SINGLE CONSPIRATOR
MUST BE VACATED, 5TH AND 6TH U.S.C.A.

A court should 'defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence. See United States v Morrison, 153 F. 3d 34, 49 (2nd Cir 1998), held:

> "We will not disturb a conviction on the grounds of legal insufficiency of the evidence at trial if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

See United States v Feliciano, 223 F. 3d 102, 113 (2nd Cir 2000). These principles apply to both direct and circumstantial evidence. On May 18, 2021, Defendant was charged in a four count indictment: Count 1 - Conspiracy to commit sex trafficking of a minor in violation of Title 18 USC § 1594; Count 2 - Sex trafficking of a minor in violation of 18 USC § 1591; Count 3 -Transportation of a minor to engage in prostitution, in violation of 18 USC § 2423(a); and Count 4 - inducement or enticement of an individual to engage in prostitution, in violation of 18 USC § 2422(a).

Each count alleged related to a single minor victim, aged 17, named Caitlyn Ponce, AKA 'Smith'. May 2, 2023, Defendant's trial began. On May 4, 2023, at the close of the government's case, Defendant moved for a judgment of acquittal on each count for insufficient evidence.

Defendant's trial judge, Honorable Vernon S. Broderick, a United States District Judge for the Southern District of New

York, denied each count that which defense counsel moved, pursuant to rule 29 post-trial. See Fed. R. Crim. P. 29(c)(2), which provides, in part, that if the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. A District Court Judge may enter a judgment of acquittal under Rule 29 only if, after viewing the evidence in the light most favorable to the prosecution, and drawing all reasonable inferences in the governments favor, it concludes that no rational trial of fact could have found the defendant guilty beyond a reasonable doubt. See United States v Reyes, 302 F. 3d 122, 130 (2nd Cir 2002).

In other words, 'evidence that the defendant committed the crime alleged must be so non-existant or so meager, that no reasonable jury could find guilt beyond a reasonable doubt' for a court to acquit. See United States v Guadanga, 183 F. 3d 122, 130 (2nd Cir 1999) (citation omitted). When making this determination of... the weight of the evidence and the reasonable inferences to be drawn for that of the jury. See i.e., United States v Mariani, 725 F. 2d 862. A jury found the defendant guilty of conspiracy to steal money of the United States in violation of 18 USC § 641. The District Court, however, concluded that a reasonable jury could not have found the defendant guilty of conspiracy beyond a reasonable doubt, and granted his motion for acquittal. On review, the court found that, in order to convict the defendant, the jury had to have found beyond a reasonable doubt that he participated in the conspiracy, rather than merely associated with the conspirators. The Appeals Court determined that the

District Court erred when it substituted it's own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury.

To convict Michael Paschal committing Count 1's conspiracy, the jury had to find beyond a reasonable doubt that he participated in the conspiracy, rather than merely associated with the conspirators. See Glasser v United States, 315 US 60 (1942). See United States v Ruben, 844 F. 2d 979 (2nd Cir 1988), holding:

> "The fundamental element of a conspiracy is the unlawful agreement."

United States v Wardy, 777 F. 2d 101, 107 (2nd Cir 1985), cert denied, 475 US 1053 (1986); United States v Barnes, 604 F. 2d 121, 154 (2nd Cir 1979) cert denied, 446 US 907 (1980).

The government's proof of an agreement 'does not require evidence of a formal or express agreement. It is enough that the parties have a tacit understanding to carry out the prohibited conduct.' See United States v Pirro, 212 F. 3d 86, 91 (2nd Cir 2000), held:

> "A criminal defendant is entitled to an indictment that states the essential elements of the charge against him. Otherwise, the indictment offends both the 5th and 6th Amendments. The 5th, because it does not ensure against double jeopardy, and the defendant cannot be assured that he is being tried on the evidence presented to the grand jury... or that the grand jury properly indicted him. The 6th Amendment, because the defendant would not be informed of the nature and case of the accusation against him."

The Federal Rule of Criminal Procedure 7(c)(1) provides that an indictment must be plain, concise, and definite written statement of the essential facts constituting the offense charged. Looking into Count 1's conspiracy, and the essential elements, although

trial and appellate counsel themselves continued to call Michael Paschal's girlfriend his co-conspirator, Tanesia Stokes. Tanesia Stokes was never indicted as a co-conspirator committing prohibited acts of sexual trafficking violation as the alleged statement of the case by the government contemplates. Jurists of reason would question Count 1's jury verdict of guilt beyond a reasonable doubt, where the essential elements of two or more persons, are not charged committing the prohibited conduct. See __United States v Miller__, 2025 US App LEXIS 19530 (2nd Cir 2025) holds:

> "To prove conspiracy, the government must show that the defendant agreed with another to commit the offense; That he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and that the overt act in furtherance of the conspiracy was committed. The government need not show that the defendant knew all of the details of the conspiracy, so long as he knew it's general nature and extent."

A court will reverse only if: (1) There is error; (2) The error is clear and obvious, rather than subject to reasonable dispute; (3) The error affected the defendant's substantial rights; and (4) The error seriously affects the fairness, integrity, or public reputation of judicial proceedings.


## ARGUMENT

A conspiracy ends when the objectives of the conspiracy have been achieved, or when all the members of the conspiracy have withdrawn from it. However, a conspiracy may be a continuing conspiracy if it is, it lasts, or until there is some affirmative showing that it has ended or that all the members have withdrawn.

A conspiracy may be a continuing one if the agreement includes an understanding that the conspiracy will continue over time. Also, a conspiracy may have a continuing purpose, or objective, and therefore, may be a continuing conspiracy.

In this instance, the indictment filed on April 10, 2023, 21-CR-331-VSB, United States v Michael Paschal, Count 1, grand jury charge conspiracy to commit sex trafficking, is in fact not a conspiracy. Michael Paschal may not conspire to commit a crime conspiracy of prohibited conduct by himself. All of the known and unknown persons where not charged with any criminal conduct, although the government's offense conduct alleged that the Defendant operated a prostitution business out of his house in the Bronx for several years, and that on July 2020, the Defendant and Stokes traveled to North Carolina, and while there, they met the 17 year Caitlyn Ponce (the victim) at a motor pool. The Defendant and Tanesia Stokes drove the victim from North Carolina to the Defendant's house in the Bronx, 927 Brady Ave, Bronx NY.

The government declared that Tanesia Stokes was both a co-conspirator and a woman who engaged in prostitution from the Defendant's home. This is outrageous conduct, because Tanesia Stokes was never charged with committing any prohibited conduct in the instant case of United States v Paschal.

The established rule that a hearsay statement of a co-conspirator is admissible in evidence when made in furtherance of the objective of the conspiracy and 'could not be expanded so as to make admissible a declaration made in furtherance of an alleged implied but uncharged conspiracy aimed at preventing

detection and punishment, and that the erroneous admission of the statement was not harmless error'. <u>Krulewitch v United States</u>, 336 US 440 (1949).

Even Paschal's attorney's never objected to the government's use of Tanesia Stokes's name as a co-conspirator of Paschal, who was also alleged to engage in prostitution at Paschal's residence. 336 US 440 (1949) Krulewitch SUPRA.

The government's use of Tanesia Stokes name, and calling her a co-conspirator, has ignored the hearsay rule of inadmissible evidence not made in furtherance of an alleged sex trafficking violation of a minor. The government's use of a hearsay statement attributed to the alleged co-conspirator, Tanesia Stokes, was merely cumulative evidence, and that without it's use in the case against Michael Paschal, would have made it an impossibility. Further, the outrageous conduct on the part of the government in detecting and obtaining incriminating evidence, can arise to a level of a 5th Amendment violation. See Document 133, filed January 15, 2024, Case No 1:21-CR-00331-VSB, pages 1-6, Exhibit . Offense conduct in or about early August, 2020. The government explained that shortly after arriving in the Defendant's home on or about July, 2020, the Defendant and Stokes transported Caitlyn Ponce to the New York Presbyterian Children's Hospital because she was sick. Clearly, the government's theory allowed for the jury to consider Stokes's testimony as to the basis for it's proof that a conspiracy existed between herself and Michael Paschal, her boyfriend. Upon hearing evidence of her alleged uncharged involvement, Michael Paschal had the right to stand or

fall with the proof of the charge made against him alone. Statements by one co-conspirator are to be received against others only when made in furtherance of an ongoing conspiracy against them. United States v Hall, 178 F. 2d 853 (2nd Cir 1950).

The indictment included not only the conspiracy count to which reference has just been made, but also substantive counts charging Paschal with sex trafficking violations, 18 USC § 1591(a), 18 USC § 2423(a), 18 USC § 2422(a). The evidence showed that the government agents stormed 927 Brady Ave, Bronx NY, removing Caitlyn Ponce, AKA Smith, the victim, and several electronics (cell phones, tablets, etc.). No arrest was made against Michael Paschal that day.

That the result of a conspiracy is continuing, does not make the conspriacy a continuing one. To make a continuing conspiracy, there must be continuity of action to produce the unlawful result. Fiswick v United States, 329 US 211 (1946). A criminal conspiracy is a partnership in crime. See United States v DeCicco, 435 F. 2d 478 (2nd Cir 1970). The evidence used to infer Tanesia Stokes as a co-conspirator with Michael Paschal permitted the jury to draw the unwarranted inference that both Paschal and his uncharged girlfriend were a continuing pair inducing minors to work for them in commercial sex acts. Accordingly, the government never charged any other individual other than Michael Paschal in the conspiracy count. The conviction must therefore be vacated. Krulewitch v United States SUPRA.

## CONCLUSION

Defendant herein shows forth conclusive material evidence that is Brady material that which the government suppressed. It is not a valid strategic choice of defense counsels ignorance of the material evidence of the December 9 search that took place at 927 Brady Avenue, Bronx NY, the residence of Michael Paschal, the sole defendant in this case, whom was arrested based upon a sealed complaint sworn to & authorized by the Homeland Security Investigator Kevin Kuntz, who blatantly and with reckless disregard for the truth, made deliberately false statements in order to gain a conviction of an alleged sex trafficker of an under aged victim, and filed a false affidavit for an arrest of which Magistrate Judge at that time granted the arrest warrant, did not know that the search and seized evidence had taken place December 9, 2020, prior to granting of a search warrant December 11, 2020. It was ineffective assistance of counsel, and resulted in a straight forwardly unjustified prosecution, as a matter of law.

Respectfully Submitted,

Dated ___1- 13- 2026___

_Michael Paschal_

Michael Paschal
Reg #
FCI Fort Dix
PO Box 2000
Joint Base MDL
NJ 08640

44

EXHIBIT SHEET

(1) Interview of HSI SA Kevin Kuntz
    US v Paschal
    21-CR-331 (VSB), 2020R01346
    2/23/23

(2) Arrest Warrant
    USA v Paschal
    Case No. 21 MAG 4018
    4/13/21

(3) Warrant by Telephone
    927 Brady Avenue, 1st Floor, Bronx NY
    Case No. 20 MAG 13230
    12/11/20

(4) Warrant by Telephone
    Case No. 21-CR-331 (VSB)
    Hon. Vernon S. Broderick, USDJ
    *Undated Issuance

(5) Homeland Security Investigations
    Report of Investigation
    Case No. NY15HT21NY0001
    Case Opening
    Date Approved 12/12/2020

(6) Homeland Security Investigations
    Report of Investigation
    Case No. NY15HT21NY0001
    Warrant Obtained on Phone # (347) 510-9141
    Date Approved 12/15/2020

(7) Homeland Security Investigations
    Report of Investigation
    Case No. NY15HT21NY0001
    Review of Prostitution Advertisements
    Date Approved 12/15/2020

(8) Homeland Security Investigations
    Report of Investigation
    Case No. NY15HT21NY0001
    Review of TextNow Subpoena
    Date Approved 12/21/2020

(9) Homeland Security Investigations
    Report of Investigation
    Case No. NY15HT21NY0001
    IP Address Information Obtained
    Date Approved 12/21/2020

(10) Homeland Security Investigations
     Report of Investigation
     Case No. NY15HT21NY0001
     Information Obtained from Seacus NJ Police
     Date Approved 12/21/2020

(11) Homeland Security Investigations
     Report of Investigation
     Case No. NY15HT21NY0001
     Interview of Source of Information "Mya"
     Date Approved 12/21/2020

(12) Homeland Security Investigations
     Report of Investigation
     Case No. NY15HT21NY0001
     Rescue of a Minor Victim
     Date Approved 12/29/2020

(13) Homeland Security Investigations
     Report of Investigation
     Case No. NY15HT21NY0001
     Surveillance Conducted on 12/30/2020
     Date Approved 12/30/2020

(14) Homeland Security Investigations
     Report of Investigation
     Case No. NY15HT21NY0001
     Ponce Interview 1
     Date Approved 5/17/2021

(15) Investigation Progress Notes
     Detective Shackel
     (917) 853-9062
     NYPD
     Entry Date 8/5/2020

(16) Homeland Security Investigations
     Report of Investigation
     Case No. NY15HT21NY0001
     January 2022 Case Update
     Date Approved 1/5/2022

(17) Homeland Security Investigations
     Report of Investigation
     Case No. NY15HT21NY0001
     December 14, 2020 Digital Evidence
     Date Approved 3/31/2023

(18) Sealed Complaint
     21 MAG 4018
     18 USC §§ 1594(c), 1591(a), (b)(2), and 2
     Filed 4/13/2021

(19) Meeting with TFO Lanora Moore
     US v Paschal
     21-CR-331 (VSB), 2020R01346
     4/29/2023

(20) Trial Testimony Transcripts
     Pages 30-44

(21) Grand Jury Transcripts
     5/18/2021
     Pages 1-16

(22) Warrant by Telephone
     Case No. 21-CR-331 (VSB)
     4/4/23

(23) Affidavit in Support of Application of Search Warrant
     Case No. 21 MAG 220
     1/8/21

(24) Testimony of Caitlyn Ponce, AKA 'Smith'
     Pages 284-362

EXHIBIT 1

Interview of HSI SA Kevin Kuntz
US v Paschal
21-CR-331 (VSB), 2020R01346
2/23/23

Wrong
supervisor
on the case

US v. Paschal

21-CR-331 (VSB), 2020R01346

2/23/2023

Interview of HSI SA Kevin Kuntz

AUSA Kevin Mead (notetaker)

AUSA Jackie Delligatti

SDNY Paralegal Julia Gutierrez

HSI SA Kevin Kuntz (interviewee)

### The Search

Remember the search on December 14, 2020

Priority was recovering the victim

Once she was safe, then do the search

Done in conjunction with USMS

Premises was in the Bronx

It was a house, but the house was subdivided

6 am search

Probably had 20-something people between HSI and USMS. HSI – me, SA Antonio Bolfo, NYPD Sgt. Taiwo Adelki, Det. Scott Cote, SA Ilya Feinstein, GS Charles Engel

Door had to be taken

Go in with guns drawn. Marshals do the entry. In interstate missing child cases, marshals grab the kid and take them back. They don't collect evidence or do the casework.

Marshals had long guns

Found on the bottom floor, Paschal and two other adult women. Bottom floor is first floor

On main floor, found one adult male, the victim, and one adult female. Main floor is the second floor.

Marshals are doing the clearing, we are behind them. Marshals get the girl, we ID her. We keep her upstairs temporarily to keep her separated from Paschal. We eventually turn her over to ACS. I believe she goes to the hospital, not sure who took her there, I think HSI.

I think the marshals cuffed everyone on the first floor, including Paschal.

Paschal gets put on the couch with adult woman no. 1. Adult woman no. 2 says she wants to leave, we let her leave. Paschal and adult woman no.1 wait in the living room for a little while, and then we uncuff them relatively fast.

About an hour after we hit the door, we take him to his bedroom to do the interview. I believe he was uncuffed. Interview was extremely short. We read him his Miranda rights. He invoked right to attorney immediately. Not recorded in any way, didn't sign a waiver.

After invoked, we take him back to the couch, think he's been uncuffed at that point. He hangs out on the couch until we leave.

We were in the house for about three hours total. I think we were imaging devices on the scene, and that's what was taking so long.

He was frustrated that we were there. He didn't seem to understand the gravity of the situation.

He would ask us if he could do stuff. Things like can he grab something from his bedroom. Think he asked for something to eat. We let him get food, my memory is that he was vegetarian/vegan. He went to the kitchen to get the food.

Don't recall all the substance. He was talking a lot. Most of it was not germane. I think he talked about being a vegetarian for about ten minutes. He talked about the Giants football team for a while, think there was a giants mural on the wall

At one point, he made a comment about this case not being a big deal because she was almost 18. Don't recall exact phrasing or what prompted him to say that. I would not have asked a question about that. Not the kind of thing I would ask about after someone invoked. That conversation was post-Miranda. I don't think I said anything to him in response.

I think that one of the detectives, prior to Mirandizing, had talked to Paschal about the best way to address the situation was to work with us. I heard the cooperation comment from the detective once, but the detective may have talked about it again when I was not there. Cooperation conversation was pre-Miranda, that prompted me to pick Scott Cote as the other person to take with me into the room to do the interview. He was noncommittal.

Firearms were holstered after initial sweep. Marshals had also left. By time of comment, 8 people there and firearms holstered. He did not ask to leave.

I believe we gave him the option to leave, but told him he could not come back into apartment until the search was over if he left, and we had his electronics. That's what I think I said, but not positive.

Pretty low-key, low-stress search as far as executing warrants are concerned.

## Documents

Ops plan- they will send

ROI – I drafted

No handwritten notes

Don't think I texted/emailed with anyone about the search, but I will review my old cellphone. Don't think it was at the time that my phone broke

Have sent over all the search materials photos etc. Will double check.

**Giglio**

Testified in a federal trial twice. Testified in state/local trials maybe 8-10 times

No credibility/candor finding

No prior judicial findings

No impairment

Never been sued in capacity as LEO or personally

No agency misconduct

No agency discipline

Never testified at agency/admin trial

Not under investigation

Never charged with committing a crime or arrested, not subject/target of criminal investigation

No public statements about witness

No social media except for Snapchat. Nothing problematic about that account.

No prior inconsistent statements

No other issues

**Background**

HSI SA. Been there about five years, since 2018. First in document fraud. Moved over to trafficking in August of 2020.

Before that BOP investigator

Before that BOP paramedic

Before that Firefighter paramedic Horry county (Myrtle beach)


Get training on searches and how to interview. Training on Miranda is not to engage them on anything substantive about the case after they've invoked.



Kuntz called back 5 minutes to let me know that the ops plan listed the wrong supervisor

EXHIBIT 2

Arrest Warrant
USA v Paschal
Case No. 21 MAG 4018
4/13/21

Mod AO 442 (09/13) Arrest Warrant    AUSA Name & Telno:  Kevin Mead; 646-565-0622

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.  **21 MAG 4018** |
| Michael Paschal | ) | |
| | ) | |
| | ) | |
| | ) | |

*Defendant*

## ARREST WARRANT

To:    Any authorized law enforcement officer

YOU ARE COMMANDED to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*    Michael Paschal

who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment        ☐ Superseding Indictment        ☐ Information        ☐ Superseding Information        ☑ Complaint
☐ Probation Violation Petition        ☐ Supervised Release Violation Petition        ☐ Violation Notice        ☐ Order of the Court

This offense is briefly described as follows:

Violations of 18 U.S.C. §§ 1594(c), 1591(a), (b)(2), and 2

Date:    April 13, 2021

*Issuing officer's signature*

City and state:    New York, NY

Hon. Ona T. Wang, U.S.M.J.

*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____ |
| *Arresting officer's signature* |
| *Printed name and title* |



DEPARTMENT OF HOMELAND SECURITY
**HOMELAND SECURITY INVESTIGATIONS**
ENFORCEMENT OPERATION PLAN



04/18/2023 13:33 EDT        OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE        Page 1 of 6

## Arrest Warrant at 927 Brady Avenue, Bronx, NY

| **HSI Office**<br>NY - New York, NY | | **Case Number**<br>NY15HT21NY0001 | | **Case Agent(s)**<br>Kevin Kuntz - 646-942-0827<br>Antonio Bolfo - | |
| --- | --- | --- | --- | --- | --- |
| **HSI Supervisor**<br>Neviene Habeeb<br>646-805-6763<br>Neviene.Habeeb@ice.dhs.gov | | **Team Lead**<br>Kevin Kuntz<br>646-942-0827<br>Kevin.Kuntz@ice.dhs.gov | | **AUSA / Prosecutor**<br>Kevin Mead<br>646-565-0622 | |
| **Briefing** | Location:<br>49th Precinct | | Address:<br>2121 Eastchester Road, Bronx, NY | | Date/Time:<br>Apr 21, 2021 5:00 AM |
| **Staging** | Location:<br>49th Precinct | | Address:<br>2121 Eastchester Road, Bronx, NY | | Date/Time:<br>Apr 21, 2021 5:00 AM |
| **Execution** | Location:<br>927 Brady Avenue, 1st Floor, Bronx, NY | | Address:<br>927 Brady Avenue, 1st Floor, Bronx, NY | | Date/Time:<br>Apr 21, 2021 5:59 AM |
| **Type of Operation**<br>AR - Arrest Warrant | | **Violations / Charges**<br>- 18USC1591 | | **Contraband Description** | |
| **Premises:** House<br>Multi Family Dwelling with Side Entry | | | | | |
| **Operational Objectives**<br><br>Arrest Michael PASCHAL<br><br>Interview Occupants of House | | | | | |

# Personnel Assignments

| Name | Call Sign | Vehicle Description | Assignment(s) | Report Assignment(s) | Notes |
|------|-----------|---------------------|---------------|----------------------|-------|
| Taiwo Adeleke | SGT | | - Arrest Team | | |
| Mei Mei Chui 347-996-1219 | | | - Arrest Team - Prisoner Transport | - EAGLE Booking | Assist With Booking |
| RYAN SAMAROO 646-345-7271 | NYA7483 | | - Arrest Team - Prisoner Transport | | |
| Joseph Kang 646-477-0301 | | | - Arrest Team | | |
| DAVID MILLS | | | - Arrest Team | | |
| Ryan Theiss | | | - Arrest Team | | |
| Lt John Tancredi | | | - Supervisor | | |
| SCOTT COTE | | | - Arrest Team | | |
| USMS Mike Romani | | | - Arrest Team | | |
| DSS SA Evan Danaher | | | - Arrest Team | | |
| Dana Galante | | | - Arrest Team | | |
| Kevin Kuntz 646-942-0827 | | | - Team Leader | - ICM Incident Report - Report of Investigation (ROI) | HSI Team Lead |
| CHARLES ENGLE 404-450-3244 | GAA1084 | | - Supervisor | - Significant Incident Report (SIR) | |
| Lanora Moore | | | - Arrest Team | | |
| ANTONIO BOLFO | | | - Arrest Team | | |
| Ilya Faynshteyn 646-988-6310 | A7323 | | - Arrest Team - Prisoner Transport | | |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

## Operation Information

| | |
|---|---|
| **Brief Summary of Investigation** | On December 9, 2020 HSI Special Agents obtained information from the U.S Marshals Service (USMS) that a 17 year old was the victim of Sex Trafficking in New York (Bronx). On October 15, 2020 the victim was reported missing from Johnson County, North Carolina after running away from home. A juvenile friend of the victim has been contact with the victim and stated that the victim was involved in commercial sex work in New York City. On December 11, 2020, a search warrant was obtained for the residence at 927 Brady Avenue, 1st Floor, Bronx, NY. On April 13, 2021, an arrest warrant was issued for Michael PASCHAL for Sex Trafficking of a Minor. |
| **Violations / Charges** | 18USC1591 - SEX TRAFFICKING OF CHILDREN OR BY FORCE, FRAUD OR COERCION |

## Deconfliction

| | |
|---|---|
| **High Risk Operation?** | No |
| **Title 21 Investigation?** | No |
| **Operation Deconflicted?** | Yes |
| **Methods of Deconfliction** | NYPD |
| **Operation Has Conflicts?** | No |
| **Local Law Enforcement Notified?** | Yes |
| **Notified Local Law Enforcement Information** | |
| Agency Or Department | NYPD |
| Contact Name | Task Force Officers |
| Date Of Contact | March 1, 2021 |
| **Undercover Operatives?** | No |

## Communications & Safety

| | |
|---|---|
| **Sector Contact Number** | 8009732867 |
| **Communications & Safety Section Required?** | Yes |
| **Nearest Trauma Center** | |
| Trauma Center Name | Jacobi Medical Center |
| Address | 1400 Pelham Pkwy S, The Bronx, NY 10461 |
| Phone | 7189185000 |
| **Nearest Hospital** | |
| Hospital Name | Jacobi Medical Center |
| Address | 1400 Pelham Pkwy S, The Bronx, NY 10461 |
| Phone | 7189185000 |
| **Radio** | |
| Primary Radio | NYTAC1 |
| Secondary Radio | 49 PCT Frequency |

## Other Considerations

| Equipment Required | Ballistic Vest, Firearm, OC Spray and/or Baton, Handcuffs, Mask |
|---|---|
| **Attire** | |
| Type | TD - Tactical Dress |
| **Prisoner Processing Location** | |
| Location Name | 49th Precinct |
| Address | 2121 EASTCHESTER RD, Bronx, NY |
| **Anticipated Evidence** | Electronic Evidence, Unknown Others |
| **Air Support?** | No |
| **Seized Property Specialist Participating?** | No |
| **Foreign Language Required?** | No |
| **Computer Forensics Agent Needed?** | No |
| **Technical Enforcement Officer Needed?** | No |
| **Victim/Witness Assistance Needed?** | No |
| **Potential Media Attention?** | No |

*OPERATIONAL CONSIDERATIONS UNDER SARAVIA v. BARR SETTLEMENT AGREEMENT: Saravia class members include any noncitizen minor who (1) came to the United States as an unaccompanied minor; (2) was previously detained in Department of Health and Human Services Office of Refugee Resettlement (ORR) custody and then released by ORR to a sponsor; and (3) has been or will be rearrested by ICE on the basis of a removability warrant based in whole or in part on allegations of gang affiliation. HSI must contact their local OPLA field office as soon as operationally possible when there is a probability of targeting or arresting a Saravia class member, or if a Saravia class member is identified after arrest. Under the terms of the settlement agreement, Saravia class members are entitled to expedited custody hearings and the government is required to prove that there has been change of circumstances to justify ICE's rearrest of the minor.*

## PASCHAL, Michael

| Alias | | Nickname | |
|---|---|---|---|
| **Height** | **Weight** | **Gender** | **Race**<br>B - BLACK OR<br>AFRICAN AMERICAN |
| **Hair Color** | **Eye Color** | **Date(s) of Birth**<br>01/20/1971 | **Citizenship**<br>USA - United States |

| **Address(es)**<br>927 Brady Avenue, New York, NY - NEW YORK USA - United States | **Physical Characteristics** | **Resident Status** |
|---|---|---|
| | | **Alien File Number** |

| **Vehicle Descriptions** | **History of Violence** |
|---|---|
| **Criminal History** | **Remarks** |

## Operation Approval History

| First-Line Approval | Charles Engle<br>1038 - SPECIAL AGENT<br>April 18, 2021 08:51:46 -04:00 |
|---|---|
| Second-Line Approval | Michael Conlon<br>1002 - ASSISTANT SPECIAL AGENT IN CHARGE<br>April 19, 2021 10:39:26 -04:00 |

EXHIBIT 3

Warrant by Telephone
927 Brady Avenue, 1st Floor, Bronx NY
Case No. 20 MAG 13230
12/11/20

AO 93C  (08/18) SDNY Rev.  Warrant by Telephone or Other Reliable Electronic Means          ☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) Case No. | **20 MAG 13230** |
| 927 Brady Avenue, Floor 1, Bronx, New York | ) | |
| | ) | |
| | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Southern_____ District of _____New York_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

The search and seizure are related to violation(s) of *(insert statutory citations)*:

18 U.S.C. §§ 1591(a)(1) & (a)(2) (sex trafficking of a minor

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment A

**YOU ARE COMMANDED** to execute this warrant on or before _____December 25, 2020_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Duty Magistrate Judge_____ .

*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     _____12/11/2020 at 12:45 pm_____

_____
*Judge's signature*

City and state:   New York, New York

Hon. Sarah Netburn, U.S.M.J.
*Printed name and title*

USAO000061

Case 1:21-cr-00331-VSB   Document 70-11   Filed 04/10/23   Page 2 of 4

AO 93C  (08/18) SDNY Rev.  Warrant by Telephone or Other Reliable Electronic Means     ☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>See Attachment A | )<br>)<br>)   Case No.  21-CR-331 (VSB)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Southern _____ District of _____ New York _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

The search and seizure are related to violation(s) of *(insert statutory citations):*

Title 18, United States Code, Sections 1594(c) (conspiracy to commit sex trafficking); 1591(a) and (b)(2) (sex trafficking of a minor); 2423(a) and (e) (transportation of a minor for the purpose of prostitution); and 2422(a) (coercion and enticement of a minor to travel to engage in prostitution)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See attachment A

**YOU ARE COMMANDED** to execute this warrant on or before _____ April 18, 2023 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ the Duty Magistrate Judge ~~USDJ~~ _____.
                                                                                            *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for ____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:    5:38 pm

City and state:    New York, NY

_____
                 *Judge's signature*

Hon. Vernon S. Broderick U.S.D.J.
*Printed name and title*

USAO000583

EXHIBIT 5

Homeland Security Investigations
Report of Investigation
Case No. NY15HT21NY0001
Case Opening
Date Approved 12/12/2020



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



## DETAILS OF INVESTIGATION

On December 9, 2020 HSI Special Agents obtained information from the U.S Marshals Service (USMS) that a 17 year old was a possible victim of Sex Trafficking in The Bronx, New York. USMS Deputies reported Caitlyn Ponce ( DOB: 03/01/2003) was believed to be in the company of Michael PASCHAL(DOB: 01/20/1971) and possibly at 927 Brady Avenue, Bronx, New York. USMS Deputies stated that Ponce was reported missing on October 15, 2020 by the Johnston County, North Carolina Sheriff's Office. According to the USMS Ponce was recovered in August of 2020 in a New York City hospital after being treated for a STD or STD(s). During the hospital stay information was obtained that indicated that Ponce was involved in commercial sex work and that her pimp was PASCHAL. It was further reported that Ponce was staying with PASCHAL while she was in New York. The USMS reported that it was believed Ponce had returned to New York to be involved in commercial sex work under PASCHAL. The USMS had obtained the following phone numbers in the course of the investigation; 347-510-9141 (Ponce, from November 2020 to present), 919-521-7757 (Ponce, until November 2020), and 347-208-3427 (PASCHAL from at least 2018). USMS Deputies also advised HSI Agents that  the Johnston County (NC) Sheriff's Office had obtained a pen register and GPS ping order on the 347-510-9141 phone number believed to be used by Ponce. The subscriber information of that phone number was CAITHLIN NEVARAREZ, and listed the address of 927 Brady Avenue, Bronx, NY. USMS Deputies further reported that the address of PASCHAL's Non-Driver ID was 927 Brady Avenue, Bronx, NY. The investigation will be lead by HSI, with the assistance of the USMS, of the Southern District of New York.

The investigation continues.

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-001 | 12/12/2020 |

USAO000287
This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



05/12/2021 23:19 EDT

Page 1 of 2

**CASE NUMBER**
NY15HT21NY0001

**CASE OPENED**
12/9/2020

**CURRENT CASE TITLE**
Operation Tar Heel Trafficking

**REPORT TITLE**
Case Opening

## SYNOPSIS

On December 9, 2020 HSI Special Agents obtained information
from the U.S Marshals Service (USMS) that a 17 year old was the
victim of Sex Trafficking in New York (Bronx). The victim had
run away from home earlier in 2020 and had been recovered in
New York around August, after being seen in a hospital, where
she treated for multiple STDs and made statements that she was
involved in commercial sex work. On October 15, 2020 the victim
was reported missing from Johnson County, North Carolina after
running away from home. A juvenile friend of the victim has
been contact with the victim and stated that the victim was
involved in commercial sex work in New York City. The
investigation will be conducted in coordination with the USMS
and HSI

This report serves to document the case opening and initial
checks on December 9, 2020.

**REPORTED BY**
Kevin Kuntz
SPECIAL AGENT

**APPROVED BY**
Charles Engle
SPECIAL AGENT

**DATE APPROVED**
12/12/2020

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-001 | 12/12/2020 |

USAO000286
This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of
this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

EXHIBIT 6

Homeland Security Investigations
Report of Investigation
Case No. NY15HT21NY0001
Warrant Obtained on Phone # (347) 510-9141
Date Approved 12/15/2020



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

05/12/2021 23:19 EDT

Page 1 of 2

**CASE NUMBER**
NY15HT21NY0001

**CASE OPENED**
12/9/2020

**CURRENT CASE TITLE**
Operation Tar Heel Trafficking

**REPORT TITLE**
Warrant Obtained for Historical and
Prospective Location Information for
347-510-9141 on 12/11/20

## SYNOPSIS

On December 9, 2020 HSI Special Agents obtained information
from the U.S Marshals Service (USMS) that a 17 year old was the
victim of Sex Trafficking in New York (Bronx). The victim had
run away from home earlier in 2020 and had been recovered in
New York around August, after being seen in a hospital, where
she treated for multiple STDs and made statements that she was
involved in commercial sex work. On October 15, 2020 the victim
was reported missing from Johnson County, North Carolina after
running away from home. A juvenile friend of the victim has
been contact with the victim and stated that the victim was
involved in commercial sex work in New York City. The
investigation will be conducted in coordination with the USMS
and HSI

This report serves to document the warrant obtained on phone
number 347-510-9141 on 12/11/20 for GPS location and Pen
Register information.

**REPORTED BY**
Kevin Kuntz
SPECIAL AGENT

**APPROVED BY**
Charles Engle
SPECIAL AGENT

**DATE APPROVED**
12/15/2020

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-002 | 12/15/2020 |

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of
this document or Information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000288





# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



05/12/2021 23:19 EDT

Page 2 of 2

## DETAILS OF INVESTIGATION

On December 11, 2020 at approximately 9:54am, HSI Special Agents obtained a Warrant from the Hon. Sarah Netburn U.S. Magistrate Judge of the Southern District of New York for phone number 347-510-9141. The Warrant was for historical and prospective location information along with a pen register, authorized for a period of 45 days.

The investigation continues.

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-002 | 12/15/2020 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000289

EXHIBIT 7

Homeland Security Investigations
Report of Investigation
Case No. NY15HT21NY0001
Review of Prostitution Advertisements
Date Approved 12/15/2020



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



05/12/2021 23:19 EDT

Page 1 of 2

**CASE NUMBER**
NY15HT21NY0001

**CASE OPENED**
12/9/2020

**CURRENT CASE TITLE**
Operation Tar Heel Trafficking

**REPORT TITLE**
Review of Prostitution
Advertisements for Phone Number
929-483-0420

## SYNOPSIS

On December 9, 2020 HSI Special Agents obtained information
from the U.S Marshals Service (USMS) that a 17 year old was the
victim of Sex Trafficking in New York (Bronx). The victim had
run away from home earlier in 2020 and had been recovered in
New York around August, after being seen in a hospital, where
she treated for multiple STDs and made statements that she was
involved in commercial sex work. On October 15, 2020 the victim
was reported missing from Johnson County, North Carolina after
running away from home. A juvenile friend of the victim has
been contact with the victim and stated that the victim was
involved in commercial sex work in New York City. The
investigation will be conducted in coordination with the USMS
and HSI

This report serves to document a review of Prostitution
Advertisements for Phone Number 929-483-0420 that was conducted
on December, 11, 2020.

**REPORTED BY**
Kevin Kuntz
SPECIAL AGENT

**APPROVED BY**
Charles Engle
SPECIAL AGENT

**DATE APPROVED**
12/15/2020

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-005 | 12/15/2020 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE
This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of
this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000292



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



05/12/2021 23:19 EDT

Page 2 of 2

## DETAILS OF INVESTIGATION

On December 11, 2020 HSI Special Agents reviewed prostitution advertisements for the phone number 929-483-0420. It was found that there were 47 ads posted between November 8, 2020 and December 6, 2020 for this phone number. There were 46 ads posted to "Megapersonals" and 1 posted to "Harlot Hub." The ads indicated the person depicted was named "Sunshine" and the photos on the ads showed a Hispanic female with dark colored hair. The ads were posted for incalls in the Bronx, NY. The clothing worn by the female in the photos that were posted on December 6, 2020 match a photo that a social media account associated with Caitlyn Ponce had posted on Instagram.

Investigator's Note:

The photos in the ads that have the clothing consistant with the clothing posted on Instagram appear to be taken in such a way in which a 3rd party is taking the photos rather than the subject of the photos taking them their self.

The investigation continues

| **Current Case Title** | **ROI Number** | **Date Approved** |
| --- | --- | --- |
| Operation Tar Heel Trafficking | NY15HT21NY0001-005 | 12/15/2020 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000293

EXHIBIT 8

Homeland Security Investigations
Report of Investigation
Case No. NY15HT21NY0001
Review of TextNow Subpoena
Date Approved 12/21/2020



# DEPARTMENT OF HOMELAND SECURITY

HOMELAND SECURITY INVESTIGATIONS

REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



05/12/2021 23:19 EDT

**CASE NUMBER**
NY15HT21NY0001

**CASE OPENED**
12/9/2020

**CURRENT CASE TITLE**
Operation Tar Heel Trafficking

**REPORT TITLE**
Review of TextNow Subpoena Return
on 12/15/20

**REPORTED BY**
Kevin Kuntz
SPECIAL AGENT

**APPROVED BY**
Charles Engle
SPECIAL AGENT

**DATE APPROVED**
12/21/2020

## SYNOPSIS

On December 9, 2020 HSI Special Agents obtained information from the U.S Marshals Service (USMS) that a 17 year old was the victim of Sex Trafficking in New York (Bronx). The victim had run away from home earlier in 2020 and had been recovered in New York around August, after being seen in a hospital, where she treated for multiple STDs and made statements that she was involved in commercial sex work. On October 15, 2020 the victim was reported missing from Johnson County, North Carolina after running away from home. A juvenile friend of the victim has been contact with the victim and stated that the victim was involved in commercial sex work in New York City. The investigation will be conducted in coordination with the USMS and HSI

This report serves to document the review of a subpoena return from TextNow in regards to the account associated with 929-483-0420 on December 15, 2020

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-009 | 12/21/2020 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000296



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

## DETAILS OF INVESTIGATION

On December 15, 2020, HSI Special Agents reviewed the subpoena return from TextNow regarding the phone number 929-483-0420, which had been used in 47 prostitution ads believed to be associated with a minor.

The subscriber information for the account associated with 929-483-0420 is as follows:

Username: caitlynnmariee03

Phone Number: +1 929-483-0420

Name: Caitlyn Ponce

Email: caitlynnponcee1@icloud.com

DOB: (Blank)

Registration Date: 2020-11-05 14:53:59 UTC

Registration IP: 67.81.126.90

Phone Ownership: 2020-11-05 14:54:58 UTC

Phone Ownership to: 2020-12-12 04:59:59 UTC (Still assigned to the user as of date of subpoena service)

A review of the IP addresses associated with the account revealed (6) IP addresses associated with T-Mobile Wireless mobile connection (cell phone based internet) and an IP address of 67.81.126.90, which is a fixed line connection (Wifi or hardwired internet connection at a fixed location).

The call/message history had 1,281 total contacts, and the following numbers as the most frequent contacts:

347-599-4617- 336 Contacts from 11/19/2020 to 12/1/2020

347-499-5512- 275 Contacts from 11/6/2020 to 11/23/2020

646-349-6322- 258 Contacts from 11/18/2020 to 12/3/2020

347-599-4617- 336 Contacts from 11/19/2020 to 12/1/2020

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-009 | 12/21/2020 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000297



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



05/12/2021 23:19 EDT                                                                                     Page 3 of 3

347-499-5512- 275 Contacts from11/06/2020 to 11/23/2020

646-349-6322- 258 Contacts from 11/18/2020 to 12/03/2020

917-736-7234- 236 Contacts from 11/07/2020 to 11/21/2020

718-578-0264-169 Contacts from 11/07/2020 to 11/11/2020

347-208-3427- 146  Contacts from 11/06/2020 to 12/09/2020

929-336-0995- 131 Contacts from 11/07/2020 to 11/07/2020

Investigator's Note:

The IP Address 67.81.126.90 is registered to Optimum Online, who lists this subscriber as
Michael PASCHAL, and the service location to be 927 Brady Avenue, Bronx, NY

The investigation continues

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-009 | 12/21/2020 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

USAO000298

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of
this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

EXHIBIT 9

Homeland Security Investigations
Report of Investigation
Case No. NY15HT21NY0001
IP Address Information Obtained
Date Approved 12/21/2020



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



05/12/2021 23:19 EDT

Page 1 of 2

**CASE NUMBER**
NY15HT21NY0001

**CASE OPENED**
12/9/2020

**CURRENT CASE TITLE**
Operation Tar Heel Trafficking

**REPORT TITLE**
IP Address Information Obtained
From Optimum on 12/11/20

## SYNOPSIS

On December 9, 2020 HSI Special Agents obtained information
from the U.S Marshals Service (USMS) that a 17 year old was the
victim of Sex Trafficking in New York (Bronx). The victim had
run away from home earlier in 2020 and had been recovered in
New York around August, after being seen in a hospital, where
she treated for multiple STDs and made statements that she was
involved in commercial sex work. On October 15, 2020 the victim
was reported missing from Johnson County, North Carolina after
running away from home. A juvenile friend of the victim has
been contact with the victim and stated that the victim was
involved in commercial sex work in New York City. The
investigation will be conducted in coordination with the USMS
and HSI.

This report serves to document the IP address information
obtained from Optimum/Yaana Technologies/Altice USA on December
11, 2020.

**REPORTED BY**
Kevin Kuntz
SPECIAL AGENT

**APPROVED BY**
Charles Engle
SPECIAL AGENT

**DATE APPROVED**
12/21/2020

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-010 | 12/21/2020 |

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of
this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000299



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

05/12/2021 23:19 EDT                                                                                    Page 2 of 2

## DETAILS OF INVESTIGATION

On December 11, 2020 HSI Special Agents requested the disclosure of information for the IP
address 67.81.126.90 on 12/11/20 at 04:03 UTC. The information was requested on exigency with a
concurrent subpoena served on the company via email. HSI Special Agents were contacted via
telephone with the requested information. The subscriber for the IP Address was reported to be
Michael PASCHAL and the location of the service was 927 Brady Ave, Bronx, NY.

Investigator's Note: The IP address was obtained through a VOIP application associated with the
phone number 929-483-0420, which was listed under prostitution ads with a minor victim's photo
on it.

The investigation continues

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-010 | 12/21/2020 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of
this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000300

EXHIBIT 10

Homeland Security Investigations
Report of Investigation
Case No. NY15HT21NY0001
Information Obtained from Seacus NJ Police
Date Approved 12/21/2020



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



05/12/2021 23:19 EDT

Page 2 of 2

## DETAILS OF INVESTIGATION

On December 18, 2020, HSI Special Agents obtained information from Police Officer Borelli, Badge#192, of the Secaucus, New Jersey Police Department. Specifically, On September 3, 2020 Secaucus Police Officers stopped a 2004 Chevy Tahoe with Alaska Plate 2AV6325 driven by Tanesia STOKES on County Avenue in Secaucus. According to Officer Borelli the vehicle's license plates were fraudulent and that STOKES received a ticket for driving an unregistered motor vehicle. The vehicle was registered to Kevin Smith, residing at 1970 East Tremont Ave, Apt12H, Bronx, New York. The vehicle was then towed at STOKES' request to 968 3rd Avenue, Brooklyn, New York. Officer Borelli added that the citing officer had been told by STOKES that she was driving in Secaucus to pick up her boyfriend at the UPS Center in Secaucus.

The investigation continues

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-007 | 12/21/2020 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000295



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



05/12/2021 23:19 EDT

Page 1 of 2

**CASE NUMBER**
NY15HT21NY0001

**CASE OPENED**
12/9/2020

**CURRENT CASE TITLE**
Operation Tar Heel Trafficking

**REPORT TITLE**
Information Obtained from Secaucus,
NJ Police on 12/18/20

## SYNOPSIS

On December 9, 2020 HSI Special Agents obtained information
from the U.S Marshals Service (USMS) that a 17 year old was the
victim of Sex Trafficking in New York (Bronx). The victim had
run away from home earlier in 2020 and had been recovered in
New York around August, after being seen in a hospital, where
she treated for multiple STDs and made statements that she was
involved in commercial sex work. On October 15, 2020 the victim
was reported missing from Johnson County, North Carolina after
running away from home. A juvenile friend of the victim has
been contact with the victim and stated that the victim was
involved in commercial sex work in New York City. The
investigation will be conducted in coordination with the USMS
and HSI

This report serves to document the information obtained from
Secaucus, New Jersey Police Department on December 18, 2020

**REPORTED BY**
Kevin Kuntz
SPECIAL AGENT

**APPROVED BY**
Charles Engle
SPECIAL AGENT

**DATE APPROVED**
12/21/2020

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-007 | 12/21/2020 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of
this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000294

EXHIBIT 11

Homeland Security Investigations
Report of Investigation
Case No. NY15HT21NY0001
Interview of Source of Information "Mya"
Date Approved 12/21/2020



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



05/12/2021 23:19 EDT

**CASE NUMBER**
NY15HT21NY0001

**CASE OPENED**
12/9/2020

**CURRENT CASE TITLE**
Operation Tar Heel Trafficking

**REPORT TITLE**
Interview of Source of Information
known as "Mya" on 12/18/20

**REPORTED BY**
Kevin Kuntz
SPECIAL AGENT

**APPROVED BY**
Charles Engle
SPECIAL AGENT

**DATE APPROVED**
12/21/2020

## SYNOPSIS

On December 9, 2020 HSI Special Agents obtained information from the U.S Marshals Service (USMS) that a 17 year old was the victim of Sex Trafficking in New York (Bronx). The victim had run away from home earlier in 2020 and had been recovered in New York around August, after being seen in a hospital, where she treated for multiple STDs and made statements that she was involved in commercial sex work. On October 15, 2020 the victim was reported missing from Johnson County, North Carolina after running away from home. A juvenile friend of the victim has been contact with the victim and stated that the victim was involved in commercial sex work in New York City. The investigation will be conducted in coordination with the USMS and HSI

This report serves to document the interview of a source of information on December 18, 2020

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-008 | 12/21/2020 |

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of information contained herein should be referred to HSI Headquarters together with a copy of the document.

SUBJECT TO PROTECTIVE ORDER



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



## DETAILS OF INVESTIGATION

On December 18, 2020, HSI Special Agents conducted a telephonic interview of a source of information, known only by the name "Mya", at the phone number 804-441-0613. The phone number was obtained through the cell phone of Michael PASCHAL. Specifically, there is a text based conversation on the phone of PASCHAL which indicated PASCHAL had been threatening towards Mya. Mya was asked about Michael PASCHAL after which the Mya asked questions about from where and then stated "what, did you kick down the door and find a bunch of under age kids in there." Mya was asked to elaborate on that to which the Mya explained that they had worked as a prostitute for PASCHAL, operating out of 927 Brady Ave, Bronx, New York, and that she and several of the other prostitutes that worked for him questioned some of the girls that he had working for him. Specifically, they were believed by the other prostitutes to be underage. Furthermore, Mya stated that it was commonly stated throughout the neighborhood that PASCHAL prostituted underage girls. Mya stated PASCHAL would "beat bitches" and cause bodily harm to the prostitutes that worked for him. Mya further stated PASCHAL would collect a fee for any of the prostitution related activities that were arranged through PASCAL/the Brady Avenue address. Mya reported that they were threatened with violence after wanting to leave the employ of PASCHAL.

The investigation continues.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-008 | 12/21/2020 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of information contained herein should be referred to HSI Headquarters together with a copy of the document.

SUBJECT TO PROTECTIVE ORDER

EXHIBIT 12

Homeland Security Investigations
Report of Investigation
Case No. NY15HT21NY0001
Rescue of a Minor Victim
Date Approved 12/29/2020



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



05/12/2021 23:19 EDT

Page 2 of 3

## DETAILS OF INVESTIGATION

On December 14, 2020, HSI Special Agents, along with Deputy United States Marshals, and Detectives from the New York City Police Department, executed a search warrant at 927 Brady Avenue, Bronx, New York, in reference to an allegation of 18 USC 1591, Sex Trafficking of a Minor. Law enforcement announced their presence multiple times after which movement was heard and no individuals would answer the door of the 1st Floor. The door was opened by DUSMs with tools following the lack of response. Encountered inside the 1st Floor was Michael PASCAL, Tanesia STOKES and Sonya PEOPLES. A protective sweep was conducted where Jermaine JOHNSON, Roslyn JOHNSON, believed to be the mother of PASCHAL, and Minor Victim 1, hereinafter known as the victim, were recovered on the 2nd Floor. PASCHAL was attempted to be interviewed by HSI Special Agent Kevin Kuntz and Detective Scott Cote at which time he was read his rights. PASCHAL stated he did not want to make any statements and wished to talk to a lawyer before talking with police. During the course of the Search Warrant PASCHAL made numerous spontaneous comments to law enforcement officers conducting the warrant. at no time was PASCHAL questioned by HSI Agents following his invocation of his right to an attorney. PASCHAL stated that he had taken the victim into his home after her mother had threw her out. PASCHAL stated he believed was in a bad situation and that he was just trying to do the right thing and help her. At one point PASCHAL stated that he found the whole situation ridiculous as the victim was turning 18 in March, only a few months away. Following the conclusion of the warrant the following items were seized:

1. Mail
2. Condoms
3. Ibuprofen
4. Lenovo Laptop
5. Samsung Box
6. iPhone Box
7. iPhone (Electronically Searched and then Returned on Location)
8. Sex Paraphernalia
9. Lab Test Results
10. Medical Records
11. Samsung Phone
12. Samsung Phone
13. Blue Phone
14. Grey iPhone
15. Samsung Phone
16. HDD
17. LG Phone
18. Samsung Galaxy Note 4

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-013 | 12/29/2020 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000302



Case 1:21-cr-00331-VSB   Document 47   Filed 02/21/23   Page 13 of 15
# DEPARTMENT OF HOMELAND SECURITY
## HOMELAND SECURITY INVESTIGATIONS
### REPORT OF INVESTIGATION




OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

05/12/2021 23:19 EDT

Page 1 of 3

**CASE NUMBER**
NY15HT21NY0001

**CASE OPENED**
12/9/2020

**CURRENT CASE TITLE**
Operation Tar Heel Trafficking

**REPORT TITLE**
Rescue of a Minor Victim of Sex
Trafficking on 12/14/2020

## SYNOPSIS

On December 9, 2020 HSI Special Agents obtained information from the U.S Marshals Service (USMS) that a 17 year old was the victim of Sex Trafficking in New York (Bronx). The victim had run away from home earlier in 2020 and had been recovered in New York around August, after being seen in a hospital, where she treated for multiple STDs and made statements that she was involved in commercial sex work. On October 15, 2020 the victim was reported missing from Johnson County, North Carolina after running away from home. A juvenile friend of the victim has been contact with the victim and stated that the victim was involved in commercial sex work in New York City. The investigation will be conducted in coordination with the USMS and HSI

This report serves to document the rescue of a minor victim of sex trafficking and the execution of a search warrant at 927 Brady Ave, Bronx, NY on December 14, 2020.

**REPORTED BY**
Kevin Kuntz
SPECIAL AGENT

**APPROVED BY**
Charles Engle
SPECIAL AGENT

**DATE APPROVED**
12/29/2020

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-013 | 12/29/2020 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000301



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

05/12/2021 23:19 EDT

19. Alcatel Phone
20. Condoms
21. Samsung Tablet (Electronically Searched and then Returned on Location)
22. UHX Phone (Electronically Searched and then Returned on Location)
23. Red iPhone (Electronically Searched and then Returned on Location)
24. Samsung Cellphone

Investigator's Note: The statements made by PASCHAL are a summary of statements made and are not
the exact wording of the comments.

The investigation continues

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-013 | 12/29/2020 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of
this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000303

EXHIBIT 13

Homeland Security Investigations
Report of Investigation
Case No. NY15HT21NY0001
Surveillance Conducted on 12/30/2020
Date Approved 12/30/2020



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



05/12/2021 23:19 EDT

## DETAILS OF INVESTIGATION

On December 30, 2020 at approximately 0245, HSI Special Agents started surveillance of UPS Meadowlands, located at 493 County Avenue, Secaucus, NJ. UPS Meadowlands is the known employer of Michael PASCHAL, who was reported to routinely leave the facility at approximately 3:00am. At approximately 0445 the surveillance was concluded at the location. HSI Special Agents then travelled to and started surveillance at 927 Brady Avenue, Bronx, NY, the known residence of PASCHAL. At approximately 0515 HSI Special Agents arrived at the intersection of Brady Avenue and Muliner Avenue and observed a Tan Chevrolet Tahoe with what appeared to be a black male sitting in the driver's seat, parked on Brady Avenue in the vicinity of the intersection with Muliner Avenue. The vehicle was not running, had no lights, and did not have a front license plate. Agents then left the vicinity in order to approach the vehicle from another angle. At approximately 0518 HSI Special Agents were able to observe the Tan Tahoe at the same location, due to the environmental factors (darkness, lack of lighting, reflection of vehicle headlights) and positioning it was unable to be determined if it was occupied at that time. The vehicle was noted to have a temporary (paper) license plate but Agents were unable to determine the state of residence or the tag number printed due to the tag's location, condition of the tag, and the aforementioned environmental factors.

Investigator's Note:

A 2004 Tan Chevrolet Tahoe driven by Tanesia STOKES was written a citation by Secaucus Police in September of 2020 for driving an unregistered vehicle (fictitious plates). During the encounter Secaucus Police reported STOKES stated she was going traveling to pick PASCHAL up from work at UPS Meadowlands.

On December 14, 2020, a search warrant was executed by HSI Agents at 927 Brady Avenue, Bronx, NY, the residence of PASCHAL. During the course of the search warrant a buyer's receipt with the name Tanesia STOKES for a 2004 Chevrolet with VIN 1GNEK13T44R182662. According to United States Department of Transportation records, this VIN is associated with a 2004 Chevrolet Tahoe.

The investigation continues.

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-015 | 12/30/2020 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000307



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



05/12/2021 23:19 EDT

Page 1 of 2

**CASE NUMBER**
NY15HT21NY0001

**CASE OPENED**
12/9/2020

**CURRENT CASE TITLE**
Operation Tar Heel Trafficking

**REPORT TITLE**
Surveillance Conducted on 12/30
/2020

**REPORTED BY**
Kevin Kuntz
SPECIAL AGENT

**APPROVED BY**
Charles Engle
SPECIAL AGENT

**DATE APPROVED**
12/30/2020

## SYNOPSIS

On December 9, 2020 HSI Special Agents obtained information
from the U.S Marshals Service (USMS) that a 17 year old was the
victim of Sex Trafficking in New York (Bronx). The victim had
run away from home earlier in 2020 and had been recovered in
New York around August, after being seen in a hospital, where
she treated for multiple STDs and made statements that she was
involved in commercial sex work. On October 15, 2020 the victim
was reported missing from Johnson County, North Carolina after
running away from home. A juvenile friend of the victim has
been contact with the victim and stated that the victim was
involved in commercial sex work in New York City. The
investigation will be conducted in coordination with the USMS
and HSI.

This report serves to document the surveillance conducted on
December 30, 2020

**Current Case Title**

Operation Tar Heel Trafficking

**ROI Number**

NY15HT21NY0001-015

**Date Approved**

12/30/2020

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of
this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000306

EXHIBIT 14

Homeland Security Investigations
Report of Investigation
Case No. NY15HT21NY0001
Ponce Interview 1
Date Approved 5/17/2021



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



05/17/2021 20:01 EDT

Page 1 of 3

**CASE NUMBER**
NY15HT21NY0001

**CASE OPENED**
12/9/2020

**CURRENT CASE TITLE**
Operation Tar Heel Trafficking

**REPORT TITLE**
PONCE Interview 1

**REPORTED BY**
Antonio Bolfo
SPECIAL AGENT

**APPROVED BY**
Charles Engle
SPECIAL AGENT

**DATE APPROVED**
5/17/2021

## SYNOPSIS

On December 9, 2020 HSI Special Agents obtained information from the U.S Marshals Service (USMS) that a 17 year old was the victim of Sex Trafficking in New York (Bronx). The victim had run away from home earlier in 2020 and had been recovered in New York around August, after being seen in a hospital, where she treated for multiple STDs and made statements that she was involved in commercial sex work. On October 15, 2020 the victim was reported missing from Johnson County, North Carolina after running away from home. A juvenile friend of the victim has been contact with the victim and stated that the victim was involved in commercial sex work in New York City. The investigation will be conducted in coordination with the USMS and HSI

This ROI details the first interview of Caitlyn PONCE.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-016 | 5/17/2021 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

SUBJECT TO PROTECTIVE ORDER

3511-011
Page 1 of 3



# DEPARTMENT OF HOMELAND SECURITY
## HOMELAND SECURITY INVESTIGATIONS
### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

## DETAILS OF INVESTIGATION

On December 9, 2020, at approximately 1400 hours, Homeland Security Investigations forensic interviewer Brodsky interviewed Caitlyn PONCE at Jacobi Hospital in Bronx, NY. HSI Special Agents Bolfo and Kuntz, and NYPD Detective Moore observed the interview from an observation room through a live video and audio feed.

PONCE stated that she did not want to be rescued by law enforcement, referring to the search warrant executed by HSI and U.S. Marshalls at 927 Brady Ave Bronx, NY on the morning of December 9, 2020. PONCE stated that she was not being sex trafficked, and that she voluntarily engaged in commercial sex with the assistance of Michael PASCHAL, at 927 Brady Ave Bronx, NY. PONCE stated, "If I want to have sex for money, it's my decision. I could have said no, I could have remained homeless and broke on the street but I decided not to." PONCE stated that she was very sexually active in North Carolina, and was having sex with many people in North Carolina.

PONCE stated that around end of July, PONCE and her friend met PASCHAL and PASCHAL's girlfriend Tane'sia (who law enforcement identified as Tane'sia Leondra Queen STOKES) at a hotel in Greensboro, North Carolina. PONCE's friend introduced PONCE to PASCHAL and STOKES, and PONCE told them that PONCE was seventeen years old and homeless. STOKES told PONCE that PONCE could go with them to New York City and have a place to stay and eat. PONCE believed this to mean if she prostituted for them, she'll have a place to live and eat. PONCE started crying at this point in the interview.

PONCE stated that PASHCAL, STOKES, and PONCE began driving to New York the day after they met. PONCE described the vehicle as a tan Chevrolet or Ford car with New York license plates, and stated that vehicle was owned by STOKES. PONCE slept the whole time due to her feeling sick (cramps and fatigue) due to contracting a sexually transmitted disease. Upon arriving to New York, PONCE, PASCHAL and STOKES stayed together on the first floor at 927 Brady Ave Bronx, NY. PONCE stated that PASCHAL's mother (later identified as Roslyn JOHNSON) owned the house.

PONCE stated that PONCE, STOKES, and one other female (who law enforcement identified as ZOLA) engaged in commercial sex in the house, and that PONCE had her own room. ZOLA stated to PONCE that working with PASCHAL allowed her to get her own apartment. PONCE overheard PASCHAL and JOHNSON talking about the commercial sex work that PONCE was engaged in.

PONCE stated that customers would pay $140 dollars for 30 minutes of sex with her, and that PASCHAL arranged for dates with customers. In the beginning PONCE was not aware how PASCHAL was finding clients, but PASCHAL eventually told her that he was posting her ads on websites. PASCHAL showed PONCE the ads, and PONCE stated that they included photos of PONCE in lingerie taken by STOKES and ZOLA. PONCE further described the ads as listing her height,

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-016 | 5/17/2021 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or the information contained herein should be referred to HSI Headquarters together with a copy of the document.

SUBJECT TO PROTECTIVE ORDER



# DEPARTMENT OF HOMELAND SECURITY
## HOMELAND SECURITY INVESTIGATIONS
### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

race, and a slogan.  PONCE stated that her name in the ads was "Sunshine," and that it was PASCHAL who came up with the name.

PONCE stated that PONCE, STOKES, and ZOLA each had their own phone and Text Now number, and customers would call them. The customers would pay in cash or cash app. If it was cash app, the money would go to ZOLA's account who would then forward the money to PASCHAL.  Customers would pay upfront, and customers were allowed to have sex once. PONCE stated that she was working seven days per week.

In or around the fall of 2020, PONCE's mother Tiffany PEREZ cooperated with U.S. Marshalls to recover PONCE and return her to South Carolina. PEREZ met PONCE in South Carolina, and transported her to North Carolina. Once there, PEREZ called the Sheriff's Department to have PONCE arrested for allegedly threatening her with a fork. At around that time, PONCE was spending time with her older friend and the both of them decided to purchase bus tickets to New York City. On the bus, they met two UKNOWN MALES, one of which PONCE had a brief romantic relationship with. After the relationship ended, PONCE texted PASCHAL stating that she wanted to start working in commercial sex with him again.

PONCE gave PASCHAL fifty percent of the money she made from sex she had with clients.  PASHCAL would justify his fifty percent cut as payment for room and board.  PONCE quoted PASCHAL as saying, "I'm doing laundry and stuff for you and for room and board."  PONCE stated that almost every female had the same rate and percentage that would go back to PASCHAL.  PONCE stated that when PASCHAL was in a bad mood, it was "downhill from there."  If he was in a bad mood, he would keep all the money, and PONCE would have to hide a little bit of the money to keep for herself.  PASCHAL and STOKES would get into arguments, and then PASCHAL would direct his anger at PONCE.

PONCE stated that wearing a condom is a rule, and that a customer is not allowed to take it off.  Only one time did one of PONCE's customers take the condom off with PONCE's permission.  PONCE set that specific rate for $300 dollars for ten minutes.

PONCE stated that ZOLA was very supportive of PONCE leaving the life of commercial sex, and told PONCE that Covenant House has helped ZOLA in the past.

THE INVESTIGATION CONTINUES

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-016 | 5/17/2021 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or the information contained herein should be referred to HSI Headquarters together with a copy of the document.

3511-011
Page 3 of 3

SUBJECT TO PROTECTIVE ORDER

EXHIBIT 15

Investigation Progress Notes
Detective Shackel
(917) 853-9062
NYPD
Entry Date 8/5/2020

|  |  |  | **Investigation**<br>**Progress Notes** | | *****WARNING*****<br>CONFIDENTIAL INFORMATION<br>AUTHORIZED PERSONNEL ONLY |
|---|---|---|---|---|---|
| **CASE NAME:** | Perez, Tiffany | **CASE ID:** | 27571826 | | |
| **STAGE NAME:** | Perez, Tiffany | **STAGE ID:** | 33188162 | | |

*************************************************End    of    Note*************************************************

| **Event Date:** | 8/5/2020 | **Event Time:** | 9:30 AM | **Duration:** | |
|---|---|---|---|---|---|
| **Entry Date:** | 8/5/2020 | **Dist.Agy:** | A66 | **Note Status:** | Final |
| **Author:** | Bellinger, Danielle | | | **Entered By:** | Bellinger, Danielle |
| **Method:** | Phone | | | | |
| **Location:** | | | | | |
| **Type(s):** | Collateral Contact | | | | |
| **Purpose(s):** | Investigation | | | | |
| **Other Participant(s):** | Law Enforcement | | | | |
| **Family Participant(s):** | | | | | |
| **Focus:** | Perez, Tiffany; Ponce, Caitlyn | | | | |

**Progress Notes Narrative:**

Detective Shackel

✓ 917 853 9062

NYPD

CPS spoke to detective Shackel who reported to have interviewed the SC yesterday at the hospital. The Detective reported that the SC was basically pissed and stated she was tired of hearing the same questions and that her major concern was that she did not want to be in the system again as she had been before. Detective Shakel reported that the SC is a very tough girl and stated she was going to throw something at him.

Detective Shackel reported that case is depending upon the SC statement and that there can be no prosecution without one. He stated that the SC denies being trafficked and reported to have sex in North Carolina for shelter, sex with friends from facebook and with friends of friends. He stated that the SC admitted being promiscuous and also stated that that is where she met Mr. Paschal. The Detective reported that the SC also stated that some people did not want to have sex with her but she needed housing.

CPS gave the Detective the names, address and telephone numbers of Michael Paschal and Chiquita Morton and he reported he would run their information. CPS also sent the detective the screen shots that BM sent CPS, as he stated he would need a statement admitting to the trafficking or even some kind of proof, and right now he does not have it.

He reported he would keep CPS in the loop with how he plans to move further.

*************************************************End    of    Note*************************************************

| **Event Date:** | 8/5/2020 | **Event Time:** | 10:00 AM | **Duration:** | |
|---|---|---|---|---|---|
| **Entry Date:** | 8/5/2020 | **Dist.Agy:** | A66 | **Note Status:** | Final |
| **Author:** | Bellinger, Danielle | | | **Entered By:** | Bellinger, Danielle |
| **Method:** | Phone | | | | |
| **Location:** | | | | | |
| **Type(s):** | Collateral Contact | | | | |
| **Purpose(s):** | Investigation | | | | |
| **Other Participant(s):** | Medical | | | | |
| **Family Participant(s):** | | | | | |

3506-013<br>Page 34 of 80<br>Page : 34

|  | Investigation<br>Progress Notes | *****WARNING*****<br>CONFIDENTIAL INFORMATION<br>AUTHORIZED PERSONNEL ONLY |
|---|---|---|

| **CASE NAME:** Perez, Tiffany | **CASE ID:** 27571826 |
|---|---|
| **STAGE NAME:** Perez, Tiffany | **STAGE ID:** 33188162 |



EXHIBIT 16

Homeland Security Investigations
Report of Investigation
Case No. NY15HT21NY0001
January 2022 Case Update
Date Approved 1/5/2022



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



04/18/2023 13:31 EDT

**CASE NUMBER**
NY15HT21NY0001

**CASE OPENED**
12/9/2020

**CURRENT CASE TITLE**
Operation Tar Heel Trafficking

**REPORT TITLE**
January 2022 Case Update

## SYNOPSIS

On December 9, 2020 HSI Special Agents obtained information from the U.S Marshals Service (USMS) that a 17 year old was the victim of Sex Trafficking in New York (Bronx). The victim had run away from home earlier in 2020 and had been recovered in New York around August, after being seen in a hospital, where she treated for multiple STDs and made statements that she was involved in commercial sex work. On October 15, 2020 the victim was reported missing from Johnson County, North Carolina after running away from home. A juvenile friend of the victim has been contact with the victim and stated that the victim was involved in commercial sex work in New York City. The investigation will be conducted in coordination with the USMS and HSI

This report serves to document the case updates as of January 2022.

**REPORTED BY**
Kevin Kuntz
SPECIAL AGENT

**APPROVED BY**
Miguel Collazo
SPECIAL AGENT

**DATE APPROVED**
1/5/2022

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-017 | 1/5/2022 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE
This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000688



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



04/18/2023 13:31 EDT

Page 2 of 2

## DETAILS OF INVESTIGATION

In January 2022, AUSA Kevin Mead was contacted for case updates regarding the prosecution of Michael PASCHAL. AUSA Mead advised PASCHAL was still awaiting trial for the sex trafficking of a minor and no further updates were available.

The investigation continues.

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-017 | 1/5/2022 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000689

EXHIBIT 17

Homeland Security Investigations
Report of Investigation
Case No. NY15HT21NY0001
December 14, 2020 Digital Evidence
Date Approved 3/31/2023



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE





03/31/2023 15:23 EDT

Page 1 of 4

**CASE NUMBER**
NY15HT21NY0001

**CASE OPENED**
12/9/2020

**CURRENT CASE TITLE**
Operation Tar Heel Trafficking

**REPORT TITLE**
14 December, 2020 Digital Evidence
ROI

**SYNOPSIS**

A request for computer forensics assistance was received by the HSI New York Computer Forensics Unit (CFU) in reference to case number NY15HT21NY0001. A Search Warrant (SW) was conducted on 14 December, 2020 with possible time sensitive digital evidence. Suspected cellphone and/or a laptop computer(s) were to be analyzed or seized on December 14th, 2020. These items were turned over to HSI New York CFU for analysis.

**REPORTED BY**
Kevin Tillman
HSI COMPUTER FORENSICS
ANALYST

**APPROVED BY**
Neviene Habeeb
SPECIAL AGENT

**DATE APPROVED**
3/31/2023

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-019 | 3/31/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000495



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



03/31/2023 15:23 EDT                                                                                      Page 1 of 4

**CASE NUMBER**
NY15HT21NY0001

**CASE OPENED**
12/9/2020

**CURRENT CASE TITLE**
Operation Tar Heel Trafficking

**REPORT TITLE**
14 December, 2020 Digital Evidence
ROI

**SYNOPSIS**

A request for computer forensics assistance was received by the HSI New York Computer Forensics Unit (CFU) in reference to case number NY15HT21NY0001. A Search Warrant (SW) was conducted on 14 December, 2020 with possible time sensitive digital evidence. Suspected cellphone and/or a laptop computer(s) were to be analyzed or seized on December 14th, 2020. These items were turned over to HSI New York CFU for analysis.

**REPORTED BY**
Kevin Tillman
HSI COMPUTER FORENSICS
ANALYST

**APPROVED BY**
Neviene Habeeb
SPECIAL AGENT

**DATE APPROVED**
3/31/2023

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Operation Tar Heel Trafficking | NY15HT21NY0001-019 | 3/31/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE
This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

USAO000495

EXHIBIT 18

Sealed Complaint
21 MAG 4018
18 USC §§ 1594(c), 1591(a), (b)(2), and 2
Filed 4/13/2021

Case 1:21-cr-00331-VSB  Document 1  Filed 04/13/21  Page 1 of 12

# 21 MAG 4018

Sed: [signature]

KEVIN MEAD
Assistant United States Attorney

Before:     THE HONORABLE ONA T. WANG
            United States Magistrate Judge
            Southern District of New York

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :     SEALED COMPLAINT
                                  :
        - v. -                    :     Violations of
                                  :     18 U.S.C. §§ 1594(c),
MICHAEL PASCHAL,                  :     1591(a), (b)(2), and 2
                                  :
                                  :
                Defendant.        :     COUNTY OF OFFENSE:
                                  :     BRONX
- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        KEVIN KUNTZ, being duly sworn, deposes and says that
he is a Special Agent with Homeland Security Investigations
("HSI"), and charges as follows:

## COUNT ONE
(Conspiracy to Engage in Sex Trafficking of Minors)

        1.    From at least in or about July 2020 until at
least in or about December 2020, in the Southern District of New
York and elsewhere, MICHAEL PASCHAL, the defendant, and others
known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit sex trafficking, in violation of Title 18, United States
Code, Sections 1591(a) and (b).

        2.    It was a part and object of the conspiracy that
MICHAEL PASCHAL, the defendant, and others known and unknown,
willfully and knowingly, in and affecting interstate and foreign
commerce, would and did recruit, entice, harbor, transport,
provide, obtain, advertise, maintain, patronize, and solicit by
any means one and more persons, and did benefit, financially and
by receiving things of value, from participation in a venture
that engaged in any such act, knowing and in reckless disregard
of the fact that one and more such persons had not attained the

age of 18 years and would be caused to engage in one and more commercial sex acts.

(Title 18, United States Code, Section 1594(c).)

## COUNT TWO
(Sex Trafficking)

3.  From in or about July 2020 through on or about December 2020, in the Southern District of New York and elsewhere, MICHAEL PASCHAL, the defendant, willfully and knowingly, in and affecting interstate and foreign commerce, recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized and solicited by any means a person, and did benefit, financially and by receiving anything of value, from participation in a venture which had engaged in such acts, and having had a reasonable opportunity to observe such person, knowing and in reckless disregard of the fact that the person had not obtained the age of eighteen years and would be caused to engage in commercial sex acts, and did aid and abet the same, to wit, PASCHAL advertised and arranged for a minor victim (the "Victim") to engage in commercial sex.

(Title 18, United States Code, Sections 1591(a),(b)(2), and 2.)

The bases for my knowledge and for the foregoing charge are, in part, described in the following paragraphs.

4.  I have been involved in the investigation of this matter, and I base this affidavit on that experience, as well as on my conversations with other law enforcement agents, and my examination of various reports and records.  Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

5.  In or about July 2020, MICHAEL PASCHAL, the defendant, transported the Victim from North Carolina to New York, where she engaged in commercial sex work at PASCHAL's direction.  The Victim was then hospitalized, rescued by the New York City Administration for Children's Services ("NYC ACS"), and transported back to North Carolina.  When the Victim

2

returned to New York, she again resided with PASCHAL, and
PASCHAL again caused her to engage in commercial sex work at his
direction until at least in or about December 2020.

## The Victim

      6.   Based on my conversations with the Victim and my
review of reports of conversations with the Victim, I have
learned the following:

      a.   The Victim turned 18 in 2021.[1]

      b.   In or about July of 2020, MICHAEL PASCHAL,
the defendant, met with the Victim at a hotel in North Carolina.
PASCHAL was with another woman ("Female-1") at the hotel.[2]
Female-1 engaged in commercial sex work at the hotel, and the
Victim left the hotel room each time that Female-1 had a "date."

      c.   When the Victim first met PASCHAL, the
Victim informed PASCHAL that she was 17 years old.

      d.   PASCHAL and Female-1 drove the Victim from
North Carolina to New York in or about July of 2020.

      e.   The Victim had an understanding with PASCHAL
that she would engage in commercial sex work when she arrived in
New York.

      f.   The Victim stayed at a particular address in
the Bronx (the "Brady Avenue Address") with PASCHAL and Female-1
when she arrived in New York.

      g.   The Victim began engaging in commercial sex
work approximately a week after she arrived at the Brady Avenue
Address.

      h.   The Victim was hospitalized for
approximately two weeks shortly after arriving at the Brady
Avenue Address.

      i.   PASCHAL attempted to visit the Victim in the
hospital, but was not allowed to because the Victim was a minor.

---

[1] I have confirmed the Victim's date of birth through my review
of government records.

[2] Female-1 was above the age of 18 during the relevant time
period.

3

j.   The Victim put PASCHAL in contact with a representative for New York City Administration for Children's Services ("NYC ACS" and the "NYC ACS Representative"), and PASCHAL spoke with the NYC ACS Representative about the Victim.

k.   In or about August 2020, NYC ACS transported the Victim back to North Carolina.

l.   In or about October 2020, the Victim returned to New York, and again began residing at the Brady Avenue Address and engaging in commercial sex work that was arranged by PASCHAL.

m.   The Victim engaged in commercial sex work seven days a week at the Brady Avenue Address until being rescued by law enforcement officers on or about December 14, 2020.

n.   PASCHAL referred to the Victim as "Sunshine." While PASCHAL employed several other sexworkers, he only used "Sunshine" to refer to the Victim.

o.   PASCHAL would sometimes pretend to be the Victim in phone communications, in order to set up "dates" for the Victim.

p.   The Victim paid a substantial percentage of the funds she received for commercial sex work to PASCHAL.

## The Brady Avenue Search

7.   On or about December 14, 2020, I and other law enforcement officers executed a judicially authorized search warrant on the Brady Avenue Address.  I know from my involvement in the search that the following occurred during the search:

a.   Law enforcement officers located MICHAEL PASCHAL, the defendant; the Victim; the brother of PASCHAL (the "Brother"); and Female-1.

b.   Law enforcement officers recovered evidence that sex work occurred at the Brady Avenue Address and evidence that PASCHAL, the Victim, and Female-1 resided at the Brady Avenue Address, including condoms, mail addressed to PASCHAL, and prescription medication in the name of the Victim.

4

c. As further described below, law enforcement officers recovered several cellphones containing evidence of trafficking, including a cellphone (the "PASCHAL Phone"), which PASCHAL subsequently identified as his.

## The Sex Work Ads

8. I have reviewed a substantial number of online sex work advertisements (the "Sex Work Ads") dated from in or around November 2020 until in or around December 2020 that appear to show the Victim. In particular:

a. Most of the Sex Work Ads identify the sexworker being advertised using the alias "Sunshine," that, as described above, MICHAEL PASCHAL, the defendant, used to refer to the Victim.

b. A representative Sex Work Ad says the following: "Sunshine's Holiday Specials. 5'8 150 long legged Spanish and black queen in an incall Bronx location young with a nice wap I love all races welcomed."

c. The Sex Work Ads also contain revealing photos of an individual but do not show the face of that individual.

d. Several of the Sex Work Ads also list a phone number that I know belongs to the Victim because a subpoena return stated that the Victim was the subscriber.

9. Based on my conversations with the Victim and my review of reports of conversations with the Victim, I know that the Victim reviewed certain of the Sex Work Ads, stated that the Sex Work Ads referred to her, and stated that the photographs in the Sex Work Ads she reviewed were of her.

## Communications with Purchasers of Commercial Sexual Services

10. Based on my review of communications obtained from the PASCHAL Phone between MICHAEL PASCHAL, the defendant; and a purchaser of commercial sexual services with a phone number ending in the digits 8781 ("Client-1") and my review of

communications between the Victim[3] and Client-1, I know the following:

      a.    Client-1 had the following conversation with PASCHAL on or about December 10, 2020:

| SENDER | MESSAGE |
| --- | --- |
| Client-1 | Hey |
| PASCHAL | Hey u a cop |
| Client-1 | No |
| PASCHAL | 100ss 150hh 200hr |
| PASCHAL | How long u coming for |
| Client-1 | 30mins |
| PASCHAL | Ok at [Fake Address] |
| PASCHAL | How long will it take u to get here |
| PASCHAL | No bbj ,no raw,no gfe safe play only |
| PASCHAL | It's off Pelham parkway south |
| Client-1 | Ok give me 15mins |
| Client-1 | How much? |
| Client-1 | I'm here |
| Client-1 | Missed call from [number of Client-1] |
| PASCHAL | Really i waited for u |
| PASCHAL | Text me on my other number [number of Victim's cellphone]] |
| PASCHAL | Sunshine |

---

[3] The messages were recovered from a TextNow account. I know that the TextNow account belongs to the Victim because a subpoena return stated that the Victim was the subscriber.

| Client-1 | Ok |
|----------|-----|
| PASCHAL | [sends picture] |
| PASCHAL | [sends picture] |
| PASCHAL | [sends picture] |
| PASCHAL | [sends picture] |
| PASCHAL | [sends picture] |
| PASCHAL | [sends picture] |

        b.    Client-1 had the following conversation with the Victim on or about December 10, 2020:

| SENDER | MESSAGE |
|--------|---------|
| Client-1 | Hey |
| Victim | Hey. Are you involved with any form of law enforcement |
| Client-1 | No |
| Victim | How long are you looking for |
| Client-1 | 30mins |
| Victim | My half hour is 140 |
| Client-1 | Ok |
| Victim | So? |
| Client-1 | Incall? |
| Victim | Yes |
| Client-1 | Ok I'm down for tonight |
| Victim | What time |
| Client-1 | 12 |
| Victim | Alright text me when you're ready and I'll give you the after |

7

| Victim | Address** |
|--------|-----------|
| Client-1 | I'm gonna head out now |
| Victim | [messages an address (the "Fake Address")] |
| Victim | How far are you? |
| Client-1 | I'm here |
| Victim | You didn't even text me. |
| Client-1 | I'm sorry I didn't your massage until just now |
| Victim | Walk in the direction the cars are facing. Come to the blue light. Last door on the left. |
| Client-1 | Ok |
| Client-1 | I'm here |

c.      Based on my training and experience, I
understand these conversations to refer to rates for sex work
and to rules for commercial sex work.  In particular, I
understand the acronym "bbj" to mean "bare blow job," the word
"raw" to mean condomless sex, and the acronym "gfe" to refer to
"girlfriend experience."

d.      I have reviewed the photographs sent in the
message thread, which are revealing pictures that do not show
the individual's face.  Based on my conversations with the
Victim and my review of reports of conversations with the
Victim, I know that the Victim reviewed the photographs in these
messages and stated that the photographs were of her.

e.      Based on my conversations with the Victim
and my review of reports of conversations with the Victim, I
know that the Victim and PASCHAL would inform purchasers to meet
at an address next to the Brady Avenue Address (the "Fake
Address").  When the purchaser arrived, the Victim or PASCHAL
would call the purchasers and inform them that they should go
next door to the Brady Avenue Address.

f.      Based on the use of the name "Sunshine" and
the use of photographs of the Victim, I understand that the
individual who would be engaging in the commercial sex work
arranged by PASCHAL was the Victim.

8

11. Based on my review of electronic communications from the PASCHAL Phone between MICHAEL PASCHAL, the defendant, and a purchaser of commercial sexual services with a phone number ending in the digits 8359 ("Client-2"), I know the following:

a. On or about November 12, 2020, PASCHAL and Client-2 had a conversation that I understood to be about arranging commercial sex work. In particular, PASCHAL messaged, "100ss 140hhr 180hr." Based on my training and experience, I understand this conversation to refer to rates for sex work. In particular, I know that the phrase "100ss 140hhr 180hr" means that the charge is $100 for a "short stay" of 15 minutes, $140 for half an hour, and $180 for an hour.

b. In that same conversation, PASCHAL stated that the name of the sexworker was "Sunshine" and sent several revealing photographs of a young woman that do not show the individual's face. Based on the use of the name "Sunshine" and similarities in the clothing and physical appearance in the photographs, I understand that the individual who would be engaging in the commercial sex work arranged by PASCHAL was the Victim.

12. Based on my review of electronic communications from the PASCHAL Phone between MICHAEL PASCHAL, the defendant; and a purchaser of commercial sexual services with a phone number ending in the digits 9937 ("Client-3"), I know the following:

a. On or about November 15, 2020, PASCHAL and Client-3 had a conversation that I understood to be about arranging commercial sex work. In particular, PASCHAL messaged, "80ss 120hhr 180hr." Based on my training and experience, I understand this conversation to refer to rates for sex work. In particular, I know that the phrase "80ss 120hhr 180hr" means that the charge is $80 for a "short stay" of 15 minutes, $120 for half an hour, and $180 for an hour. I further know that Client-3 asked about "gfe," which I understand from my training and experience to refer to "girlfriend experience," a common term in commercial sex work.

b. In that same conversation, Client-3 messaged "Hello sunshine." Based on the use of the name "Sunshine", I understand that the individual who would be engaging in the commercial sex work arranged by PASCHAL was the Victim.

9

13.    Based on my review of electronic communications from the PASCHAL Phone between MICHAEL PASCHAL, the defendant; and a purchaser of commercial sexual services with a phone number ending in the digits 9168 ("Client-4"), I know the following:

a.    On or about November 16, 2020, PASCHAL and Client-4 had a conversation that I understood to be about arranging commercial sex work. In particular, PASCHAL messaged, "100ss 140hhr 200hr." Based on my training and experience, I understand this conversation to refer to rates for sex work. In particular, I know that the phrase "100ss 140hhr 200hr" means that the charge is $100 for a "short stay" of 15 minutes, $120 for half an hour, and $180 for an hour.

b.    In that same conversation, Client-4 messaged "Is this sunshine." Based on the use of the name "Sunshine", I understand that the individual who would be engaging in the commercial sex work arranged by PASCHAL was the Victim.

14.    I Based on my review of electronic communications from the PASCHAL Phone between MICHAEL PASCHAL, the defendant; and a purchaser of commercial sexual services with a phone number ending in the digits 9149 ("Client-5"), I know the following:

a.    On or about November 18, 2020, PASCHAL and Client-5 had a conversation that I understood to be about arranging commercial sex work. In particular, PASCHAL messaged, "100ss 150hh 200hr." Based on my training and experience, I understand this conversation to refer to rates for sex work. In particular, I know that the phrase "100ss 150hh 200hr" means that the charge is $100 for a "short stay" of 15 minutes, $150 for half an hour, and $200 for an hour.

b.    In that same conversation, PASCHAL stated that the name of the sexworker was "Sunshine" and sent several revealing photographs of a young woman that do not show the individual's face. Based on the use of the name "Sunshine" and similarities in the clothing and physical appearance in the photographs, I understand that the individual who would be engaging in the commercial sex work arranged by PASCHAL was the Victim.

15.    Based on my review of electronic communications from the PASCHAL Phone between MICHAEL PASCHAL, the defendant; and a purchaser of commercial sexual services with a phone

10

number ending in the digits 9167 ("Client-6"), I know the
following:

a. On or about November 18, 2020, PASCHAL and
Client-6 had a conversation that I understood to be about
arranging commercial sex work. In particular, Client-6
messaged, "Do You Have Condoms Or I Have To Take Some."

b. In that same conversation, PASCHAL stated
that the name of the sexworker was "Sunshine" and sent several
revealing photographs of a young woman that do not show the
individual's face. Based on the use of the name "Sunshine" and
similarities in the clothing and physical appearance in the
photographs, I understand that the individual who would be
engaging in the commercial sex work arranged by PASCHAL was the
Victim.

Communications Between Paschal and the Victim

16. I have reviewed communications between the
PASCHAL Phone and a phone belonging to the Victim:[4]

a. I understand from my conversations with the
Victim that the messages took place during the time in which the
Victim was hospitalized in July and August 2020.

b. In several of those messages, the Victim
informed MICHAEL PASCHAL, the defendant, that she was a minor
under the care of NYC ACS and could not be released without an
adult. In particular, the Victim sent the following messages:

i. "They tryna bring social services to
talk to me because I cannot be 'discharged' without somebody
over 18."

ii. "But they still need my momma consent
to release me so Idk when I'm getting released"

iii. "just spoke to the medical social work
and I asked her when I was getting released and she said she
waiting on acs. She finna [gonna] bring me back acs number
because this shii is ridiculous"

_____

[4] I know that this phone number belongs to the Victim because the
Victim's mother stated that she used it and MICHAEL PASCHAL, the
defendant, sent messages in which he referred to the user of the
phone as "Sunshine."

11

### Messages Involving the Brother

17.   I have reviewed the contents of a cellphone belonging to the Brother (the "Brother Phone")[5] that contains messages between the Brother and a third party from or about December 9, 2020, in which the Brother messaged the full name of the Victim, referred to her as "[o]ne of [my brother's] hoes," and stated that the Victim did not turn 18 until March 2020. 2021/otw, kk

18.   I have reviewed messages on the Brother Phone between the Brother and MICHAEL PASCHAL, the defendant, from on or about December 3, 2020 that describe "Sunshine" involving in commercial sex work, and, in particular, in which PASCHAL stated, "Bitches get clients they need to text u."

WHEREFORE, deponent respectfully requests that a warrant issue for the arrest of MICHAEL PASCHAL, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

S/ Kevin Kuntz/otw

_____

KEVIN KUNTZ   ID confirmed by Badge No.
Special Agent
Department of Homeland Security

Sworn to me through the transmission
of this Complaint by reliable electronic
means, pursuant to Federal Rules of
Criminal Procedure 41(d)(3) and 4.1, this
~~14th~~ of April, 2021
13th

_____

THE HONORABLE ONA T. WANG
United States Magistrate Judge
Southern District of New York

_____

[5] I know that the Brother Phone belongs to the Brother because it was seized from the Brady Avenue Address; it contains "selfie" photographs of the Brother; and the "contacts" section of the Brother Phone lists the PASCHAL Phone as "Mike My Brother."

12

EXHIBIT 19

Meeting with TFO Lanora Moore
US v Paschal
21-CR-331 (VSB), 2020R01346
4/29/2023

US v. Paschal

21-CR-331 (VSB), 2020R01346

4/29/2023

Meeting w TFO Lanora Moore

Remembers the search

Remember finding Caitlyn

Remember the defendant coming out of the house

Older woman upstairs in the house

Think there may have been a man upstairs there

Don't remember anyone else being there


Think we had a photo of Caitlyn, and that's how we IDed her

Met with Caitlyn since then

Based on those meetings and prior ID, knows person was Caitlyn

I could recognize a picture of Caitlyn as Caitlyn


Don't remember if I stayed at the house or went with Caitlyn

Defendant is Michael Paschal

I wasn't there for an interview of him

I don't remember hearing him talk


Tax ID 95611

Never testified in federal court

Testified in state court about 3 times.  Doesn't cocunt grand jury

No finding of lack of credibility or candor

No prior judicial findings

No impairment except for I wear glasses

Not aware of being sued as a cop

Divorced, but no fight in court

I went to family court for my child

My child's father wanted custody, and he lost

No accusations of lying or anything

I testified in the divorce proceeding

Judge found that I was telling the truth, I got full custody

Lost firearm years ago, lost 15 days vacation time, around 2017

No other agency misconduct

No CCRBs

Complaint to IAB, but they found it unfounded

     Complaint was that I didn't want to uncuff a violent EDP at a hospital

No other HSI/NYPD issues

Never testified at NYPD proceeding

No current investigation

Been arrested as a minor, I was in the mall, I shoplifted. I did community service and my parents paid a fine and it was sealed

     Don't remember if I testified, I was around 14, don't think I testified

No public statements re truthfulness

No social media

No prior inconsistent statements

No other issues


TFO since 3 years ago, in human trafficking the whole time

3rd grade detective 2018 or 2019

Joined the NYPD in 2014. I was a UC

NYPD was first job. I'm 33.


No notes

No NYPD file

I drew up a FOA – will send

Didn't write anything for HSI

No memobook

Will look for texts/emails

EXHIBIT 20

Trial Testimony Transcripts
Pages 30-44

N52Gpas2

1   on.  And again, the rest, we'll just have to see how trial
2   comes in -- and maybe before I comment on that last piece --
3   again, we're not going to disagree with many of the things the
4   government is going to put into evidence.  We're not going to
5   disagree he was involved in adult prostitution.  So there may
6   be witnesses they call, texts they put up that we're not going
7   to have much question with.

8        But I do want to comment on the texts that they say
9   they're going to offer into evidence.  Because the evidence is
10  going to show that they took those two phones that the
11  prosecutor told you about.  They actually took lots of
12  different electronic devices.  They got search warrants for
13  texts, they got subpoenas for texts.  And sure, there's going
14  to be lots of texts showing that Caitlyn was engaging in sex
15  work during this four-week period between mid November 2020 and
16  mid December 2020.  There will be evidence that shows that in
17  the texts.  There will also be evidence that Mike Paschal was
18  involved.  But you know what there won't be evidence in the
19  texts of?  There won't be any evidence, any evidence at all
20  that Mike Paschal knew she was underage.

21        Now, I'm going to sit down in just a second, but I
22  want to leave you with one thing, because I think it's very
23  powerful -- and the government didn't tell you about this --
24  because there's something else in the texts that the government
25  didn't mention.  The government didn't mention that in all

N52Gpas2

1  agents that he knew she was under 18.  Remember, they talked
2  about how there will be evidence that there was a search
3  warrant on Michael Paschal's house -- that was, you are going
4  to learn, in December of 2020 -- and that Michael Paschal
5  confessed that he knew she was 18.  The evidence is going to
6  show they have that, ladies and gentlemen, exactly backwards.
7  The evidence is going to show what happened was agents
8  completely lawfully -- the judge may instruct you to that --
9  agents completely lawfully, bust into his home at 6:00 in the
10  morning, 20 of them, they had a search warrant, it said
11  trafficking a minor, they get Caitlyn from the house, they take
12  her out of there, so Mike Paschal learns from that that this
13  girl, Caitlyn, is not 18 in fact.  And this will also be a
14  lesson about what's competent evidence, what's sufficient
15  evidence beyond a reasonable doubt.  Because they make it seem
16  like it's certain, it's certain he said this thing that they
17  attribute to him about what's the big deal.  The evidence is
18  going to show that, of those 20 agents there, there's one
19  person, one agent, who didn't write it down at the time, who
20  remembers him saying something like, what's the big deal, she
21  was going to turn 18.  And when you think about that statement
22  and interpret that statement, also interpret what's going on
23  and what might make a man say, what's the big deal when 20
24  people have burst into his door at 6:00 in the morning.
25      There's one other piece of evidence I want to comment

N52Gpas2                    Moore - Direct

1    those texts, Caitlyn is repeatedly asked about her age.  She's
2    repeatedly asked by clients or prospective clients, how old are
3    you.  And you know what she says in those texts to every
4    client -- and she's lying, by the way, we're not disputing, at
5    this point, the government can prove she was 17 -- you know
6    what she says to each and every one of those clients at the
7    time?  She says she's 18, she says she's is 19, she says she's
8    21.  That's what she tells these people during the period when
9    she was engaging in prostitution.

10          So as you listen to this case, just think to yourself,
11   if that's what she was telling the clients that she was
12   intending to engage in prostitution with, why on earth would
13   she be telling Michael Paschal something different, that she's
14   underage?  She wouldn't and she didn't, ladies and gentlemen.

15          THE COURT:  Thank you very much.

16          The government's first witness.

17          MR. MEAD:  Your Honor, the government calls Detective
18   Lanora Moore.

19   LANORA MOORE,

20        called as a witness by the Government,

21        having been duly sworn, testified as follows:

22   DIRECT EXAMINATION

23   BY MS. DELLIGATTI:

24   Q.  Good afternoon, Detective Moore.

25   A.  Good afternoon.

N52Gpas2                              Moore - Direct

1    Q.   Where do you work?

2    A.   I work in a Homeland Security/NYPD task force.

3    Q.   And let's start with the NYPD, what's your title at the

4    NYPD?

5    A.   Detective.

6    Q.   And how long have you been with the NYPD?

7    A.   Just about ten years.

8    Q.   And you mentioned that you also work on a task force.  Can

9    you explain that for the jury?

10   A.   Yes.  We have NYPD with Homeland Security agents, we work

11   together and investigate human trafficking.

12   Q.   How long have you been a task force officer with Homeland

13   Security Investigations?

14   A.   Three years.

15   Q.   What are your responsibilities as a task force officer with

16   Homeland Security Investigations?

17   A.   I investigate any tips of human trafficking or concerns or

18   complaints that we receive.

19   Q.   And approximately how many human trafficking investigations

20   have you participated in?

21   A.   About 50.

22   Q.   Detective Moore, as part of your work, did you participate

23   in the execution of a search warrant at 927 Brady Avenue in the

24   Bronx in December of 2020?

25   A.   Yes.

N52Gpas2                          Moore - Direct

1    Q.  And do you think you would recognize a photograph of the
2    house at 927 Brady Avenue if I showed one to you?
3    A.  Yes.
4               MS. DELLIGATTI:  Ms. Loftus, could you please pull up
5    for the witness what's been marked as Government Exhibit 803.
6    BY MS. DELLIGATTI:
7    Q.  Detective Moore, do you see this photograph?
8    A.  Yes.
9    Q.  Do you recognize this photograph?
10   A.  Yes.
11   Q.  What is depicted in this photograph?
12   A.  The house at 927 Brady Avenue.
13              MS. DELLIGATTI:  Your Honor, the government offers
14   Government Exhibit 803.
15              MR. DEVLIN-BROWN:  No objection.
16              THE COURT:  Government Exhibit 803 is admitted in
17   evidence.
18              (Government Exhibit 803 received in evidence)
19              MS. DELLIGATTI:  Thank you, your Honor.
20              Ms. Loftus, could you please publish for the jury.
21   BY MS. DELLIGATTI:
22   Q.  Detective Moore, is this the same house you participated in
23   the search warrant that you were just describing in December of
24   2020?
25   A.  Yes.

N52Gpas2                    Moore - Direct

1    Q.  Do you remember the purpose of that search?

2    A.  We were conducting a rescue operation for a minor victim.

3    Q.  What was your role in the search?

4    A.  I was going to be there to assist with any person searches

5    for any females.  If we were able to find the victim, then I

6    would do the search.

7    Q.  Approximately how many search warrants have you

8    participated in in the course of your career?

9    A.  Hundreds.

10   Q.  When you executed the search warrant at 927 Brady Avenue,

11   who, if anyone, do you remember being at the house?

12   A.  I remember that we did find the minor victim at the house.

13   I remember the defendant at the house.  I remember an older

14   woman upstairs in the home.

15   Q.  And you mentioned you saw the defendant in the house.

16   Based on your participation in the search, do you think you

17   would recognize a photograph of the defendant if I showed one

18   to you?

19   A.  Yes.

20        MS. DELLIGATTI:  Ms. Loftus, could you please pull up

21   for the witness what's been marked as Government Exhibit 811.

22   Q.  Detective Moore, do you recognize the person in this photo?

23   A.  Yes.

24   Q.  Who is this?

25   A.  Michael Paschal.

N52Gpas2                    Moore - Direct

1          MS. DELLIGATTI:  Your Honor, the government offers

2     Exhibit 811.

3          THE COURT:  Any objection?

4          MR. DEVLIN-BROWN:  No, your Honor.

5          THE COURT:  Government Exhibit 811 is admitted in

6     evidence.

7          (Government Exhibit 811 received in evidence)

8          MS. DELLIGATTI:  Thank you, your Honor.

9          Ms. Loftus, could you please publish the exhibit.

10    BY MS. DELLIGATTI:

11    Q.   Detective Moore, do you also see the defendant in the

12    courtroom today?

13    A.   Yes.

14         MR. DEVLIN-BROWN:  We stipulate to his identity, your

15    Honor.

16         THE COURT:  So stipulated.

17    BY MS. DELLIGATTI:

18    Q.   Detective Moore, you also mentioned that there was a minor

19    who was recovered from the home.  Without saying the name out

20    loud, do you know the name of that minor?

21    A.   Yes.

22         MS. DELLIGATTI:  Your Honor, at this time, the

23    government would like to read a sealed stipulation into the

24    record, which has been marked as Government Exhibit 902.

25         THE COURT:  Okay.

N52Gpas2                    Moore - Direct

1          MS. DELLIGATTI:  And I will read it in a way that

2     preserves the fact that it is a sealed exhibit.

3          THE COURT:  Go ahead.

4          MS. DELLIGATTI:  It is hereby stipulated and agreed by

5     and between the United States of America, by Damian Williams,

6     United States Attorney, Kevin Mead, Jackie Delligatti and Jane

7     Kim, Assistant United States Attorney's, of counsel, and

8     Michael Paschal, the defendant, by and through his attorney,

9     Arlo Devlin-Brown, that the following individual will be

10    testifying under the following pseudonym.

11         There's then a table at the lower left-hand corner of

12    the document.  There's the true name of the individual on the

13    left-hand side of the table.  Then there is a pseudonym next to

14    that name that says Caitlyn Smith.

15         Your Honor, at this time, the government offers

16    Government Exhibit 902.

17         MR. DEVLIN-BROWN:  No objection.

18         THE COURT:  Government Exhibit 902 is admitted in

19    evidence.

20         (Government Exhibit 902 received in evidence)

21         MS. DELLIGATTI:  Could you please publish, Ms. Loftus.

22    BY MS. DELLIGATTI:

23    Q.  Ms. Moore, do you see that the stipulation references the

24    name of the individual who will testify at this trial under a

25    pseudonym?

N52Gpas2                        Moore – Direct

1   A.   Yes.

2   Q.   Without saying the name, do you recognize the name listed

3   on the left-hand side of that table?

4   A.   Yes.

5   Q.   Do you know that individual?

6   A.   Yes.

7   Q.   I'm going to refer to her as Caitlyn.

8            How do you know Caitlyn?

9   A.   Caitlyn is the minor victim that we rescued.

10  Q.   And when you say you rescued her, is that from the search

11  you conducted at 927 Brady Avenue?

12  A.   Yes.

13  Q.   Detective Moore, when did you first meet Caitlyn?

14  A.   At that search warrant.

15  Q.   And was that in December of 2020?

16  A.   Yes.

17  Q.   Have you seen her since the search?

18  A.   Yes.

19  Q.   Approximately how many times have you seen her since?

20  A.   About half a dozen times.

21  Q.   And if you had to estimate, in total, how much time have

22  you spent with Caitlyn?

23  A.   I would say, somewhere between 20 to 30 hours.

24  Q.   And when is the last time you saw her?

25  A.   Yesterday.

N52Gpas2                        Moore - Direct

1   Q.   Do you think you would recognize a photograph of Caitlyn if
2   I showed some to you?
3   A.   Yes.
4            MS. DELLIGATTI:   Ms. Loftus, could you please pull up
5   for the witness what has been marked as Government
6   Exhibits 601, 605 and 606.
7   Q.   Detective Moore, do you recognize the individual in these
8   photos?
9   A.   Yes.
10  Q.   And do all of these photos depict the same individual?
11  A.   Yes.
12  Q.   Who do they depict?
13  A.   Caitlyn Smith.
14           MS. DELLIGATTI:   Your Honor, the government offers
15  Exhibits 601, 605 and 606 under seal.
16           THE COURT:   Okay.
17           MR. DEVLIN-BROWN:   No objection.
18           THE COURT:   Government Exhibits 601, 605 and 606 are
19  admitted, and they will be under seal.
20           (Government Exhibits 601, 605 and 606 received in
21  evidence)
22           MS. DELLIGATTI:   Ms. Loftus, could you please publish
23  for the jury.
24  BY MS. DELLIGATTI:
25  Q.   Detective Moore, do each of these three photos depict the

1    victim who was recovered from 927 Brady Avenue in December of

2    2020?

3    A.   Yes.

4            MS. DELLIGATTI:  Thank you.  Nothing further.

5            THE COURT:  Any cross-examination?

6            MR. DEVLIN-BROWN:  Yes, your Honor.

7            THE COURT:  Okay.

8    CROSS-EXAMINATION

9    BY MR. DEVLIN-BROWN:

10   Q.   Just briefly, could we publish for the jury photo 601,

11   please.

12           MR. DEVLIN-BROWN:  And Mr. Robinson, I don't know if

13   you have your system set up for this.  But this will be quick,

14   so if it's easier for the government to put it up, that's fine

15   too.  So we can publish that for the jury and counsel and the

16   witness.

17   Q.   Do you see it?

18   A.   Yes, I see it.

19           THE COURT:  It's on the screen.

20   Q.   You don't know who took this photo, do you?

21   A.   I believe Caitlyn Smith took the photo.

22   Q.   Why do you believe that?

23   A.   Because she told me.

24           MR. DEVLIN-BROWN:  We can put that down.

25   Q.   You testified on direct that you went to the house pursuant

N52Gpas2                        Moore - Cross

1   to a search warrant; is that right?

2   A.   Yes.

3              MR. DEVLIN-BROWN:  May I approach, your Honor.

4              THE COURT:  You may.

5              MR. DEVLIN-BROWN:  I don't know if we have this on the

6   screen yet, but maybe I can give one to your Honor.

7   BY MR. DEVLIN-BROWN:

8   Q.   I'm showing you what's been marked as defense Exhibit 41.

9   Is this the search warrant that you had when you entered his

10  home, you and your team?

11  A.   I don't remember if this is the exact one.

12  Q.   Well, you see on this first page, right, it appears to be

13  signed by a judge?

14  A.   Yes.  But I don't know if this is the exact search warrant,

15  I.   Don't remember if this is the exact search warrant.

16  Q.   I understand.  But I'm just asking a few questions.

17             So it appears to be signed by a judge.  Does it appear

18  to list his address on it?

19             THE COURT:  By "his" --

20             MR. DEVLIN-BROWN:  Mr. Paschal's.

21             THE COURT:  Okay.

22             THE WITNESS:  I do see the address at the top.

23  BY MR. DEVLIN-BROWN:

24  Q.   And do you see a date on the bottom of, I think,

25  December 11th, 2020?

N52Gpas2                          Moore - Cross

1    A.   I do.

2    Q.   There was only one search of his home, to your knowledge,

3    pursuant to a warrant; right?

4    A.   What do you mean by "pursuant to a warrant?"

5    Q.   Agents only searched his home one time with a search

6    warrant, as far as you know?

7    A.   I don't know how many times agents searched his home.

8         MR. DEVLIN-BROWN:   We would offer Exhibit 41.

9         MR. MEAD:   No objection, your Honor.

10        THE COURT:   Defense Exhibit 41 is admitted in

11   evidence.

12        (Defendant's Exhibit 41 received in evidence)

13        MR. DEVLIN-BROWN:   May we publish the first page of

14   that, if we have it on our system.

15        We may be having some technical difficulties, and I

16   don't want to delay the jury here, but I will move on and if we

17   come back to it, I will have her read it.

18        THE COURT:   Okay.

19        MR. DEVLIN-BROWN:   I just have another question or two

20   for you, and then you will be on your way.

21        I guess we have published it.

22        Can we blow up the line below, it says, the search and

23   seizure, can we highlight and blow up that area.

24   BY MR. DEVLIN-BROWN:

25   Q.   And can you read what it says under the search and seizure

N52Gpas2                    Moore - Cross

1   are related to violations of?

2   A.   The search and seizure are related to violations of 18 USC

3   1591(a)(1) and (a)(2) sex trafficking of a minor.

4         MR. DEVLIN-BROWN:   You can take that off.

5   BY MR. DEVLIN-BROWN:

6   Q.   Now, you testified on direct that you have seen Caitlyn a

7   number of times; is that right?

8   A.   Yes.

9   Q.   And the first occasion was during the time in December of

10  2020 when she left the building with you, left Mr. Paschal's

11  residence?

12  A.   It was when we entered into the home.

13  Q.   And then you didn't see her again, did you, until last

14  week?

15  A.   I saw her one more time in the hospital.  I didn't approach

16  her, she was speaking with an ACS counselor.

17  Q.   But that was shortly after the search warrant was executed

18  in 2020?

19  A.   Yes.

20  Q.   So between December 2020 and last week, you haven't seen

21  her at all?

22  A.   That's correct.

23  Q.   And you said you have seen her on a number of occasions the

24  last couple of weeks?

25  A.   Yes.

N52Gpas2                          Faynshteyn - Direct

1   Q.  And that's because she's here in meetings preparing with

2   the government for possible testimony; right?

3   A.  Yes.

4            MR. DEVLIN-BROWN:  No further questions.

5            THE COURT:  Any redirect?

6            MS. DELLIGATTI:  No, your Honor.  Thank you.

7            THE COURT:  Thank you, detective.  You may step down.

8            MR. MEAD:  The government calls special agent Ilya

9   Faynshteyn.

10   ILYA FAYNSHTEYN,

11        called as a witness by the Government,

12        having been duly sworn, testified as follows:

13   DIRECT EXAMINATION

14   BY MR. MEAD:

15   Q.  Good afternoon, Special Agent Faynshteyn.

16   A.  Good afternoon.

17   Q.  Where do you work?

18   A.  I work for Homeland Security Investigations in New York.

19   Q.  And what is your title at Homeland Security Investigations?

20   A.  Special agent, currently program manager.

21   Q.  If I refer to Homeland Security Investigations as HSI, will

22   you understand what I mean?

23   A.  Yes.

24   Q.  So right now, I know you just said you are a program

25   manager at HSI; is that right?

N52Gpas2                        Faynshteyn - Direct

1   A.  That's correct.

2   Q.  Thinking back to approximately December of 2020, what was

3   your job then?

4   A.  In December 2020, I was a special agent in our human

5   trafficking task force.

6   Q.  And generally speaking, what kind of cases or

7   investigations does the human trafficking task force work on?

8   A.  The human trafficking task force investigates allegations

9   of domestic and transnational human trafficking.

10  Q.  Do you recall participating in a search of an address, 927

11  Brady Avenue, in approximately December 2020?

12  A.  Yes, I do.

13  Q.  Do you recall who the case agents were at the time?

14  A.  Agents Kevin Kuntz and Antonio Bolfo.

15  Q.  Just generally speaking, what does it mean to be a case

16  agent on a case?

17  A.  To be the case agent on a case is to be in charge of the

18  investigation and controlling the investigative steps.

19  Q.  And that was not your role on this case; correct?

20  A.  That's correct.

21  Q.  Do you recall why law enforcement did this search of

22  927 Brady Avenue?

23  A.  The search was conducted to obtain possible evidence of

24  human trafficking and to possibly rescue a victim of

25  trafficking.

EXHIBIT 21

Grand Jury Transcripts
5/18/2021
Pages 1-16

*[Handwritten in left margin:]* Sepeova For Bank records Ask if Kevin Kurtz N.Y. or D.C.
UKRAINIAN Empeney over there arrived

1

2

3    UNITED STATES GRAND JURY

4    SOUTHERN DISTRICT OF NEW YORK

5    - - - - - - - - - - - - - - --x

     UNITED STATES OF AMERICA      :

6
                -v-              :    November 8, 2018 Special
7

     MICHAEL PASCHAL             :

8
     (2020R01346)               :
9    - - - - - - - - - - - - - - -x

10                                        United States Courthouse
                                          Foley Square
11                                        New York, New York

12                                        May 18, 2021
                                          2:04 p.m.
13

14   A P P E A R A N C E S:

15                            KEVIN MEAD
                              Assistant United States Attorney
16

17

18

19

20

21

22

23                            JENNIFER MYRIE
                              Acting Grand Jury Reporter
24

25

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Kevin Kuntz                                           05/18/21    2

1               (Colloquy Precedes)

2               (Witness Enters Room)

3               (Time Noted:  2:10 p.m.)

4    KEVIN KUNTZ called as a witness, having been duly sworn by

5               the Foreperson of the Grand Jury, was examined and

6               testified as follows:

7    BY MR. KUNTZ:

8         Q.   Can you please state your full name for the

9    record?

10        A.   Kevin Patrick Kuntz Jr.

11        Q.   Where do you work?

12        A.   Homeland Security Investigations SAC New York.

13        Q.   What is your title at Homeland Security

14   Investigations?

15        A.   Special agent.

16        Q.   How long have you been with Homeland Security

17   Investigations?

18        A.   Three-and-a-half years.

19        Q.   Do you work on a particular team at Homeland

20   Security Investigations?

21        A.   Yes, the Human Trafficking Task Force.

22        Q.   And what are your duties as a special agent on

23   Human Trafficking Task Force?

24        A.   My duties are to respond to investigate and assist

25   in the prosecution of allegations of the labor and sex

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

3502-019
Page 2 of 16

Kevin Kuntz                                    05/18/21   3

1   trafficking of both adults and minors.

2        Q.   During the course of your duties, did you become

3   involved in an investigation into Michael Paschal?

4        A.   Yes.

5        Q.   In the course of that investigation, did you speak

6   with other people including other law enforcement officers?

7        A.   Yes.

8        Q.   And did you review reports and documents prepared

9   by others?

10       A.   Yes.

11       Q.   Will your testimony today be based in part of

12   those conversations with other individuals and documents

13   prepared by other persons?

14       A.   Yes.

15            MR. MEAD.   Ladies and gentlemen, some testimony

16   you will hear from Special Agent Kuntz will include hearsay.

17   That means he will not be testifying solely from his own

18   observations but will also be reporting what others have

19   told him and he's read reports and documents prepared by

20   others.   Hearsay evidence, as you know, is admissible in

21   grand jury proceedings and you are free to rely on it to

22   determine whether there's probable cause to indict.   If you

23   would like to hear testimony by any other witness you have

24   the right to request it and I will make reasonable efforts

25   to bring that witness before you.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

3502-019
Page 3 of 16

Kevin Kuntz                                           05/18/21    4

1   BY MR. MEAD:

2        Q.   Special Agent Kuntz, I'm showing you what's been

3   marked for identification as Grand Jury Exhibit 2.  Do you

4   recognize this document?

5        A.   I do.

6        Q.   Is it a PowerPoint presentation?

7        A.   Yes.

8        Q.   You've seen it before in preparing to testify

9   today?

10       A.   Yes.

11       Q.   Does it contain and/or -- photographs,

12  communications, documents, and other records from reviewing

13  -- in this case?

14       A.   Yes.

15       Q.   Were there a number of -- PowerPoint, are they

16  always exact numbers or are they sometimes approximate?

17       A.   They're sometimes approximate.

18       Q.   Does the PowerPoint include a fair and accurate

19  reproduction --?

20       A.   Yes.

21       Q.   Will it assist you with your testimony today?

22       A.   Yes.

23       Q.   Did you also review an electronic version of

24  Grand Jury Exhibit 2 before testifying today?

25       A.   Yes.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947
3502-019
Page 4 of 16

Kevin Kuntz                                    05/18/21    5

1    Q.    Is the first page of that electronic version
2  displayed on the screen for the grand jury?

3    A.    Yes.

4    Q.    And I will make Grand Jury Exhibit 2 part of the
5  record and publish it for the grand jury.  Have you reviewed
6  reports of law enforcement conversations with the victim?

7    A.    Yes.

8    Q.    Did the victim tell law enforcement that she met
9  an individual named Michael Paschal?

10   A.    Yes.

11   Q.    What did she tell law enforcement about that, if
12  anything?

13   A.    The victim stated that she had met Michael Paschal
14  in July 2020 in North Carolina and that Mr. Paschal had
15  offered her the ability to go into commercial sex with him
16  and enticed her to come into North Carolina -- from
17  North Carolina to New York to engage in commercial sex.

18   Q.    Did the victim say anything about whether she
19  spoke about her age when she spoke to Mr. Paschal for the
20  first time?

21   A.    Yes.  The victim stated that she was 17 years old.

22   Q.    And was anyone else present at that conversation
23  besides the victim and Mr. Paschal?

24   A.    Yes, Tenesha Stokes.

25   Q.    Did the victim say that Paschal and Tenesha Stokes

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

3502-019
Page 5 of 16

1    then drove her from North Carolina to New York City?

2         A.    Yes.

3         Q.    Where did the victim stay in New York City?

4         A.    Mr. Paschal's residence in the Bronx.

5         Q.    Did she say that she then engaged in commercial

6    sex work at Paschal's direction?

7         A.    Yes.

8         Q.    Was the victim then hospitalized?

9         A.    Yes.

10        Q.    Did she speak with a social worker from the

11   Administration for Children Services?

12        A.    Yes.

13        Q.    Is that also known as ACS?

14        A.    Yes.

15        Q.    Did she say that Paschal also spoke with the

16   social worker from ACS?

17        A.    Yes.

18        Q.    And what happened after the victim left the

19   hospital?

20        A.    The victim was returned to her mother in North

21   Carolina through ACS.

22        Q.    Where did the victim go after that?

23        A.    The victim shortly afterwards then returned to

24   New York to engage in commercial sex with -- through

25   Mr. Paschal.

FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

3502-019
Page 6 of 16

Kevin Kuntz                                        05/18/21    7

1        Q.    And did she again stay at Paschal's in the Bronx?

2        A.    Yes.

3        Q.    And did she say that she engaged in commercial sex

4   seven days a week?

5        A.    Yes.

6        Q.    Were you involved in a search of Paschal's house

7   in the Bronx on December 14, 2020?

8        A.    Yes.

9        Q.    Who was found in the house at the time of the

10  search?

11       A.    The victim was found in the house along with

12  Mr. Paschal, Tenesha Stokes, Mr. Paschal's mother,

13  Mr. Paschal's brother, and another female that is reported

14  to be involved in commercial sex and several other tenants

15  in subdivided apartments.

16       Q.    Did you recover cell phones belonging to Paschal

17  and his brother?

18       A.    Yes.

19       Q.    And did you also obtain a search warrant for text

20  messages on the victim's phone?

21       A.    Yes.

22       Q.    Let's turn to slide two.  Are these communications

23  between Paschal and a buyer for commercial sex?

24       A.    Yes.

25       Q.    Can you read the first highlighted line for the

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

3502-019
Page 7 of 16

Kevin Kuntz                                    05/18/21   8

1   grand jury?

2        A.    So the first line is, 100 SS, 150 HH, 200 HR.

3   100 SS typically means short stay which is to offer sexual

4   services for 15 minutes.  150 offering sexual services for a

5   half hour, and 200 HR offering sexual services for an hour.

6        Q.    And can you read the second highlighted line for

7   the grand jury please and explain what it means?

8        A.    The second highlighted line is, no bbj, no raw, no

9   gfe, safe play only.  BBJ is bare back blow job which

10  indicates a blow job without the condom.  No raw means no

11  raw sex, no anal or vaginal sex without a condom.  No gfe,

12  gfe meaning girlfriend experience as in kissing and cuddling

13  and items such as that.  And safe play only means only a

14  condom will be used indicating that there will be no

15  physical contact other than condom based sexual contact.

16       Q.    Did the victim tell you that Paschal used any kind

17  of nickname for her?

18       A.    The victim stated she was called Sunshine.

19       Q.    Did the victim also tell law enforcement that

20  Paschal sometimes pretended that he was the victim in text

21  messages with potential clients in order to set dates?

22       A.    Yes.

23       Q.    Is that your understanding what happened here?

24       A.    Yes.

25       Q.    Did Paschal send a client pictures of a sex worker

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947
3502-019
Page 8 of 16

1    in this conversation?

2        A.    Yes.

3        Q.    Turning to slide three.  Are these some of the

4    photos that Paschal sent?

5        A.    Yes.

6        Q.    Did law enforcement officers show these photos to

7    the victim?

8        A.    Yes.

9        Q.    Did the victim identify these photos as being

10   photos of her?

11       A.    Yes.

12       Q.    Based on the pictures and the use of the name

13   Sunshine, who do understand that Paschal has been talking

14   about in that conversation?

15       A.    The victim.

16       Q.    And to be clear, in December of 2020, how old was

17   the victim?

18       A.    17.

19       Q.    Let's turn to slide four.  Are these conversations

20   between the same client and victim?

21       A.    Yes.

22       Q.    Can you read the first two highlighted lines to

23   the grand jury and explain what they mean?

24       A.    Hey, are you involved within any form of law

25   enforcement?  And the client replies, no.  Normally,

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

3502-019
Page 9 of 16

Kevin Kuntz                                          05/18/21   10

 1  individuals involved with commercial sex believe that

 2  undercover law enforcement will have to reveal their

 3  identity if they ask.  So they often ask because much of

 4  what they offer is an illicit activty.

 5       Q.   And is the second line -- is the last highlighted

 6  line, my half hour is 2040.  Is that a reference to rates

 7  for commercial sex?

 8       A.   Yes.

 9       Q.   Okay.  Let's turn to slide five.  Are these

10  conversations between Paschal and another client?

11       A.   Yes.

12       Q.   Is the first highlighted line, again, in reference

13  to rates for commercial sex work?

14       A.   Yes.

15       Q.   And is the -- do you understand this conversation

16  to be about the victim?

17       A.   Yes.

18       Q.   Why do you think that?

19       A.   Because the individual -- the individual being

20  offered for commercial sex is named, Sunshine.

21       Q.   Let's turn to slide six.  Are these conversations

22  between Paschal and another client?

23       A.   Yes.

24       Q.   Is the first -- are the first and third

25  highlighted lines in references to the rate for commercial

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

3502-019
Page 10 of 16

1 sex work?

2        A.    Yes.

3        Q.    And is the line referencing gfe, is that a

4 reference to the girlfriend experience that you had

5 described?

6        A.    Yes.

7        Q.    All right, let's turn to slide seven.  Are these

8 conversations between Paschal and another client?

9        A.    Yes.

10       Q.    And is the bottom highlighted line, 100 SS, 140

11 HHR, 200 HR, in reference to rates for commercial sex work?

12       A.    Yes.

13       Q.    Do you understand this conversation to be about

14 the victim?

15       A.    Yes.

16       Q.    Why do you think that?

17       A.    Indicates that the provider's name is Sunshine.

18       Q.    Let's turn to slide eight.  Did you also review

19 messages between Paschal and the victim?

20       A.    Yes.

21       Q.    Are those on the screen?

22       A.    Yes.

23       Q.    Can you read those messages to the grand jury?

24       A.    The victim stated that they're trying to bring

25 social services to talk to me because I cannot be discharged

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

3502-019
Page 11 of 16

Kevin Kuntz                                          05/18/21   12

1  without someone over 18, but they still need my mom to

2  consent to release me so I don't know when I'm getting

3  released.  And then the victim adds, she just spoke to

4  medical social worker and she said she's waiting on ACS.

5  That indicates that she is unable to sign herself out as she

6  is under the age of 18 and still a minor legally.

7       Q.   What is the acronym ACS mean in this conversation?

8       A.   The Administration for Children Services.

9       Q.   Let's turn to slide nine.  Did you also review

10  messages between Paschal and his brother?

11      A.   Yes.

12      Q.   Are those messages on the screen?

13      A.   Yes.

14      Q.   Can you read the first line and tell the grand

15  jury what it means?

16      A.   So Paschal states to his brother to tell Zola

17  (ph.), another individual that we believe to be involved in

18  commercial sex, and Sunshine that house clients are on the

19  way.  The -- this is giving his brother a warning to tell

20  the individuals to expect individuals to come to the house

21  and to be able to provide commercial sex.

22      Q.   And what about the second message?

23      A.   The second sentence is regards to if either one of

24  the women are to get a client, they are to advise Paschal's

25  brother so he can communicate that information to Paschal.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

3502-019
Page 12 of 16

Kevin Kuntz                                    05/18/21   13

1      Q.   And just for the benefit of the grand jurors who

2   may not be able to read it, what is that?

3      A.   The second line said, bitches get clients they

4   need to text you.

5      Q.   Let's turn to slide 10.  Did you also review

6   messages between Paschal's brother and a third party?

7      A.   Yes.

8      Q.   Are they about the victim?

9      A.   Yes.

10      Q.   Are they on the screen?

11      A.   Yes.

12      Q.   Can you read this conversation with the grand jury

13   to explain the significance?

14      A.   Well, ain't she like 17 though?  She had a -- this

15   is from the third party, well, ain't she 17 though?  She had

16   a b-day?  She so pretty I can't deny but she's a baby.

17   Paschal's brother stated, yeah, not until March.  Third

18   party states, I don't want to be a part of nothing that can

19   be seen as --.  She is an amazing though a sweetheart.  And

20   the brother states, I know wait until she turn 18.

21      Q.   What does this conversation mean?

22      A.   So based on this conversation, Paschal's brother

23   is offering the victim to a third party to engage in

24   commercial sex.  That third party does not want to get

25   commercial sex due to the victim being 17 and not being

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

3502-019
Page 13 of 16

Kevin Kuntz                                              05/18/21   14

1   legally an adult.

2        Q.   Turn to slide 11.  Did you also review online

3   advertisements for sex work involving the victim?

4        A.   Yes.

5        Q.   One of those messages up on the -- or

6   advertisements up on the screen?

7        A.   Yes.

8        Q.   And are photographs a part of the ad, right?

9        A.   Yes.

10       Q.   Were these photographs shown to the victim?

11       A.   Yes.

12       Q.   And the victim identified that to be photos of

13   her?

14       A.   Yes.

15       Q.   Could these internet ads be viewed outside of the

16   state of New York?

17       A.   Yes.

18       Q.   Special Agent Kuntz, have you told the grand jury

19   everything you know about this case or have you just

20   answered the questions that I've asked?

21       A.   I've just answered the questions.

22       Q.   And you've testified about documents reviewed or

23   the conversations you've had with others or were you

24   testifying to the exact words used or just the sum and

25   substance of those documents or conversations?

FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

3502-019
Page 14 of 16

Kevin Kuntz                                          05/18/21    15

1         A.    Just the sum and substance.

2         Q.    Are you willing to return to the grand jury if the

3    grand jury has additional questions for you?

4         A.    Yes.

5               MR. MEAD.    Mr. Foreperson, with your permission,

6    I ask that Special Agent Kuntz be excused.

7               FOREPERSON.    Yes.

8               (Witness Excused)

9               (Time Noted:  2:25 p.m.)

10               (Colloquy Follows)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947
3502-019
Page 15 of 16

1                          *C E R T I F I C A T E*

2

3          I hereby certify that the foregoing is a true and

4    accurate transcription, to the best of my skill and ability,

5    from my electronic notes of this proceeding.

6

7    June 2, 2021
     Date                              Jennifer Myrie
8                                      Acting Grand Jury Reporter
                                       Free State Reporting, Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

3502-019
Page 16 of 16

EXHIBIT 22


Warrant by Telephone
Case No. 21-CR-331 (VSB)
4/4/23

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

See Attachment A

)
)
)
)
)

Case No. 21 Cr 331 (VSB)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Southern _____ District of _____ New York _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1594(c), 1591(a) and (b)(2), 2423(a) and (e), and 2422(a) | Conspiracy to commit sex trafficking; sex trafficking of a minor; transportation of a minor for the purpose of prostitution; coercion and enticement of a minor to travel in prostitution |

The application is based on these facts:
See Attachment A

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*SA Antonio Bolfo* /VSB   w/permission of on bolfo
*Applicant's signature*

SA Antonio Bolfo
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ FaceTime and/or telephone _____ *(specify reliable electronic means).*

Date:  4/4/23

City and state:  New York, NY

*Judge's signature*

Hon. Vernon S. Broderick
*Printed name and title*

USAO000523

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of the Application of the United
States Of America for a Search and Seizure
Warrant for the forensic image of a red Apple
iPhone ·with IMEI 356469107235753 and
assigned phone number 929-434-6507; USAO
Reference No. 2020R01346

**TO BE FILED UNDER SEAL**

**Agent Affidavit in Support of
Application for Search and Seizure
Warrant**

SOUTHERN DISTRICT OF NEW YORK) ss.:

ANTONIO BOLFO, being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1.    I am a Special Agent with Homeland Security Investigations ("HSI" or the
"Investigating Agency"). As such, I am a "federal law enforcement officer" within the meaning of
Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing
the criminal laws and duly authorized by the Attorney General to request a search warrant. I have
been a Special Agent with HSI for nearly five years. During my tenure as a Special Agent, I have
conducted and participated in numerous investigations of criminal activity, including, but not
limited to, sex trafficking, enticement and child exploitation offenses, violations of the Mann Act,
violations of the Travel Act, and other crimes involving the exploitation of children, in violation
of 18 U.S.C. §§ 371, 1591, 1594, 1952, 2421, and 2423. During these investigations, I have
executed, or participated in the execution of, numerous search warrants for electronic devices.

2.    I make this Affidavit in support of an application pursuant to Rule 41 of the Federal
Rules of Criminal Procedure for a warrant to search the electronic device specified below (the
"Subject Device") for the items and information described in Attachment A. This affidavit is based
upon my personal knowledge; my review of documents and other evidence; my conversations with

2

USAO000524

other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B. The Subject Device**

3.     The Subject Device is particularly described as the forensic image of a red Apple iPhone with IMEI 356469107235753 and assigned phone number 929-434-6507 (the "Red iPhone").

4.     Based on my training, experience, and research, I know that the Red iPhone has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.

5.     The Subject Device (*i.e.*, the forensic image of the Red iPhone) is presently located in the Southern District of New York.

**C. The Subject Offenses**

6.     For the reasons detailed below, I believe that there is probable cause to believe that the Subject Device contains evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1594(c) (conspiracy to commit sex trafficking); 1591(a) and (b)(2) (sex trafficking of a minor); 2423(a) and (e) (transportation of a minor for the purpose of prostitution); and 2422(a) (coercion and enticement of a minor to travel to engage in prostitution) (the "Subject Offenses").

3

USAO000525

## II.  Probable Cause

### A.  Probable Cause Regarding Subjects' Commission of the Subject Offenses

7.      On or about April 13, 2021, the Honorable Ona T. Wang, United States Magistrate Judge for the Southern District of New York, authorized a complaint (the "Complaint") charging MICHAEL PASCHAL with violations of Title 18, United States Code, Sections 1594(c), and 1594(a) and (b)(2), which are two of the Subject Offenses. On or about May 18, 2021, a grand jury in the Southern District of New York returned an indictment (the "Indictment") charging PASCHAL with the Subject Offenses. Copies of the Complaint and the Indictment are attached here as Exhibits A and B, and are incorporated herein. The Indictment establishes probable cause to believe that PASCHAL committed the Subject Offenses during the period from approximately July 2020 until approximately December 2020. The Complaint contains more detailed allegations, and establishes probable cause to believe the following:

a.      PASCHAL trafficked a minor victim (the "Victim") from a particular address in the Bronx (the "Brady Avenue Address"). Complaint at ¶ 6.

b.      On or about December 14, 2020, law enforcement executed a search of the Brady Avenue Address pursuant to a search warrant, and in that search they recovered a cellphone belonging to PASCHAL (the "Paschal Phone"). Complaint at ¶ 7.

c.      The Paschal Phone contained multiple messages related to sex trafficking. Complaint at ¶¶ 10-16.

d.      PASCHAL referred to the Victim using the alias "Sunshine." Complaint at ¶¶ 6(n), 8, 10-15.

8.      A copy of the warrant authorizing the search of the Brady Avenue Address and the affidavit submitted in support thereof are attached here as Exhibits C and D, and are incorporated herein.

4

USAO000526

9.   I know the following from my involvement in the investigation:

a.      In addition to the Paschal Phone, several additional cellphones were recovered during the search of the Brady Avenue Address, including a red Apple iPhone (the "Red iPhone").

b.      After obtaining the Red iPhone, law enforcement created a forensic image of the Red iPhone, and that forensic image is the Subject Device.

c.      Law enforcement reviewed the forensic image (i.e., the Subject Device) and identified approximately 20 messages between the Subject Device and an individual listed in the contacts as "Michael Paschal" that referred to the Victim's alias, Sunshine.[1]  A set of those 20 messages are attached here as Exhibit E and incorporated by reference herein.

d.      The 20 messages are the only information from the Subject Device that law enforcement seized pursuant to the search warrant during its prior review.

**B. Probable Cause Justifying Search of the Subject Device**

10.     Law enforcement seeks permission to search the Subject Device again for additional evidence of the Subject Offenses, including evidence of ownership of the Subject Device and evidence of additional communications between the owner of the Subject Device and PASCHAL. In conducting the search, law enforcement will open the file that is the Subject Device and review it for the material described in the warrant—law enforcement will not need to access

---

[1] I know from my review of those messages that the Red iPhone uses the phone number 929-434-6507 (the "6507 Number"). I know from my review of government databases that the 6507 Number belongs to Tanesia Stokes, who I know from involvement in the investigation was present at the Brady Avenue Address when the search was carried out. There is therefore probable cause to believe that Stokes used the Red iPhone, but probable cause to search the Subject Device does not depend on the identity of the user of the Subject Device in light of the location at which the Red iPhone was found and the messages it contains between its user and PASCHAL, as identified by law enforcement during the earlier review of its contents.

5

and review the physical Red iPhone itself again. Law enforcement seeks permission to seek the Subject Device for the time period July 1, 2020 (approximately when the Subject Offenses began) until December 14, 2020 (when the Red iPhone was seized by law enforcement).

11.    Like individuals engaged in any other kind of activity, individuals who engage in the Subject Offenses store records relating to their illegal activity and to persons involved with them in that activity on electronic devices such as the Red iPhone. Such records can include, for example, communications with co-conspirators and victims, sexwork advertisements, and evidence of knowledge of the age of minor victims.

12.    Based on the foregoing, I respectfully submit there is probable cause to believe that PASCHAL and the owner of the Red iPhone engaged in the Subject Offenses, and that evidence of that criminal activity is likely to be found on the Subject Device.

III.  Procedures for Searching ESI

A.  Review of ESI

13.    Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained on the Subject Device for information responsive to the warrant.

14.    In conducting this review, law enforcement may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

6

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. (Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.)

15.    Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement may need to conduct a complete review of all the ESI from the Subject Device to locate all data responsive to the warrant.

7

## IV. Conclusion and Ancillary Provisions

16.    Based on the foregoing, I respectfully request the court to issue a warrant to seize

the items and information specified in Attachment A to this affidavit and to the Search and Seizure

Warrant.

w/ permission of
SA Bolfo VSB

ANTONIO BOLFO
Special Agent
Homeland Security Investigations

Sworn to me through the transmission of this
Affidavit by reliable telephonic/electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1 this
April 4, 2023

HON. VERNON S. BRODERICK
UNITED STATES DISTRICT JUDGE

EXHIBIT 23

**Affidavit in Support of Application of Search Warrant**
**Case No. 21 MAG 220**
**1/8/21**

**21 MAG 220**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of a Warrant for All
Content and Other Information
Associated with the TextNow, Inc.
Records for Phone Numbers 929-262-
3106 and 929-483-0420, USAO
Reference No. 2020R01346

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

### Agent Affidavit in Support of Application for a Search Warrant
### for Stored Electronic Communications

STATE OF NEW YORK        )
                          ) ss.
COUNTY OF NEW YORK   )

     KEVIN KUNTZ, Special Agent, Homeland Security Investigations, being duly sworn,
deposes and states:

## I.   Introduction

### A. Affiant

     1. I am a Special Agent with Homeland Security Investigations ("HSI" or the
"Investigating Agency"). As such, I am a "federal law enforcement officer" within the meaning of
Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing
the criminal laws and duly authorized by the Attorney General to request a search warrant. I have
been a Special Agent with HSI for approximately three years. Before joining HSI, I worked at the
Federal Bureau of Prisons. During my time at HSI, I have investigated, among other things, violent
crimes, fraud, and human trafficking. I have extensive training in investigating cases relating to
sex trafficking and sex trafficking of minors. I also have experience executing search warrants on
accounts maintained by TextNow, Inc.

6. Based on my personal observations and conversations with law enforcement officers who have communicated with the Provider, I have learned, in substance and in part, that the Provider maintains the following records and information with respect to subscriber accounts:

i. *Text Message contents.* In general, messages sent to or from a subscriber's account are maintained on the Provider's servers. Even if the subscriber deletes a message, it may continue to be available on the Provider's servers for a certain period of time.

ii. *Media Files.* The Provider retains video and image files sent to or from a subscriber's account for a period of 30 days from that date on which such files were sent or received.

iii. *Subscriber and billing information.* The Provider collects and maintains (typically unverified) identifying information about each subscriber, including, for example, username, email address, and telephone number. The Provider also maintains records concerning the date on which the account was created and the length of service.

**D. Jurisdiction and Authority to Issue Warrant**

7. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

8. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

9. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C.

3

15. On or about December 14, 2020, I and other law enforcement officers executed a search on the address where PASCHAL resides (the "Paschal Residence"), as authorized by a search warrant signed by the Hon. Sarah Netburn, United States Magistrate Judge for the Southern District of New York. In the course of that search, the following occurred:

a. Law enforcement officers located PASCHAL and the Victim at the Paschal Residence.

b. Pursuant to the premises search warrant signed by Judge Netburn described above, law enforcement officers seized and searched a phone with the phone number of the Other Paschal Number from PASCHAL (the "Paschal Phone").

c. In the course of their review of the Paschal Phone, law enforcement officers discovered that TextNow was installed on the phone and that PASCHAL had been using the Paschal Account to communicate regarding the Subject Offenses.[1] In particular, law enforcement officers reviewed the following messages from the Paschal Account:

i. On or about December 5, 2020, PASCHAL messaged a potential purchaser of commercial sexual services ("Buyer-1"), "U a cop?" Based on my training and experience, I understand this to suggest that PASCHAL planned to discuss illegal activity, was messaging a person he was unfamiliar with, and wished to confirm that the individual did not work for law enforcement.

ii. On or about December 6, 2020, PASCHAL messaged Buyer-1 "Safe play no bbj no raw no gfe" Based on my training and experience, I understand this to refer to limitations on the offering of commercial sex work. For example, I understand the term "raw" to

---

[1] I know from my training and experience that a single cellphone can use both a conventional phone number and a TextNow phone number, as the Paschal Phone does

USAO000114

vii.    On or about December 10, 2020, PASCHAL messaged Buyer-2 Photo-

1.

d.  No cellphone was seized from the Victim, and law enforcement officers have

not reviewed any messages involving the Victim TextNow.

16. Shortly after the search described above, law enforcement officers interviewed the

Victim, during which she said the following:

a.  The Victim stated that she was engaged in commercial sex work at the Paschal

Residence, and that PASCHAL facilitated and coordinated her commercial sex work.

b.  The Victim stated that this was the second time that she had been engaged in

commercial sex work at the Paschal Residence, with PASCHAL facilitating and coordinating her

commercial sex work.  She stated that PASCHAL drove to North Carolina to pick her up to drive

her to New York the first time she engaged in commercial sex work, which occurred in or about

July 2020.

17. I have reviewed the returns of a subpoena seeking subscriber information from

TextNow from which I have learned that the subscriber of the Victim Account is the Victim.[2]

18. I have reviewed the returns of a subpoena seeking call detail records from TextNow for

the Paschal Account.  I have compared those records against the TextNow messages located on

the Paschal Phone, and there appear to be many messages missing from the Paschal Phone.  I know

from my training and experience that these messages may have been deleted from the Paschal

Phone, but that TextNow may still retain copies of the messages.

---

[2] The subscriber of the Paschal Account is listed as "Ike Jones," but for the reasons described
above I believe that it is in fact used by PASCHAL.

7

b.      Evidence of the identities and locations of co-conspirators and victims of the Subject Offenses;

c.      Evidence of communications between the Subject Accounts' users and co-conspirators or potential co-conspirators related to the Subject Offenses, such as communications about the recruitment of victims, the use of threats and force to induce the victims to work in commercial sex, the solicitation of prostitution customers, the posting of advertisements for commercial sex, and efforts to avoid detection by law enforcement;

d.      Evidence (*e.g.*, communications, photographs, videos, and advertisements) of the use of the Internet to promote sex trafficking, including evidence of communications with and regarding customers and potential customers and evidence of the posting of advertisements for commercial sex on dating or other websites;

e.      Evidence of communications between the Subject Accounts' users and victims or perpetrators of the Subject Offenses;

f.      Evidence of communications by the Subject Accounts' users related to payment for prostitution services;

g.      Evidence of communications reflecting registration of other online accounts potentially containing evidence of the Subject Offenses;

h.      Evidence concerning the geographic location of users, computers, or devices employed in the commission of the Subject Offenses;

i.      Evidence concerning the location of other evidence, including additional devices, financial accounts, email accounts, social media accounts, or other online accounts used in furtherance of the Subject Offenses.

9

consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

## IV.  Request for Non-Disclosure and Sealing Order

25.    While the existence of this investigation is known to PASCHAL, the cooperation of the minor Victim is not.  Premature disclosure of that cooperation could lead PASCHAL or others to harm the Victim, or to intimidate her into declining to cooperate with law enforcement. Further, disclosure of the scope of this investigation could lead PASCHAL to flee or destroy evidence.  Accordingly, there is reason to believe that, were the Provider to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

26.    For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

## V.  Conclusion

27.    Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C.

USAO000120

EXHIBIT 24

Testimony of Caitlyn Ponce, AKA 'Smith'
Pages 284-362

363

N53BPAS6                        Mills- Direct

1              THE COURT:  Detective you may have a seat and I ask

2      you to please state your name and spell it for the record.

3              THE WITNESS:  Detective David, M-I-L-L-S.

4      DIRECT EXAMINATION

5      BY MR. MEAD:

6      Q.   Good afternoon, Detective Mills.

7      A.   Good afternoon.

8      Q.   Where do you work?

9      A.   I work with the NYPD.

10     Q.   What is your title at the New York City Police Department?

11     A.   I'm currently a detective.

12     Q.   How long have you worked for the NYPD?

13     A.   I work for the NYPD for approximately 21 years.

14     Q.   And when did you become a detective with the NYPD?

15     A.   I became a detective in May of 2012.

16     Q.   What NYPD unit did you primarily work in after you became

17     an NYPD detective in 2012?

18     A.   I was assigned to the vice major case team/human

19     trafficking team.

20              (Continued on next page)

21

22

23

24

25

N53BPAS6                          Smith - Recross

1            THE COURT:  All right.

2    RECROSS EXAMINATION

3    BY MS. CARULAS:

4    Q.  Ms. Smith, the government just asked you about a time when

5    you used someone else's credit card, right?

6    A.  Yes.

7    Q.  And they had mentioned that you had experienced hard times

8    at certain points in your life, right?

9    A.  Yeah.

10   Q.  When you used the credit card it was within the last year?

11   A.  No.

12   Q.  It was in February of last year, right?

13   A.  Oh, yeah -- yeah.

14            MS. CARULAS:  Thank you very much.  Nothing further.

15            THE COURT:  Okay.  All right.  Thank you very much,

16   Ms. Smith.  You may step down.

17            (Witness excused)

18            THE COURT:  The government's next witness.

19            MR. MEAD:  Government calls Detective David Mills.

20            THE COURT:  Detective, if you could step up.  I'm

21   going to ask you to please remain standing and my deputy clerk

22   will administer the oath.

23   DAVID MILLS,

24       called as a witness by the Government,

25       having been duly sworn, testified as follows:

1   Q.   Now, if it's all right with you, I'm going to show you one

2   or two of the ads we talked about on your direct examination

3   that were on that CD.

4          Ms. Loftus, could you please pull up what's already in

5   evidence as Government Exhibit 423. I'd actually you pull up a

6   couple of them side by side, 423, 424.  Let's start with those

7   two.  Caitlyn, do you see this ad on the left?

8   A.   Yes.

9   Q.   Is this you in that ad?

10  A.   Yeah.

11  Q.   Did you take those pictures?

12  A.   No.

13  Q.   Were these pictures taken in the defendant's house?

14  A.   Yeah.

15  Q.   You can take these down Ms. Loftus.  Ms. Loftus, could you

16  please pull up first for the Court and the witness only

17  Government Exhibit 423 again.

18          Caitlyn, do you see the top of this ad it references

19  someone named Sunshine?

20  A.   Yes.

21  Q.   What's your understanding of who Sunshine refers to?

22  A.   Me.

23          MS. DELLIGATTI:  Nothing further.  Thank you.

24          THE COURT:  Any recross?

25          MS. CARULAS:  Just one question, two maybe.

N53BPAS6                           Smith - Redirect

1    already been living with the defendant at that point?

2    A.    Yes.

3    Q.    When you had been admitted to the hospital, had you already

4    engaged in dates at the defendant's house at that point?

5    A.    Yes.

6    Q.    She also asked you some questions about a time when you

7    used someone else's credit card.  Do you remember that?

8    A.    Yeah.

9    Q.    Have there been times in your life when you didn't have

10   very much money?

11   A.    Yeah.

12   Q.    Have there been times in your life when you weren't getting

13   any financial support from your mother?

14   A.    Yes.

15   Q.    Weren't getting any financial support from your father?

16   A.    Yes.

17   Q.    Weren't getting any financial support from anyone in your

18   family?

19   A.    Yes.

20   Q.    At that time when you used the credit card, was that one of

21   those times when you weren't getting any financial support?

22   A.    Yes.

23   Q.    Did you tell the government about that time when you used

24   that credit card when you met with them?

25   A.    Yes.

N53BPAS6                          Smith - Redirect

1    A.   Yes.

2    Q.   During those meetings did anyone from the government tell

3    you what to say when you testified?

4    A.   No.

5    Q.   What did they tell you to do when you testify?

6    A.   Tell the truth and tell what I remember.

7    Q.   Defense counsel also just showed you some text messages.

8    Do you remember those?

9    A.   Yes.

10   Q.   Some of them they claim were from you where you said you

11   were 19-years-old.  Do you remember that?

12   A.   Yeah.

13   Q.   Some they claim were from you where you said you were

14   21-years-old.  Do you remember that?

15   A.   Yeah.

16   Q.   Who told you to say you were 21 and 19-years-old in those

17   ads?

18   A.   The defendant.

19   Q.   Defense counsel also asked you about whether you were

20   working in July of 2020. Do you remember that?

21   A.   Yes.

22   Q.   She also asked you about whether you had been admitted to

23   the hospital in July of 2020?

24   A.   Yeah.

25   Q.   And when you had been admitted to the hospital, had you

N53BPAS6                            Smith - Redirect

1   Q.   You do want to come back to New York, right?

2   A.   At some point in my life, yeah.

3   Q.   And the government paid for your trip here today to New

4   York?

5   A.   Yes.

6   Q.   They paid $450 for flights?

7   A.   Yeah.

8   Q.   And they paid $2,000 for your stay in the hotel, right?

9   A.   Yeah.

10  Q.   And then they paid your expenses while you were here?

11  A.   Yeah.

12  Q.   And you spoke with the government about finding some

13  options for housing here, right?

14  A.   If I ever decided to come back, yeah.

15  Q.   Well, you talked about doing it at this time, right?

16  A.   Yeah.

17              MS. CARULAS:  One moment?

18              THE COURT:  Yes.

19              MS. CARULAS:  Nothing further.  Thank you, Ms. Smith.

20              THE COURT:  Okay.  Redirect examination.

21              MS. DELLIGATTI:  Thank you, your Honor.

22  REDIRECT EXAMINATION

23  BY MS. DELLIGATTI:

24  Q.   Just a couple of questions.  Defense counsel just asked you

25  about your meeting with the government.  Do you remember that?

N53BPAS6                          Smith - Cross

1   Q.  And then you came back to New York and reached out to

2   Mr. Paschal and Ms. Stokes, right?

3   A.  Yeah.

4   Q.  And you said they picked you up somewhere at Grand

5   Concourse, right?

6   A.  Mm hm.

7   Q.  And at that point you told them that you were 18?

8   A.  No.

9   Q.  You're certain?

10  A.  I'm certain.

11          MS. CARULAS:  Just one moment, your Honor.

12  Q.  Just a few last questions and then I'm done.

13          THE COURT:  Sure.

14  Q.  You're here today testifying because the government asked

15  you to come here to testify, right?

16  A.  It was my choice; but, yes, they requested.

17  Q.  Well, you weren't sure you wanted to testify at first,

18  right?

19  A.  No.

20  Q.  Right now you did want to come back to New York -- I'll

21  start over.  You said you are living in Mississippi right now?

22  A.  Yes.

23  Q.  But you do want to come back to New York at some point?

24          MS. DELLIGATTI:  Objection.

25          THE COURT:  I'll allow it.  Objection overruled.

N53BPAS6                        Smith - Cross

1    you were afraid they wouldn't come?

2              MS. DELLIGATTI:  Objection, misstates the testimony.

3              THE COURT:  I'll allow it for cross examination.

4              MS. DELLIGATTI:  Just if I could clarify, your Honor.

5    I believe that counsel said that the witness told clients she

6    was 18 years old, and that's not what the witness testified to.

7              MS. CARULAS:  I think I said 19, 20 and 21.

8              THE COURT:  Well, let's clarify it.  When you would

9    communicate with clients, what was the youngest age that you

10   told them that you remember?

11             THE WITNESS:  Nineteen.

12             THE COURT:  Okay.  Go ahead, counsel.

13             MS. CARULAS:  Just one second, your Honor.

14             THE COURT:  Yes.

15   BY MS. CARULAS:

16   Q.  A few last questions and I will be done.  Just going back

17   to when you first met Mr. Paschal and Ms. Stokes in July of

18   2020, when you were in North Carolina and then you came to New

19   York, you remember we were talking about that, right?

20   A.  Yeah.

21   Q.  And at some point -- before you went to the hospital, you

22   told them you were 17 going on 18, right?

23   A.  Yeah.

24   Q.  And then you went back to North Carolina, right?

25   A.  Yes.

N53BPAS6                    Smith - Cross

1   message, and this is Defense Exhibit 74 for the witness, the
2   parties and the Court please, and I'd like to move to admit
3   this into evidence, please.
4            THE COURT:  For same, not for the truth?
5            MS. CARULAS:  Not for the truth.
6            THE COURT:  Okay.  All right.  I assume the same
7   objection.  I would overrule the objection and admit Defense
8   Exhibit 74.  It's being admitted, but not for the truth of the
9   matters that are stated in the exhibit.
10           (Defendant's Exhibit 74 received in evidence)
11           THE COURT:  Okay.  Go ahead, counsel.
12  BY MS. CARULAS:
13  Q.  So here this is another message, and it's the same TextNow
14  number, and it says how old are you, love.  And then you
15  respond, 21.  Do you see that?
16  A.  Yeah.
17  Q.  And you sent that message?
18  A.  Not to my knowledge, but, yeah.
19  Q.  And, in fact, there are a lot of messages like this, right,
20  where you told clients I'm 21.  I'm 19, right?
21  A.  Yeah.
22  Q.  You would sometime say 19, sometimes 20, sometimes 21,
23  right?
24  A.  Yeah.
25  Q.  And you told the clients that you were 18 and 21 because

N53BPAS6                        Smith - Cross

1    781.

2              THE COURT:  Yeah.

3              MS. CARULAS:  Thank you, your Honor.

4    BY MS. CARULAS:

5    Q.  Ms. Smith, I'd like to direct your attention to the two

6    first lines here.  So the first line in Defense Exhibit 61

7    says, picks and age, 100 percent.  And then the response is 21.

8    Do you see that?

9    A.  Yeah.

10   Q.  And you sent this message, the 21 message, right?

11   A.  I don't remember sending it; but, yeah, I guess.

12   Q.  So we can zoom out again, please Mr. Robson.

13             At the bottom where it starts, you don't look 21

14   anyway.  Can we pull that up, please, and the rest of it.

15             Here the person says, the message that is being sent

16   says, You don't look 21 anyway you.  Older, and then the person

17   gets sassy.

18             MS. DELLIGATTI:  Okay, your Honor. ✸

19             THE COURT:  Yeah, with regard to the --

20             MS. CARULAS:  We can just go to another one.  I

21   understand, yes.

22             MS. DELLIGATTI:  Then take it down, please. ✸

23             THE COURT:  Yes.

24             MS. CARULAS:  And we can strike that last part.  Just

25   one moment, your Honor.  I'd just like to pull up one more

N53BPAS6                    Smith - Cross

1   truth.  We concede or we admit that Ms. Smith was actually 17
2   at the time.

3          MS. DELLIGATTI:  May I respond, your Honor?  I just
4   ask that the jury be instructed not to take the messages for
5   their truth.  And I just note for the record the witness hasn't
6   actually identified the document or indicated that she has any
7   idea of what the document is.  So I ask counsel to clarify
8   before she asks her any questions about it.

9          THE COURT:  Okay.  All right.  So, ladies and
10  gentlemen, right now the document is being offered, not for its
11  truth.  In other words, not for what it says there as being
12  true.  It's just being offered for, that's what it says, but
13  there's still some additional questions with regard to the
14  document itself.

15         MS. DELLIGATTI:  May I respond, your Honor?

16         THE COURT:  No.  In light of the fact that there have
17  been other exhibits that have come in through the government,
18  is there any issue as to its authenticity.

19         MS. DELLIGATTI:  No, your Honor.  There's not an issue
20  as to its authenticity.

21         THE COURT:  I'll allow the document, Defense Exhibit
22  61 to come in, but not for its truth.

23             (Defendant's Exhibit 61 received in evidence)

24         THE COURT:  Go ahead, counsel.

25         MS. CARULAS:  If you could pull up Government Exhibit

N53BPAS6                          Smith - Cross

1    Q.   You had run away from home, right?

2    A.   Yeah.

3    Q.   And you had gotten into some fights with your mom?

4    A.   Yeah.

5    Q.   And you wanted more independence; is that fair to say?

6    A.   Yeah.

7    Q.   And you knew that you'd have to deal with these things with

8    your mom until you turned 18; is that right?

9    A.   Yeah.

10   Q.   And you were able to pass as 18, right?

11              MS. DELLIGATTI:  Objection, vague.

12              THE COURT:  If you could rephrase.

13   Q.   You looked old for your age; is that fair to say?

14   A.   Yeah.

15   Q.   And you testified on direct that you told clients that you

16   were over 18, right?

17   A.   Yeah.

18   Q.   If we could show the witness what's been marked for

19   identification as Defense Exhibit 61, please.

20              THE COURT:  Okay.

21              MS. CARULAS:  And I like to move this into evidence

22   your Honor?

23              MS. DELLIGATTI:  Objection.  Hearsay, your Honor.

24              THE COURT:  Yes.

25              MS. CARULAS:  I'm not intending to use it for its

N53BPAS6                        Smith - Cross

1    is now -- I'm jumping around a bit.  This is now back when you

2    went to the hospital at the end of July 2020.

3             Do you remember that?

4    A.  Yeah.

5    Q.  And so I'd just like to come back to it briefly.  Your

6    testimony was that Mr. Paschal took you to the hospital and

7    dropped you off and then you went in alone, right?

8    A.  Yeah, that's what I remember.

9    Q.  But Mr. Paschal, he didn't drive you to the hospital, did

10   he?

11   A.  No, it was him and his friend.

12   Q.  But you don't remember Mr. Paschal ever driving, do you?

13   A.  Not that specific day, no.

14   Q.  The whole time you were there, taking both times, July to

15   beginning of August and in November, December, you don't

16   remember -- Mr. Paschal never drove, right?

17   A.  I don't clearly remember.

18   Q.  You don't remember him driving?

19   A.  I don't clearly remember, no.

20   Q.  And you went to the emergency room when you went to the

21   hospital in July 2020, right?

22   A.  Yes.

23   Q.  In 2019 and going into 2020, you were having a tough time;

24   is that fair to say?

25   A.  Yeah.

N53BPAS6                              Smith - Cross

1   A.   Yeah.

2   Q.   You used someone else's credit card at one point?

3   A.   Yeah.

4   Q.   And you used it to book a hotel?

5   A.   Yeah.

6   Q.   And you used it for about a year?

7   A.   Yeah.

8   Q.   And you broke into someone's hotel room in Vegas, right?

9   A.   Yeah.

10  Q.   And stole some things from there?

11  A.   Yeah.

12  Q.   I would just like to ask you to clarify something that you

13  mentioned on direct.  This is going back to your time in

14  Mr. Paschal's home from in November and December of 2020.  You

15  testified during your direct examination about a curtain in

16  Mr. Paschal's home.  You remember that?

17  A.   Yeah.

18  Q.   I just want to clarify.  There were doors on the bedrooms,

19  correct?

20  A.   Yeah.

21  Q.   The curtain separated the hallway from the living room,

22  right?

23  A.   Yeah.

24  Q.   And then another question to clarify.  We spoke earlier and

25  you testified earlier about how you got to the hospital.  This

N53BPAS6                        Smith - Cross

1   Q.  Well, you remember speaking with the prosecutors and with

2   Special Agent Bolfo at various points after you left

3   Mr. Paschal's house?

4   A.  Yes.

5   Q.  I'd like to show to the witness a document that's marked

6   3511003, just for the parties and the Court and the witness?

7            THE COURT:  Okay.  Counsel that's 3511003?

8            MS. CARULAS:  Yes.

9            THE COURT:  Okay.

10   Q.  So you met with the prosecutors Mr. Mead and Special Agent

11   Bolfo on February 25, 2021.  Do you remember that?

12   A.  Yes.

13   Q.  This was a bit closer in time to the events that happened

14   at the end of 2020, right?

15   A.  Yes.

16   Q.  If you go to the next page Mike, please.  I'd like to

17   direct your attention to the fifth bullet from the bottom.

18   Isn't it true that you told Mr. Mead and Special Agent Bulfo

19   that you kept about 60 percent of 10 to $25,000?

20   A.  I don't remember saying that, and I made nowhere near 10 to

21   $25,000 when I was staying with the defendant.  I made nowhere

22   near 2,000.

23   Q.  Okay.  We can take that down.  Just a few more questions,

24   Ms. Smith.  Since leaving Mr. Paschal's home and since the end

25   of 2020, you have committed some crimes; is that correct?

N53BPAS6                          Smith - Cross

1           MS. CARULAS:  Thank you, your Honor.

2    Q.  Can we pull up Government Exhibit 424 which has already

3    been admitted into evidence.

4           Ms. Smith, these are pictures of you in this document

5    here?

6    A.  Yes.

7    Q.  And you took these pictures, right?

8    A.  Yes, way before, way before I met the defendant; but, yes.

9    Q.  These are from far before you met Mr. Paschal?

10   A.  Yes, they were my personal pictures. *nu nic. woRking*

11   Q.  We can take that down.  So you also testified during your

12   direct about giving money to Mr. Paschal.  Do you remember

13   that?

14   A.  Yes.

15   Q.  Mr. Paschal had established rates; is that right?

16   A.  Yes.

17   Q.  And then established cuts, right?

18   A.  Yes.

19   Q.  And so you would usually give about 40 percent to

20   Mr. Paschal?

21   A.  It was more than that.

22   Q.  Well, you made during the time you were there you made

23   about 10 to $25,000 and you kept about 60 percent of that; is

24   that right?

25   A.  No.

N53BPAS6                        Smith - Cross

1    Q.   Thank you, your Honor.  Ms. Smith, so you spoke on your
2    direct testimony with the government about certain ads for sex
3    work; is that correct?
4    A.   Yes.
5    Q.   And there were pictures of you in those ads?
6    A.   Yes.
7    Q.   And you had seen some of those ads before?
8    A.   No, not in the house.  I was shown them by the government.
9    Q.   The pictures in that ad that you reviewed on your direct
10   testimony were not taken by Mr. Paschal?
11   A.   No.
12         MS. DELLIGATTI:  Objection, your Honor.  I don't
13   recall reviewing any specific ads with the witness on direct
14   testimony, so I'd ask counsel to clarify.
15         THE COURT:  If you can rephrase the question.  I think
16   the answer is already in.  But, Ms. Smith, do you recall who
17   took -- do you recall who in the house took photos of you?
18         THE WITNESS:  Yes.
19         THE COURT:  And who was that?
20         THE WITNESS:  His friend and Zola.
21         THE COURT:  And by his friend who are you referring
22   to?  Is it the woman who was down in North Carolina or someone
23   else?
24         THE WITNESS:  Yes.
25         THE COURT:  All right.  Go ahead, counsel.

1              MR. MEAD:  Very briefly, your Honor.

2              THE COURT:  Yes.

3              MR. MEAD:  On timing, we've sent home a witness with

4     childcare obligations. We're hoping after Ms. Smith testifies

5     to put on two short witnesses.  We might be done at 5:20 or so

6     today, but hopefully the Court will understand if we sent the

7     other witnesses home.

8              THE COURT:  That's fine.  I'm smiling cause there was

9     one of the trials I tried, we ended at 5:25.  We ran out of

10    witnesses, and the judge was not pleased and she said, just

11    don't let it happen again.  So I'm not going to do that.  Okay

12    let's get the jury.

13             MS. DELLIGATTI:  Should we get the witness.

14             THE COURT:  Yes, Let's get the witness.  Ms. Smith, I

15    ask you to remain standing until the jury enters and then you

16    can have a seat.

17             MS. KIM:  Your Honor, our best guess is this will take

18    around 30 minutes and then we'll call the next witness.

19             THE COURT:  Okay.

20             (Continued on next page)

21             (Jury present)

22             THE COURT:  All right.  So, ladies and gentlemen,

23    we're going to continue with the cross examination of

24    Ms. Smith.  All right.  You may proceed, counsel.

25    BY MS. CARULAS:

1          (Jury not present)

2          THE COURT:  Ms. Smith, you can go outside out of the

3    courtroom to the witness room or wherever, and I just remind

4    you, you're on cross examination now, so don't have any

5    substantive conversations with the government attorneys about

6    your testimony.  All right.  Okay.  All right.  Thank you.

7          (Witness exits courtroom)

8          THE COURT:  You may be seated.  Is there anything we

9    should take up before we take the afternoon break?

10          MS. DELLIGATTI:  I don't think so, your Honor.  I

11    think we just ask perhaps to inquire on timing.  The

12    government's preference would be to finish with this witness

13    today given that she has planned travel, and so I'm not sure

14    how much more cross examination we expect to have.

15          THE COURT:  Counsel, how much more do you think?

16          MS. CARULAS:  It shouldn't be too much longer.

17    Finishing by today will be no problem.

18          THE COURT:  That's what we're going to shoot for.  All

19    right.  Anything else?

20          MR. MEAD:  Not right now, your Honor.

21          THE COURT:  Okay.  All right.  Thank you.

22          (Recess)

23          (Jury not present)

24          THE COURT:  Are there any issues we need to discuss

25    before we get the jury?

N53BPAS6                          Smith - Cross

1    actually I'm going to move on to another topic.

2          THE COURT:  Counsel, it's about 4:10.  Is now a good

3    time for a break?

4          MS. CARULAS:  Yes.

5          THE COURT:  Okay.  All right.  So we're going to take

6    our afternoon break, ladies and gentlemen.  Please remember do

7    not discuss the case.  I believe there may be refreshments back

8    there for you.  We'll get you in about 15 minutes to continue

9    examination.  All right.

10               (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N53BPAS6                        Smith - Cross

1    that it not be received as an exhibit.

2            MS. CARULAS:  That's perfectly fine.

3    Q.  So you did tell clients that you were running from police

4    in North Carolina, right?

5    A.  I don't remember any of this.

6    Q.  This is your TextNow number?  You can find it that it's

7    yours by looking here do you see on the right side of the

8    screen in 781?

9            MS. DELLIGATTI:  Objection, counsel's testifying.

10           THE COURT:  You want to rephrase?

11           MS. CARULAS:  Yeah.

12   Q.  So, Caitlyn, can I direct your attention here to the third

13   line of 781.  That's the number you were using for TextNow?

14   A.  I don't remember the number.

15   Q.  Here in this exhibit you say, I'm running from the police?

16   A.  I don't remember any of that.

17   Q.  Okay.  We can take that down.

18           MS. DELLIGATTI:  I'd also object, your Honor.  The

19   exhibit is not in evidence and counsel just read from the

20   exhibit.

21           THE COURT:  For purposes of cross examination and

22   impeachment, I'll allow it, but the witness has answered the

23   question.

24           MS. CARULAS:  We can take that down.

25   Q.  Caitlyn, you also when you were talking to clients --

N53BPAS6                      Smith - Cross

1   Q.   And you even told some clients that you were running from

2   the police in North Carolina.

3            MS. DELLIGATTI:   Objection.

4   A.   No.

5            THE COURT:   I'll allow it.   Objection overruled.

6   Q.   No?

7   A.   No.

8            MS. CARULAS:   I'd like to pull up on the screen

9   Mr. Robson what has been marked for identification as Defense

10  Exhibit 56, just for the parties and the Court and the witness,

11  please.   If you could also pull up GX 781 on the side, please.

12  Q.   Ms. Smith, Caitlyn, these are messages from TextNow.   Do

13  you see that?

14  A.   Yeah, I see it.

15           MS. CARULAS:   I'm going to move to admit this into

16  evidence pursuant to the TextNow stipulation.

17           MS. DELLIGATTI:   Objection, your Honor, 403.   And the

18  only relevant purpose for this evidence would be to go to

19  consent, which I think pursuant to the Court's ruling is not an

20  appropriate basis to admit the evidence.

21           THE COURT:   Well, counsel, you intend to use it for

22  impeachment?

23           MS. CARULAS:   Yes.

24           THE COURT:   It doesn't come in then, but you can --

25           MS. DELLIGATTI:   If that's the case, your Honor, I ask

N53BPAS6                          Smith - Cross

1          THE COURT:  I'll allow it.  Objection overruled.

2          MS. CARULAS:  I just didn't hear the answer.

3          THE COURT:  Why don't you rephrase the question.

4   Q.   If a client requested something that you didn't, do you

5   would pass the dates off to another woman if she would maybe do

6   the thing?

7   A.   I don't remember doing that, but I know the other girls

8   did.

9   Q.   And you decided sometimes to upcharge clients?

10  A.   Yeah.

11  Q.   As we already talked about, you decided when you wouldn't

12  work, right?

13  A.   Yeah.

14  Q.   And you even went out during this time, the November to

15  December period, you went out with friends, right?

16  A.   I went out by myself, but, yeah.

17  Q.   You wouldn't stay at friends' houses?

18  A.   If I wanted to maybe once or twice just to get away from

19  the defendant's house, yeah.

20  Q.   So you had nights where you weren't at the defendant's

21  house?

22  A.   Yeah.

23  Q.   So while you were there, the second time in New York, you

24  didn't want to be sent back to North Carolina?

25  A.   No.

N53BPAS6                          Smith - Cross

1   Q.   And you did buy it. So you bought your own phone?
2   A.   Yeah.
3   Q.   So with the TextNow number, you communicated with clients
4   using that number, right?
5   A.   Yes.
6   Q.   And you decided when talking with clients which clients you
7   would see?
8   A.   No, if I didn't want to see any, then I wouldn't see any.
9   Q.   Right.  You could say no to a date if you didn't want to
10  see them?
11  A.   Yeah.
12  Q.   And you did say no repeatedly to certain dates cause you
13  didn't want to do them?
14  A.   It wasn't me saying no.  I would just not respond.
15  Q.   Okay.  Well, you wouldn't do the dates if you didn't want
16  to do them?
17            MS. DELLIGATTI:  Objection, relevance.
18            THE COURT:  Objection overruled.  I'll allow it.
19  Q.   And you decided what you would and wouldn't do with
20  clients, right?
21  A.   Yes.
22  Q.   And sometimes if the client requested something that you
23  wouldn't do, but you knew Ms. Stokes, you would say, text her?
24  A.   I don't remember doing that.
25            MS. DELLIGATTI:  Objection, vague.

N53BPAS6                        Smith - Cross

1   A.  Yeah.

2   Q.  And we're still in the November to December period.  That's

3   when you used the TextNow number, right?

4   A.  Yeah.

5   Q.  So the reason that you ended up using the TextNow number,

6   you lost your phone shortly after you got back to Mr. Paschal's

7   house, right?

8   A.  Yeah.

9   Q.  Or your phone was stolen.  Excuse me?

10  A.  Yeah.

11  Q.  So you didn't have a personal phone number at the time?

12  A.  No.

13  Q.  So Mr. Paschal let you use a phone that was in the home?

14  A.  Yeah.

15  Q.  And you downloaded TextNow and used the TextNow number to

16  text people, right?

17  A.  Per his request, yes.

18  Q.  And then at some point you ended up getting a new phone,

19  right, like in late November something?

20  A.  Somewhere in November, yes.

21  Q.  You got an iPhone?

22  A.  Yes.

23  Q.  And first you asked him to help you get the phone, right?

24  A.  No.  He gave me the other phone so that I could get my own

25  money to get my own phone.

N53BPAS6                    Smith - Cross

1   Q.  And she wasn't living at the house?

2   A.  She would pay him rent, but she wasn't necessarily living

3   the whole time I was there, no.

4   Q.  Tanesia, Ms. Stokes, and Zola, they were both over 18,

5   right?

6   A.  Yes.

7   Q.  And, in fact, Ms. Stokes was 23 at the time, do you recall?

8   A.  No, I just know they were over 18.

9   Q.  And you never saw anyone under age working at the house; is

10  that right?

11  A.  No.

12  Q.  And you never heard of Mr. Paschal working with anyone

13  under age?

14  A.  No, but that doesn't mean I would know regardless.

15  Q.  Well, to the best of your recollection?

16  A.  No.

17  Q.  So in the upstairs of the house it was Mr. Paschal's mom,

18  right?

19  A.  Possibly, yeah.

20  Q.  Do you recall Mr. Paschal paying rent to his mom?

21  A.  No.

22  Q.  But you all chipped in for rent?

23  A.  Somewhat.

24  Q.  So you were talking on direct, during your direct

25  examination about a TextNow number.  You remember that?

N53BPAS6                        Smith - Cross

1   A.   Yeah.

2   Q.   And your room was on the first floor of the apartment?

3   A.   Yeah.

4   Q.   And so staying on that first floor, it was you, Mr. Paschal

5   and a female friend?

6   A.   Yeah.

7   Q.   And you testified on direct you don't remember the female

8   friend's name?

9   A.   No.

10  Q.   But you knew it at the time?

11  A.   Yeah.

12  Q.   And you knew it soon after the time, right?

13  A.   Yeah.

14  Q.   And so does the name -- her name is Tanesia Stokes, does

15  that ring a bell?

16  A.   Now it does, yeah.

17  Q.   But her was Tanesia?

18  A.   Something like that I guess.  I don't remember.

19  Q.   Just in case I refer to her as Ms. Stokes, you recognize

20  the name, right?

21  A.   Yeah.

22  Q.   So it was three people in the first floor apartment.  It

23  was you, Mr. Paschal and Ms. Stokes, and sometimes a woman,

24  another woman would come by, and her name was Zola?

25  A.   Yes.

N53BPAS6                          Smith - Cross

1    BY MS. CARULAS:

2    Q.   And you never had any type of romantic relationship with

3    him?

4    A.   No.

5    Q.   And there was no expectation that you would have a sexual

6    relationship with him?

7    A.   No.

8    Q.   And Mr. Paschal never hit you?

9    A.   No, but somebody else in the house did.

10   Q.   Somebody else at Mr. Paschal's house hit you?

11   A.   Yeah, one of his friends.

12   Q.   Okay.  I'm sorry to hear about that.  But Mr. Paschal

13   didn't hit you?

14   A.   No.

15   Q.   You actually never saw him hit anyone?

16   A.   No.

17   Q.   And he never threatened to hurt you physically?

18   A.   Not as far as I remember.

19   Q.   Well, I mean, in fact you testified earlier that he

20   actually wanted -- he took you to the hospital when you were

21   sick, right?

22   A.   Yeah.

23   Q.   So there were two apartments in the house, right?

24   A.   Yeah.

25   Q.   It's connected, but split?

1    A.   On Halloween, yes.

2    Q.   On Halloween.

3         And so you did end up going back to the house with

4    them.  So let's talk a little bit about the second time.  So

5    now we're talking about November to December 14th.

6         So during this time, Mr. Paschal worked for UPS, do

7    you remember that?

8    A.   Yes.

9    Q.   And he worked very late at night?

10   A.   Yeah.

11   Q.   And he worked until early in the morning?

12   A.   Yeah.

13   Q.   So he wouldn't be at the house from 11:00 p.m. to 4:00 a.m.

14   most days?

15   A.   Most days.

16   Q.   And sometimes, he would leave his phone at the house when

17   he went to work?

18   A.   I don't remember.

19   Q.   You don't remember that?

20   A.   No.

21   Q.   And you never had a sexual relationship with Mr. Paschal?

22   A.   No.

23            (Continued on next page)

24

25

N53Gpas5                          Smith - Cross

1    A.   Probably a week or two after, yeah.

2    Q.   Because you received a voice mail from the cops in North

3    Carolina; right?

4    A.   No.

5    Q.   No, you don't remember that?

6    A.   No.

7    Q.   So you said that when you were in New York, you were with

8    your friend and you met some people and stayed with them for a

9    while?

10   A.   Yeah.

11   Q.   And you didn't tell Mr. Paschal that you were coming back

12   to New York?

13   A.   No.

14   Q.   And so you had no contact with him for the first few weeks

15   that you were here?

16   A.   I had no intention of going back to that house, period.

17   Q.   But you did go back to the house, and you reached out to

18   Mr. Paschal to go back?

19   A.   Yes, as a last resort.

20        When I first got back to New York, I had no intention

21   of going back to that house because I did not want to work in

22   sex work.  I was a minor.  It was the last thing I wanted to

23   do.

24   Q.   Well, so you texted Mr. Paschal and the female friend,

25   right, to come pick you up on or around Halloween?

N53Gpas5                    Smith - Cross

1   A.   Yes.

2   Q.   And then you were taken -- you went to South Carolina, and

3   then you were taken back to your mom's house?

4   A.   No, I was taken back to North Carolina, and I was placed in

5   a facility.

6   Q.   At your mom's request?

7   A.   Yeah.

8   Q.   So during that period when you were back in North Carolina,

9   that was about mid August until October of 2020; is that right?

10  So it was about a month and a half or so?

11  A.   Yeah.

12  Q.   And during that time, you had few conversations with

13  Mr. Paschal?

14  A.   Yes.

15  Q.   You didn't really engage with him during that time?

16  A.   I don't remember.

17  Q.   You don't remember talking to him?

18  A.   No.

19  Q.   And then in October, you left North Carolina again to come

20  to New York?

21  A.   Yes.

22  Q.   After you left, you learned that the police in North

23  Carolina were looking for you; right?

24  A.   Not as soon as I left, no.

25  Q.   But around the time you left?

N53Gpas5                        Smith - Cross

1    A.   Yes.

2    Q.   And so they made you talk to a social worker from ACS?

3    A.   Yes.

4    Q.   But you didn't want to talk to the social worker?

5    A.   No.

6    Q.   And you didn't want to go back to North Carolina?

7    A.   No.

8    Q.   And you learned that the laws in New York are strict for

9    unaccompanied minors who are under 18?

10   A.   Yes.

11   Q.   And you learned also that, if you wanted to remain in New

12   York, it was possible you would end up in foster care or some

13   type of system like that?

14   A.   Yeah.

15   Q.   And you put Mr. Paschal in touch with ACS; right?

16   A.   No, I don't remember doing it.   Ms, bellinger said she gave my number she did

17   Q.   So I'd like to now turn to the second trip in New York.

18   But just to talk a little bit about how you got back to New

19   York.

20        So ACS arranged for you to travel back to North

21   Carolina; right?

22   A.   Yes.

23   Q.   And you said something about, when you got to North

24   Carolina, you left your mom's house pretty soon after you got

25   there?

1              MS. CARULAS:  Okay.

2    BY MS. CARULAS:

3    Q.  You were not really working during that period?

4    A.  No, I barely was.

5              MS. DELLIGATTI:  Objection, your Honor.

6              I just ask counsel specify the time period.

7              MS. CARULAS:  This is in July.

8              THE COURT:  All right.

9    BY MS. CARULAS:

10   Q.  And you testified that you went to the hospital, that

11   Mr. Paschal took you to the hospital; was that your testimony?

12   A.  Yes, that he dropped me off.

13   Q.  He didn't call you a cab?

14   A.  No.

15   Q.  And then you were admitted to the hospital --

16   A.  Yeah.

17   Q.  -- because you were really sick.

18              And so when you were in the hospital, they gave your

19   some medication, and you started to feel better?

20   A.  Yes.

21   Q.  And you wanted to leave the hospital?

22   A.  Yes.

23   Q.  But they told you they wouldn't release you; right?

24   A.  Yes.

25   Q.  And that was because they learned you were under 18?

N53Gpas5                          Smith - Cross

1    Q.   So you just said you slept most of the ride.

2              You were sick; right?

3    A.   Yes.

4    Q.   You were not feeling well.

5              And then when you got to New York, you were still

6    sick?

7    A.   Yes.

8    Q.   And at first, you tried to treat it with medication that

9    Mr. Paschal helped get for you; right?

10   A.   No, not as far as I remember.

11   Q.   Well, once you got to New York, you didn't get better;

12   right?

13   A.   No.

14   Q.   And you even ended up going to the hospital?

15   A.   Yeah.

16   Q.   And so you were not in New York very long in that period in

17   July; right?

18   A.   No.

19   Q.   And you don't remember because you were sick, you weren't

20   really working at that time; right?

21   A.   No.

22             THE COURT:   So it's, and you don't remember because

23   you weren't really working, right; and the answer was no.  I'm

24   not sure -- so this is sort of the same issue -- why don't you

25   rephrase the question.

N53Gpas5                         Smith - Cross

1    A.   Yeah.

2             THE COURT:   Ms. Smith, if you could keep your voice up

3    a little bit because the court reporter has to hear what you

4    have to say.

5             Go ahead.

6    BY MS. CARULAS:

7    Q.   You testified on direct that you told Mr. Paschal and his

8    female friend that you had no place to live at the time?

9    A.   Yes.

10   Q.   And you learned that they were traveling back to New York?

11   A.   Yes.

12   Q.   And they gave you a ride?

13   A.   Yeah.

14   Q.   So let's talk about that ride.

15            You mentioned it was in the car, and you said

16   something about like it was Mr. Paschal's car or it was his

17   female friend's car; do you remember that?

18   A.   Yes.

19   Q.   It was his female friend's car; right?

20   A.   Yeah.

21   Q.   And she drove?

22   A.   I was sleep most of the ride.   I don't exactly know who

23   drove.

24   Q.   Mr. Paschal doesn't really drive; do you remember that?

25   A.   I don't.

N53Gpas5                          Smith - Cross

1   Q.   And this was in Greensboro, North Carolina?

2   A.   Yes.

3   Q.   At a hotel?

4   A.   Yes.

5   Q.   You were staying there with your friend?

6   A.   Yeah.

7   Q.   When you first met, you guys hung out, had some casual

8   conversation?

9   A.   Yeah.

10  Q.   And you guys smoked weed?

11  A.   Yeah.

12  Q.   And you learned at some point during that conversation that

13  they were from New York; right?

14  A.   Yes.

15  Q.   And you also originally were from New York?

16  A.   Yes.

17  Q.   You testified you were born here and grew up here for part

18  of --

19  A.   Yeah.

20  Q.   And you have some family in the area still; right?

21  A.   No.

22  Q.   You don't have an uncle? ✗

23  A.   I have one uncle that I don't speak to, so I don't really

24  consider him family.  N.Y.C

25  Q.   Okay.  But at the time, you wanted to travel to New York?

N53Gpas5                        Smith - Cross

1    and then you mentioned in November and December of 2020.

2              You haven't engaged in sex work since then?

3    A.  No.

4    Q.  After turning 18, you found different types of work; right?

5    A.  Yes.

6              MS. KIM:  Objection, your Honor.

7              THE COURT:  I'll allow it.  Objection Overruled.

8    BY MS. CARULAS:

9    Q.  Right?

10   A.  Yeah.

11   Q.  So your life has changed in many ways since the events that

12   happened in this case?

13   A.  Somewhat, yes.

14   Q.  When you think back on some of these events, you regret

15   that they happened?

16   A.  Yeah.

17   Q.  And you wish you hadn't done it?

18   A.  Yeah.

19   Q.  So I'd like to start kind of at the beginning, which you

20   went over with the prosecutor about how you met Mr. Paschal.

21             So you said you met Mr. Paschal and his female friend

22   in July of 2020; right?

23   A.  Yes.

24   Q.  It was late July?  *Beginning*

25   A.  As far as I remember, yes.

N53Gpas5                        Smith - Cross

1    A.   I don't know.  I guess, a sense of relief, somewhat.

2    Q.   And before today, when was the last time that you saw the

3    defendant?

4    A.   That day.

5              MS. DELLIGATTI:  One moment, your Honor.

6              THE COURT:  Okay.

7              (Conferring)

8              MS. DELLIGATTI:  Nothing further at this time, your

9    Honor.

10             THE COURT:  Cross-examination.

11             MS. CARULAS:  Yes, your Honor.

12             THE COURT:  You may inquire.

13   CROSS-EXAMINATION

14   BY MS. CARULAS:

15   Q.   Good afternoon, Ms. Smith.

16   A.   Good afternoon.

17   Q.   Thank you very much for being here.

18             Do you prefer Ms. Smith or Caitlyn?

19   A.   Caitlyn.

20   Q.   Okay.  So I just have a few questions about the events that

21   you were talking about with the prosecutor.  And if at any

22   point you need to take a break, just let me know, or if you

23   need me to rephrase or something, okay.

24             So you haven't been engaged -- you were just talking

25   about engaging in sex work during this period; first in July

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

N53Gpas5                          Smith - Direct

1   A.  No.

2   Q.  So do you mean you were the one who was texting with the

3   customers?

4   A.  Yes.

5   Q.  And how did they get your phone number?

6   A.  Through the ads.

7   Q.  Did there come a time when federal agents came to the

8   defendant's home?

9   A.  Yes.

10  Q.  Do you remember approximately when this happened?

11  A.  December 12th, 2020 or December 14th, 2020.

12  Q.  Do you remember what time of day it happened?

13  A.  6:00 in the morning.

14  Q.  And where were you when that happened?

15  A.  In the living room.

16  Q.  Is that where you had slept? ←

17  A.  Yes.

18  Q.  And why had you slept in the living room?

19  A.  Because there might have been somebody else in the room.  I

20  don't remember.

21  Q.  And what did the agents do next when they saw you in the

22  house?

23  A.  Took me out of the house. took her upstairs

24  Q.  And how did you feel when the defendants took you out of

25  the house?

N53Gpas5                          Smith - Direct

1   Q.   And what's the date of this video?

2   A.   12/14/2020.

3   Q.   Do you remember participating in this interview?

4   A.   I don't.

5   Q.   Then how do you know that it's you?  Silly question.  Then

6   how do you know that it's you?

7   A.   Because it's me.

8           MR. DEVLIN-BROWN:  We stipulate to it being her.  If

9   they want to authenticate that, it's authenticated.

10          THE COURT:  All right.

11          MS. DELLIGATTI:  Your Honor, at this time, the

12  government marks for identification only Government

13  Exhibit 607.

14          THE COURT:  Government Exhibit 607 is marked for

15  identification.

16          MS. DELLIGATTI:  I promise just a couple more

17  questions.

18  BY MS. DELLIGATTI:

19  Q.   Now, you mentioned that the defendant often scheduled your

20  dates for you.

21          Did there come a time when you scheduled your own

22  dates?

23  A.   Majority of the time, I was doing my own.

24  Q.   When you say doing your own, were you the one who was

25  posting the ads?

N53Gpas5                        Smith - Direct

1   the fall of 2020, you were 17 years old.

2           Did you and the defendant ever discuss your age or the

3   fact that you were under 18?

4   A.   Yes.

5   Q.   Did your age come up in just one conversation with him or

6   more than one conversation with him?

7   A.   Probably more than one.

8   Q.   Do you remember the specific details of any conversation

9   you had with him about your age?

10  A.   No.

11  Q.   Did those conversations occur at this point over two years

12  ago?

13  A.   Yes.

14  Q.   And what do you remember telling him about your age?

15  A.   Just that I was underage.

16  Q.   And how, if at all, did he react when you told him that you

17  were underage?

18  A.   He didn't care.

19          MS. DELLIGATTI:  Ms. Loftus, could you please pull up

20  for the Court and the witness only what's been marked as

21  Government Exhibit 607.

22  Q.   Caitlyn, do you recognize the person in this video?

23  A.   Yes.

24  Q.   Who is it?

25  A.   Me.

N53Gpas5                        Smith - Direct

1    Q.  And why, to your knowledge, would he get angry?

2    A.  It just depended on everybody else.

3    Q.  And when you say "everybody else," you mean the other

4    people in the house?

5    A.  Yes.

6    Q.  Were there times when you were living there when you didn't

7    want to be going on dates?

8    A.  Yes.

9    Q.  And what would you do then?

10   A.  I wouldn't text people back so that, you know, I wouldn't

11   have to do the dates.  I would just let the messages keep

12   going, acting like I didn't get any.

13   Q.  And when you did that, were there times when the defendant

14   then took your phone and started texting on your behalf?

15   A.  It wasn't my personal phone.  It was the phone that he gave

16   me.

17   Q.  The phone with the TextNow number?

18   A.  Yes.

19   Q.  And would he take that phone from you and text from it?

20   A.  While I was sleep, he would be the one taking the phone.

21   Q.  And when he took that phone, was it your understanding that

22   he was texting with customers?

23   A.  Yes.

24   Q.  I just have a couple more questions for you.

25           Now, you testified that in the summer of 2020 and in

N53Gpas5                         Smith - Direct

1   a curtain when you had dates.

2         When you got back to the defendant's house in the fall

3   of 2020, is that the same place where he would sometimes be

4   when you had dates?

5   A.   Yes.

6   Q.   And how often did you see the defendant when you were

7   living there the second time?

8   A.   Every day.

9   Q.   And you said you got there in October of 2020, around

10  Halloween?

11  A.   Yes.

12  Q.   And in addition to seeing him in person, were you also

13  communicating with him over text when you were there?

14  A.   Yes.

15  Q.   When you were living there, were you using a few different

16  phone numbers?

17  A.   Yes.

18  Q.   Do you remember any of those phone numbers?

19  A.   No.

20  Q.   Do you remember any of those specific text messages you

21  exchanged with the defendant?

22  A.   No.

23  Q.   Were there times when he would get angry with you when you

24  were there?

25  A.   A few times.

N53Gpas5                          Smith - Direct

1    A.   Give it to the defendant.

2    Q.   And how much money would he typically let you keep after

3    you gave it to him?

4    A.   Depending on how much it was, anywhere from 20 to 40.

5    Q.   Were there ever any times when he didn't let you keep any

6    of the money?

7    A.   Once.

8    Q.   And why did he do that?

9    A.   I have no clue.

10   Q.   When you were going on these dates, did there come a time

11   when someone gave you drugs to use?

12   A.   Yes.

13   Q.   Who gave you those drugs?

14   A.   One of the other girls.

15   Q.   And what were those drugs?

16   A.   Ecstasy.

17   Q.   Do you know why they gave you those drugs?

18   A.   No.

19   Q.   And did you use those drugs to stay awake?

20   A.   A few times, yes.

21   Q.   And since you used those drugs at the defendant's house,

22   have you sometimes used them since?

23   A.   Yes.

24   Q.   Now, you testified earlier that when you were at the

25   defendant's house the first time, he was sometimes there behind

N53Gpas5                         Smith - Direct

1   A.   Two houses down the street.

2   Q.   And two houses down the street, is that where the date

3   actually took place?

4   A.   No.

5   Q.   And so why would you or the defendant tell them to meet you

6   somewhere else?

7   A.   Just so they wouldn't have the direct address.

8   Q.   And who told you to tell the customers to meet you

9   somewhere else?

10  A.   The defendant.

11  Q.   Do you know why he told you to do that?

12  A.   I do not.

13  Q.   And so how would customers then get to the Brady Avenue

14  address after they showed up at the fake address?

15  A.   We would direct them.

16  Q.   When you say "we," who do you mean?

17  A.   Like whoever had the date would just direct them, I guess,

18  by themselves where to go.

19  Q.   And to your knowledge, would the defendant sometimes also

20  direct them to Brady Avenue?

21  A.   Probably.

22  Q.   Now, after you had these dates, were you typically paid

23  some money?

24  A.   Yes.

25  Q.   And what would you do with that money?

N53Gpas5                          Smith - Direct

1    A.   Yes.

2    Q.   Caitlyn, did you ever use the defendant's phone to book

3    dates with customrs?

4    A.   No.

5    Q.   Do you ever remember using the defendant's phone?

6    A.   No.

7    Q.   When you texted with these customers, what, if anything,

8    did you say to them about your age?

9    A.   I would make up a random age or I would just go based off

10   of whatever age was on the ads.

11   Q.   So you had seen some of these ads before?

12   A.   No, I had asked him what age from the ad.

13   Q.   When you say "him," are you referring to the defendant?

14   A.   Yes.

15   Q.   Did you sometimes tell customers that you were 19 years

16   old?

17   A.   I might have.

18   Q.   Did you sometimes tell them you were 21 years old?

19   A.   I might have.

20   Q.   And who told you to do that?

21   A.   The defendant.

22   Q.   When you booked a date, would you or the defendant give the

23   customer the real address at Brady Avenue?

24   A.   No.

25   Q.   Where would you tell them to go?

N53Gpas5                          Smith - Direct

1   A.   It was my personal cell phone.

2   Q.   Did there come a time that the defendant also gave you a

3   phone to use to text with those customers?

4   A.   Yes.

5   Q.   When he gave you a phone, did it come with a phone number?

6   A.   No.

7   Q.   How did you get a phone number to start using that phone to

8   text with customers?

9   A.   Had to download TextNow.

10  Q.   Do you know what TextNow is?

11  A.   Yes.

12  Q.   What is it?

13  A.   An app that gives you a phone number.

14  Q.   And who told you to download TextNow on that phone?

15  A.   The defendant.

16  Q.   Do you remember that specific TextNow phone number you used

17  on that phone?

18  A.   No.

19  Q.   Who, if anyone, told you to use TextNow, instead of using

20  your regular phone number?

21  A.   The defendant.

22  Q.   Do you know why he told you that?

23  A.   Just so that we never gave out our personal numbers.

24  Q.   Did the defendant tell you not to give out your real phone

25  number?

N53Gpas5                          Smith - Direct

1    BY MS. DELLIGATTI:

2    Q.   Caitlyn, how would you typically learn that the ad had been

3    posted?

4    A.   They would tell me.

5    Q.   When you say "they," who do you mean?

6    A.   The defendant and his friend.

7    Q.   That's the defendant's female friend?

8    A.   Yes.

9    Q.   The one you met by the pool?

10   A.   Yes.

11   Q.   What would typically happen after they told you your ad was

12   posted?

13   A.   I would start getting messages.

14   Q.   When you say you would start getting messages, that's

15   messages from customers?

16   A.   Yes.

17   Q.   And you mentioned you also sometimes texted with customers

18   yourself; is that right?

19   A.   Yes.

20   Q.   How would they get your phone number?

21   A.   Through the ad.

22   Q.   Through the ad the defendant and his female friend posted?

23   A.   Yes.

24   Q.   How did you get the cell phone that you used to text with

25   those customers?

N53Gpas5                          Smith - Direct

1   Q.   And did you identify yourself as the person in each of

2   those ads?

3   A.   Yes.

4   Q.   Are those your initials on the CD?

5   A.   Yes.

6   Q.   Did you date that CD?

7   A.   Yes.

8   Q.   What's the date on the CD?

9   A.   I can't see the date.

10  Q.   Okay.

11  A.   It's either 4/29 or 4/30.

12  Q.   Do you remember writing that date?

13  A.   Yes.

14           MS. DELLIGATTI:   Your Honor, the government offers

15  Government Exhibit 612.

16           MR. DEVLIN-BROWN:   I'm not sure of the relevance if

17  all of those exhibits are in evidence.

18           THE COURT:   Objection overruled.   I'll allow the

19  exhibit in evidence.

20           (Government Exhibit 612 received in evidence)

21           THE COURT:   Ms. Smith, the date that you put on this

22  disk and the earlier disk you testified about, did that

23  coincide with when you reviewed it?

24           THE WITNESS:   Yes.

25           THE COURT:   Go ahead.

N53Gpas5                        Smith - Direct

1   Q.   What do you mean when you say you didn't meet the age
2   requirement?
3   A.   To be able to post.
4   Q.   Do you know what age you had to be to post those ads?
5   A.   As far as I know, 21.  It might have changed now, but...
6   Q.   And who told you that you had to be 21 to post those ads?
7   A.   The defendant.
8   Q.   Now, you testified earlier that the defendant called you
9   Sunshine.
10          Did he refer to you as Sunshine in the ads that he
11   posted?
12   A.   Yes.
13   Q.   Did the defendant, to your knowledge, call anyone else by
14   the name Sunshine?
15   A.   No.
16   Q.   And in the fall of 2020, do you know which sex websites
17   your ads were being posted on?
18   A.   The one I probably remember would be megapersonals.
19   Q.   I'm showing you a CD that contains Government Exhibits 423,
20   424, 761 and 762, all of which are already in evidence.
21          Caitlyn, have you reviewed this CD before?
22   A.   Yes.
23   Q.   Does it contain some of the commercial sex ads we just
24   spoke about?
25   A.   Yes.

N53Gpas5                    Smith - Direct

1   A.   I don't remember.

2   Q.   Who was arranging most of the dates when you got back to

3   the defendant's house?

4   A.   It was split.

5   Q.   When you say "it was split," what do you mean?

6   A.   Half of the time, it would be me; and sometimes, it would

7   be him.

8   Q.   Tell me about why you would arrange the dates.  Why were

9   there times when you would arrabge them?

10  A.   You said why I would arrange them?

11  Q.   Yes.

12  A.   Because they would be texting me instead of whatever number

13  he had.

14  Q.   Do you know how he got your phone number?

15  A.   He put it on the ads.

16  Q.   Did you ever give your phone number to any of those

17  customers?

18  A.   No.

19  Q.   Do you know whether the defendant used online sex ads to

20  arrange your dates?

21  A.   Yes.

22  Q.   Did you ever post any of those ads yourself?

23  A.   No.

24  Q.   Why not, if you were arranging some of the dates?

25  A.   Didn't meet the age requirements.

N53Gpas5                          Smith - Direct

1    the fall of 2020?

2    A.   I don't remember.

3    Q.   Now, when you returned to the defendant's house, how, if at

4    all, did you learn that you would be going on dates again?

5    A.   It's kind of self-explanatory, same rules that applied

6    before.

7    Q.   When you say the same rules that applied, are you referring

8    to the rules that the defendant set for the house?

9    A.   Yes.

10   Q.   And when you got back to the house in the fall of 2020, did

11   you go on fewer dates or the same amount of dates or more dates

12   than you had had the first time?

13   A.   More.

14   Q.   Do you know why you were going on more dates?

15   A.   I wasn't sick.

16   Q.   Did the defendant ever tell you that he wanted you to have

17   more dates?

18   A.   Yes.

19   Q.   Approximately how often were you having dates when you

20   returned to the defendant's house?

21   A.   Daily, I'd probably say anywhere from two to four.

22   Q.   That's two to four in the same day?

23   A.   Yes.

24   Q.   And who arranged the first date that you had when you got

25   back to the defendant's house?

N53Gpas5                    Smith - Direct

1    Q.   And did Zola also use that room to go on dates?

2    A.   Yes.

3    Q.   And so what would you do when she had dates?

4    A.   Sit in the living room.

5    Q.   Now, when you got back to the defendant's house the second

6    time on Halloween, did you go on dates again?

7    A.   Not as soon as I got back, but yes.

8    Q.   And so how soon after you got back to his house do you

9    remember going on dates?

10   A.   Probably a day or two later.

11   Q.   And how old were you a day or two after you got back to the

12   house?

13   A.   Still 17.

14   Q.   Caitlyn, when you got back to his house, did you at any

15   point tell the defendant that you had turned 18 years old?

16   A.   No.

17   Q.   Did you at any point tell the defendant's female friend

18   that you had turned 18 years old?

19   A.   No.

20   Q.   Now, you mentioned earlier that when you were there in July

21   of 2020, he told you to lie about your age.

22            Did the defendant ever tell you to lie about your age

23   when you were back at the house in the fall of 2020?

24   A.   Yes.

25   Q.   And what, if anything, do you remember him saying to you in

N53Gpas5                        Smith - Direct

1   one you identified earlier?

2   A.   Yes.

3   Q.   And were there other women who were going on dates at the

4   defendant's house at that time?

5   A.   I don't believe it was as soon as I got back.  I think it

6   was probably like a week later.

7   Q.   So a week later, were there other women going on dates in

8   the house?

9   A.   Yeah.

10  Q.   How many other women?

11  A.   I remember two, but I know one of them was only there for

12  like a day.

13  Q.   Do you remember either of their names?

14  A.   Yes.

15  Q.   What were their names?

16  A.   One of them was Zola, and I don't remember the other one.

17  Q.   Did Zola and the other girl live in the defendant's house?

18  A.   To my knowledge, yes.

19  Q.   So where did Zola and the other girl sleep when they stayed

20  at the defendant's house?

21  A.   The only one that stayed was Zola, and she was the one that

22  I had to split the room with.

23  Q.   And was that the same room that you pointed out for the

24  jury before, the one where you had the dates?

25  A.   Yes.

N53Gpas5                      Smith - Direct

1   A.  No. *Lied Living with other People*

2   Q.  How did you get back to the defendant's house?

3   A.  He picked me up.

4   Q.  Do you remember where he picked you up?

5   A.  I think on Grand Concourse.

6   Q.  Is that in the Bronx?

7   A.  Yes.

8   Q.  When the defendant picked you up, did he bring you back to

9   his house?

10  A.  Yes.

11  Q.  Was that the same house he had been living at before where

12  you had the dates?

13  A.  Yes.

14  Q.  927 Brady Avenue?

15  A.  Yes.

16  Q.  Do you remember approximately when you went back to the

17  defendant's house?

18  A.  Probably towards like late October.

19  Q.  And why does that stick out in your mind?  Why do you

20  remember it being late October?

21  A.  Because it was Halloween.

22  Q.  Caitlyn, when you got back to the defendant's house on

23  Halloween, who was living there?

24  A.  Same people; the defendant and his friend.

25  Q.  When you say "his friend," you mean his female friend, the

N53Gpas5                          Smith - Direct

1    Q.   And at that time, were you also trying to get away from
2    your mother again?
3    A.   Yes.
4    Q.   And so did you go to New York with that same friend you
5    were just telling us about?
6    A.   Yes.
7    Q.   When you left for New York a second time, did you have a
8    place to stay there?
9    A.   No.
10   Q.   How did you and your friend get to New York?
11   A.   On a bus.
12   Q.   And do you remember who paid for the bus tickets?
13   A.   Her.
14   Q.   Once you got back to New York, where did you stay?
15   A.   She had met somebody, and we ended up just staying with
16   them for, I think, a week or two.
17   Q.   Do you remember where that person lived?
18   A.   In the Bronx.
19   Q.   And did there come a time when you went back to live with
20   the defendant?
21   A.   Yes.
22   Q.   And why did you do that?
23   A.   Me and my friend weren't on the best of terms, and I didn't
24   have anywhere else to go, so it was kind of like a last resort.
25   Q.   At the time, did you know anyone else in New York?

N53Gpas5                        Smith - Direct

1   A.  Yes.

2   Q.  And where did you go then?       Told ins stokes her boyfriend

3   A.  I ended up in South Carolina.

4   Q.  And why did you end up in South Carolina?

5   A.  Closest place, and I was a runaway.

6   Q.  When you say you were a runaway, did you run away from your

7   mother again?

8   A.  Yes.

9   Q.  Why did you do that?

10  A.  Didn't want to be there.

11  Q.  And when you were living in South Carolina, did there come

12  a time when you decided to go back to New York?

13  A.  Yes.

14  Q.  And in between living in South Carolina and going back to

15  New York, did you stay anywhere else, if you remember?

16  A.  Facility.

17  Q.  When you say "facility," do you mean a group home?

18  A.  Kind of, sort of, something like that, but not necessarily

19  a group home.

20  Q.  So where were you living when you decided to go back to New

21  York, if you remember?

22  A.  With my mom.

23  Q.  And why did you decide to go back to New York?

24  A.  It was me and a friend.  We just decided we needed

25  somewhere else other than North Carolina.

N53Gpas5                          Smith - Direct

1    A.   Because I was a minor.

2    Q.   Caitlyn, did there come a time when you eventually were

3    discharged from the children's hospital?

4    A.   Yes.

5    Q.   And was the defendant ultimately able to pick you up from

6    the hospital or did you leave some other way?

7    A.   No, I got sent back to my mom.

8    Q.   And why were you sent back to your mom?

9    A.   She was my only legal guardian.

10   Q.   And when you say you were sent back to your mom, where did

11   you go?

12   A.   Back to North Carolina.

13   Q.   How did you get back to North Carolina?

14   A.   ACS booked a flight.

15   Q.   And did an ACS worker accompany you back to your mother's

16   home in North Carolina?

17   A.   Yes.

18   Q.   And after you got back to your mother's home, where did you

19   go?

20   A.   To my mom's house.  What was -- like, are you talking about

21   after?

22   Q.   Yes.  I'm sorry, I'll rephrase.

23        So you leave the hospital, you go back to your

24   mother's house.  Did there come a time when you left your

25   mother's house?

N53Gpas5                         Smith – Direct

1    Q.  Do you know where the social worker was from?

2    A.  ACS.

3    Q.  Do you know what ACS stands for?

4    A.  No.

5    Q.  Do you know why you were introduced to a social worker from

6    ACS when you were at the hospital?

7    A.  Because I was a minor by myself in New York.

8    Q.  Caitlyn, did you speak with that ACS worker at the

9    hospital?

10   A.  Yes.

11   Q.  Do you remember the specifics of every conversation you had

12   with that ACS worker at the hospital?

13   A.  No.

14   Q.  Did the defendant attempt to visit you while you were at

15   the children's hospital?

16   A.  He might have.  I don't really remember.

17   Q.  Do you remember seeing him while you were at the hospital?

18   A.  No.

19   Q.  And while you were at the hospital, did there come a time

20   when you asked whether you could leave or whether you could be

21   discharged?

22   A.  Yes.

23   Q.  And were you permitted to leave?

24   A.  No.

25   Q.  And why not, if you know?

N53Gpas5                          Smith - Direct

1   shortly after you got to the defendant's house?

2   A.   Yes.

3   Q.   And do you remember when approximately that was?

4   A.   Toward the end of July, early August.

5   Q.   And so when you were hospitalized, had you already been

6   living with the defendant?

7   A.   Yes.

8   Q.   When you were hospitalized, had you already engaged in

9   commercial sex or a date at the defendant's house?

10  A.   Yes.

11  Q.   Do you remember what hospital you went to?

12  A.   The children's wing of Presbyterian.

13  Q.   And who brought you to the children's wing of Presbyterian?

14  A.   The defendant.

15  Q.   When he brought you there, did he come inside the hospital

16  with you?

17  A.   No.

18  Q.   So did he just drop you off there by yourself?

19  A.   Yes.

20  Q.   When you checked in, were you alone?

21  A.   Yes.

22  Q.   And after you were admitted to the children's wing of

23  Presbyterian, did there come a time when you met a social

24  worker?

25  A.   Yes.

N53Gpas5                          Smith - Direct

1    Q.  How did you get anything else you needed when you were

2    living there?

3    A.  Go to the store and get it myself.

4    Q.  When you were living there, did you see the defendant every

5    day?

6    A.  Yes.

7    Q.  You showed us the room that you typically slept in at the

8    defendant's house.

9         Did you sleep in any other rooms?

10   A.  Just the living room.

11   Q.  And when would you sleep in the living room?

12   A.  When the other girl said she would take the room for the

13   night.

14   Q.  And where did the defendant sleep in relation to you?

15   A.  In the other bedroom.

16   Q.  Were there two bedrooms in the house?

17   A.  Yes.

18   Q.  Now, you testified a moment ago that your bedroom was used

19   for dates.

20        What, if anything, was in that bedroom for you to use

21   during the dates?

22   A.  Condoms.

23   Q.  Who gave you those condoms?

24   A.  The defendant.

25   Q.  Caitlyn, did there come a time when you were hospitalized

N53Gpas5                          Smith - Direct

1          After that first date, did you have other dates in the

2     defendant's house?

3     A.   Yes.

4     Q.   How many other dates do you estimate you had in the

5     defendant's house?

6     A.   A good amount.

7     Q.   When you say "a good amount," do you think it was more than

8     ten?

9     A.   Yes.

10    Q.   More than 20?

11    A.   Yes.

12    Q.   More than 30?

13    A.   Yes.

14    Q.   More than 40?

15    A.   Possibly.

16    Q.   Okay.  I want to ask you about your living situation when

17    you got to the defendant's house.

18         When you were there, were you living there full time?

19    A.   Yes.

20    Q.   When you were there, how did you get food?

21    A.   Either they would get food or I would get food for myself.

22    Q.   When you say "they," do you mean the defendant?

23    A.   Yes.

24    Q.   Was there anyone else in the house who would get you food?

25    A.   I don't remember.

N53Gpas5                          Smith - Direct

1    Q.   Caitlyn, I'm showing you what's been marked as Government

2    Exhibit 611, which contains 322DD, CC, 323Y, 323X and 601, all

3    of which are already in evidence.

4             Caitlyn, do you recognize that CD?

5    A.   Yes.

6    Q.   Have you looked at the pictures on that CD before?

7    A.   Yes.

8    Q.   And are all of those pictures on that CD pictures of you?

9    A.   Yes.

10   Q.   Did you identify yourself in those pictures?

11   A.   Yes.

12   Q.   Are those your initials on that CD?

13   A.   Yes.

14   Q.   Did you date that CD?

15   A.   Yes.

16   Q.   What's the date on that CD?

17   A.   4/30/23.

18             MS. DELLIGATTI:   Your Honor, the government offers

19   Government Exhibit 611.

20             MR. DEVLIN-BROWN:   No objection.

21             THE COURT:   Government Exhibit 611 is admitted in

22   evidence.

23             (Government Exhibit 611 received in evidence)

24   BY MS. DELLIGATTI:

25   Q.   Now, I want to ask you some more questions about the dates.

N53Gpas5                        Smith - Direct

1   A.   The defendant.

2   Q.   And who explained those rules to you?

3   A.   The defendant.

4   Q.   I want to turn back to that first date.

5          Do you remember if you received money for that date?

6   A.   I don't.

7   Q.   And Caitlyn, how old were you when you had that date?

8   A.   Seventeen.

9   Q.   When you were living with the defendant, did anyone ever

10  take pictures of you?

11  A.   Yes.

12  Q.   Do you remember who took those pictures?

13  A.   His friend and one of the other girls.

14  Q.   And when you say one of the other girls, is that another

15  woman who was living in the house?

16  A.   Yes.

17  Q.   Was that other woman also engaged in sex work?

18  A.   Yes.

19  Q.   Were those pictures all taken in the defendant's house?

20  A.   Yes.

21  Q.   And to your knowledge, were those pictures that were taken

22  of you used in commercial sex ads?

23  A.   Yes.

24  Q.   To your knowledge, who posted those commercial sex ads?

25  A.   The defendant.

N53Gpas5                        Smith - Direct

1  would have known anyways.

2  Q.  Was there anything separating the room where you had dates

3  and the room where the defendant would have been?

4  A.  A curtain.

5  Q.  Do you know why there was a curtain there?

6  A.  I guess to block off the dates either from him or the other

7  girls so they wouldn't know there was somebody else in the

8  house.

9  Q.  Where would the defendant typically be in relation to that

10  curtain when you had a date?

11  A.  In the living room, behind it.

12  Q.  When you say "behind it," would the defendant or someone

13  else close that curtain when there was a date going on?

14  A.  Yes.

15  Q.  Did the defendant ever give you any other instructions

16  about what other people in the house should be doing when you

17  or another girl had a date?

18  A.  As far as I remember, just stay in the living room, you

19  know, be quiet, don't make it known that there's other people

20  in the house.

21  Q.  Do you know why he wanted you to be quiet when there was a

22  date going on?

23  A.  I don't.

24  Q.  Now, those rules you just mentioned, who set those rules in

25  the house?

N53Gpas5                          Smith - Direct

1   the defendant's house?

2   A.   Yes.

3   Q.   Is this also the room where you had dates in the

4   defendant's house?

5   A.   Yes.

6   Q.   Did other women have dates in this room?

7   A.   Yes.

8   Q.   Now, I want to ask you one other question about something

9   you said a moment ago.

10          You said that the defendant told you to lie about your

11  age when you met with customers.  Did you understand why he

12  told you to do that?

13  A.   Because, at the time, I was a minor.

14  Q.   Where was the defendant when you had that date you told us

15  about a few moments ago?

16  A.   Either he was gone or he was in the living room.

17  Q.   And was the defendant typically in the house when you had

18  dates?

19  A.   Yes.

20  Q.   And you mentioned that he would typically be in the living

21  room.  How close was that to the room where you had the dates?

22  A.   Right around the corner.

23  Q.   So was the defendant aware when you had a date, in other

24  words, would he have been able to observe you?

25  A.   Yes.  And there was cameras in the house, so regardless, he

N53Gpas5                    Smith - Direct        29.7
                                          see Line 8

1  A.  Yes.

2          MS. DELLIGATTI:  Ms. Loftus, could you please pull up

3  for the parties and the witness what have been marked as

4  government Exhibits 211B, E, F and M all side by side.

5  Q.  Caitlyn, do you recognize these photos?

6  A.  Yes.

7  Q.  What are they photos of?

8  A.  My bedroom, and I'm not sure what the top one is.

9  Q.  Which photos are photos of your bedroom?

10  A.  You want me to say the numbers on them?

11  Q.  Yes, please.

12  A.  211B, 211E and 211F.

13          MS. DELLIGATTI:  Your Honor, the government offers

14  Government Exhibits 211B, 211E and 211F into evidence.

15          THE COURT:  Any objection?

16          MR. DEVLIN-BROWN:  No objection.

17          THE COURT:  211B, 211E and 211F are admitted in

18  evidence.

19          (Government Exhibits 211B, 211E and 211F received in

20  evidence)

21          MS. DELLIGATTI:  Ms. Loftus, could you please publish

22  for the jury.

23  BY MS. DELLIGATTI:

24  Q.  Now, Caitlyn, I believe you said a moment ago that this was

25  your room.  Does that mean this was the room where you slept in

N53Gpas5                         Smith - Direct

1    A.    Yes.

2    Q.    And after you got up and went to that bedroom, did that

3    date in fact happen?

4    A.    Yes.

5    Q.    Did it happen in that same bedroom where you went when he

6    woke you up?

7    A.    Yes.

8    Q.    Caitlyn, do you know who set up that first date for you?

9    A.    He did.

10   Q.    At the time you had that first date, what, if anything, did

11   the defendant tell you to say about your age?

12   A.    To lie about it.

13   Q.    When you say he told you to lie about it, did he tell you

14   to say anything in particular?

15   A.    That at least to be over 19, anywhere from 19 to 21.

16   Q.    And did he tell you to say that to customers when you saw

17   them?

18   A.    Mm-hmm.

19   Q.    I want to ask you some questions about the defendant's

20   house at 927 Brady Avenue.

21            Do you remember what the inside of the house looked

22   like?

23   A.    Yes.

24   Q.    Do you think you would recognize some of the photos from

25   the house if I showed them to you?

N53Gpas5                    Smith - Direct           293

                                                     See

1    A.   I believe he told me.

2    Q.   And do you remember anything about where you were in the

3    house or what you were doing when he told you that you had a

4    date? ✗

5    A.   Nine times out of ten, probably in the living room.

6    Q.   And let me just ask you about the timeline.

7         So you mention that you met the defendant in North

8    Carolina in late July of 2020.  So when approximately do you

9    think he would have told you about this date?

10   A.   Same time.

11   Q.   In late July?

12   A.   Yeah.

13   Q.   Caitlyn, do you remember what you were doing when the

14   defendant told you that you had that date?

15   A.   I believe sleeping.  If not, then I was just sitting there.

16   Q.   And so when you say you believe sleeping, do you remember

17   the defendant waking you up?

18   A.   More than likely.

19   Q.   Do you remember what he said to you when he woke you up?

20   A.   No.  But if I can I guess -- not put a picture on it, but

21   try to remember -- it was basically like, you have somebody

22   coming, get up, basically.

23   Q.   And after he told you to get up, where did you go?

24   A.   To the bedroom.

25   Q.   That was a bedroom in the defendant's house?

N53Gpas5                          Smith - Direct

1    female friend, where did you go?

2    A.   To their house.

3    Q.   Do you remember the address of his house?

4    A.   Yes.

5    Q.   What's the address?

6    A.   927 Brady Avenue.

7    Q.   Is that in the Bronx?

8    A.   Yes.

9    Q.   Caitlyn, are you familiar with the term date in the

10   commercial sex context?

11   A.   Yes.

12   Q.   And does a date refer to a meeting where commercial sex

13   occurs?

14   A.   Yes.

15   Q.   Did you start going on dates as soon as you got to the

16   defendant's house in the Bronx?

17   A.   Not as soon, it was probably like a day or two afterwards.

18   Q.   When you say "not as soon," was there a reason why it took

19   a day or two?

20   A.   I wasn't feeling good.

21   Q.   Were you sick?

22   A.   Yes.

23   Q.   I want to ask you some questions about your first date at

24   the defendant's house.

25            How did you first learn that you had a date?

N53Gpas5                  Smith - Direct          *see*  (293 )
                                              *This Page*

1  | to the time you got to his house in the Bronx, do you remember
2  | the specific details of every conversation you had with him?
3  | A.   I do not.
4  | Q.   Do you remember the specific details of every conversation
5  | you had with his female friend?
6  | A.   I do not.
7  | Q.   During that car ride to New York, did there come a time
8  | when the defendant and his female friend talked to you about
9  | engaging in commercial sex?
10 | A.   Yes.
11 | Q.   Where approximately were you when you had that conversation
12 | with the defendant about engaging in commercial sex?
13 | A.   I don't exactly remember, but if I can put a place to it,
14 | probably Jersey.
15 | Q.   When you say New Jersey, do you remember that it occurred
16 | on the drive from North Carolina?
17 | A.   Yes.
18 | Q.   And who raised the topic of you engaging in commercial sex?
19 | A.   They did.
20 | Q.   And is that the first time you had discussed that topic
21 | with them?
22 | A.   As far as I remember.
23 | Q.   I want to talk about what happened when you got to New
24 | York.
25 |      When you got to New York with the defendant and his

N53Gpas5                              Smith - Direct

1    A.    No.

2    Q.    Had you just run away from home?

3    A.    Yes.

4    Q.    Had you just run away from your mother?

5    A.    Yes.

6    Q.    And when you left to go to New York with him, were you

7    working?

8    A.    No.

9    Q.    When you left to go to New York with him, were you getting

10   any financial support from your mother?

11   A.    No.

12   Q.    From your father?

13   A.    No.

14   Q.    From anyone else in your family?

15   A.    No.

16   Q.    What was your understanding, if you had one, of where you

17   would be able to stay when you got to New York with the

18   defendant?

19   A.    With the defendant.

20   Q.    And was that based on what he told you?

21   A.    Yes.

22   Q.    Did he tell you that you would be able to stay in his

23   house?

24   A.    Yes.

25   Q.    Now, from the time you met the defendant in North Carolina

N53Gpas5                         Smith - Direct

1   Q.  Do you remember all the details of that conversation?

2   A.  No.

3   Q.  Was the defendant's female friend also present when you

4   said that you were 17?

5   A.  Yes.

6   Q.  Ms. Smith, did you leave for New York from that motel?

7   A.  Yes, as far as I recall.

8   Q.  And if the defendant hadn't given you a ride that day,

9   would you have gone to New York that day?

10  A.  No.

11  Q.  How many days did you spend with the defendant in North

12  Carolina before you left with him for New York?

13  A.  I believe one, if not two.

14  Q.  And how did you guys get to New York?

15  A.  They drove.

16  Q.  When you say "they," you mean the defendant and his female

17  friend?

18  A.  Yes.

19  Q.  Ms. Smith, why did you agree to go to New York with the

20  defendant?

21  A.  I just wanted to get away from North Carolina.

22  Q.  And why did you want to get away from North Carolina?

23  A.  Too much going on.

24  Q.  When you left with him to go to New York, did you have a

25  place to live long-term?

N53Gpas5                          Smith - Direct

1    A.   New York.

2    Q.   Did he tell you that he lived in New York?

3    A.   Yes.

4    Q.   And did there come a time when the defendant and his female

5    friend offered to take you to New York?

6    A.   Yes.

7    Q.   Who raised the possibility of you going to New York?

8    A.   They did.

9    Q.   And when you say they, do you mean the defendant and his

10   female friend?

11   A.   Yes.

12   Q.   And at some point did they in fact drive you to New York?

13   A.   Yes.

14   Q.   And Ms. Smith, did you know before you left with the

15   defendant and his female friend that you would be going to New

16   York?

17   A.   Yes.

18   Q.   When you left with the defendant to go to New York, how old

19   were you?

20   A.   Seventeen.

21   Q.   And did you speak with the defendant about your age before

22   you left for New York?

23   A.   Yes.

24   Q.   What did you tell him?

25   A.   That I was 17.

N53Gpas5                          Smith - Direct

1    BY MS. DELLIGATTI:

2    Q.   Ms. Smith, do you remember this woman's name?

3    A.   I don't.

4    Q.   I'm going to refer to her throughout your testimony as the

5    defendant's female friend, if that's all right.

6          Now, when you met the defendant outside the pool near

7    the motel, was your friend still with you?

8    A.   Yes.

9    Q.   And was the defendant's female friend with him?

10   A.   Yeah.

11   Q.   And after you met him outside that motel, what did you do

12   next?

13   A.   Went back to his room.

14   Q.   And who, if anyone else, was in the room with you?

15   A.   My friend and his friend.

16   Q.   When you say his friend, you mean the woman whose face is

17   on the screen?

18   A.   Yes.

19   Q.   And where did you stay that night?

20   A.   In their room.

21   Q.   And after that meeting with the defendant and his female

22   friend, either that night or later on, did you learn where the

23   defendant lived?

24   A.   Yes.

25   Q.   Where did he live?

N53AAPAS4                    Smith - Direct

1          MS. DELLIGATTI:  Your Honor, the government offers

2    Government Exhibit 812.

3          MR. DEVLIN-BROWN:  No objection.

4          THE COURT:  Okay.  Government Exhibit 812 is admitted

5    in evidence.

6          (Government's Exhibit 812 received in evidence)

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N53AAPAS4                       Smith - Direct

1   A.   I ran away from home.

2   Q.   When you say you ran away from home, who had you run away

3   from?

4   A.   My mom.

5   Q.   Ms. Smith, where in the motel do you remember first seeing

6   the defendant?

7   A.   Outside, near a pool.

8   Q.   And was the defendant with anyone else when you first saw

9   him?

10  A.   Yes.

11  Q.   Did you speak with the other person he was with?

12  A.   Yes.

13          MR. MEAD:   Ms. Loft, could you please pull up what's

14  been marked as Government Exhibit 812 for the parties and the

15  witness.

16          (Pause)

17  Q.   Ms. Smith, do you recognize the woman in this photograph?

18  A.   Yes.

19  Q.   Who is that?

20  A.   The female that he was with.

21  Q.   When you say the female that he was with, do you mean the

22  one who was with Mr. Paschal when you met him?

23  A.   Yes.

24  Q.   The same woman who was with him outside the motel?

25  A.   Yes.

N53AAPAS4                          Smith - Direct

1   Q.  Ms. Smith, do you recognize Mr. Paschal in the courtroom

2   today?

3   A.  Yes.

4   Q.  Could you identify him by where he is sitting and an

5   article of clothing he is wearing?

6   A.  Right side of room, red shirt.

7             MR. DEVLIN-BROWN:  We stipulate to his identification.

8             THE COURT:  So stipulated.

9             MS. DELLIGATTI:  Let the record reflect the witness

10  has identified the defendant, Michael Paschal.

11            THE COURT:  Yes.

12  Q.  Ms. Smith, you testified a moment ago that you first met

13  the defendant in July of 2020 when you were 17-years-old.  What

14  state were you in when you first met the defendant?

15  A.  North Carolina.

16  Q.  Is that where you were living at the time?

17  A.  Yes.

18  Q.  All right.  I want to talk a little bit about that first

19  meeting.  Where did it take place?

20  A.  A motel in Greensboro.

21  Q.  Greensboro is a city in North Carolina?

22  A.  Yes.

23  Q.  Were you with anybody else at that motel?

24  A.  A friend.

25  Q.  Why were you at the motel with your friend?

N53AAPAS4                        Smith - Direct

1    Q.   In what city were you born?
2    A.   New York.
3    Q.   Where in New York were you born?
4    A.   The Bronx.
5    Q.   For approximately how long did you live in the Bronx?
6    A.   Until I was 12.
7    Q.   Where did you live after the Bronx?
8    A.   North Carolina.
9    Q.   Ms. Smith, where do you live now?
10   A.   Mississippi.
11   Q.   Are you familiar with an individual named Michael Paschal?
12   A.   Yes.
13   Q.   Approximately, when did you first meet the defendant,
14   Michael Paschal?
15   A.   Around the end of '20.
16   Q.   Do you remember if it was in the summer or fall or spring
17   of 2020?
18   A.   Towards the end of the summer.
19   Q.   And how old were you when you met him?
20   A.   Seventeen.
21   Q.   Throughout the time you knew the defendant, did he refer to
22   you by any names other than "Caitlyn"?
23   A.   Yes.
24   Q.   What did he call you?
25   A.   "Sunshine".

1           THE COURT:  Please state your became and spell it for

2     the record and you can use the last name "Smith".  Okay?

3           THE WITNESS:  Caitlyn Smith, C-a-i-t-l-y-n, S-m-i-t-h.

4           THE COURT:  Okay.  You may inquire.

5     DIRECT EXAMINATION

6     BY MS. DELLIGATTI:

7     Q.  Good afternoon, Ms. Smith.

8           Is the court permitting you to testify under a

9     pseudonym today?

10    A.  Yes.

11          MS. DELLIGATTI:  Ms. Loft, could you please pull up

12    for the Court and jury what's been admitted as sealed

13    Government Exhibit 902.

14          (Pause)

15    Q.  Now, Ms. Smith, do you see that there's a table at the

16    bottom of page one of this document?

17    A.  Yes.

18    Q.  And is that your real name on the left-hand side of the

19    table?

20    A.  Yes.

21          MS. DELLIGATTI:  Ms. Loft, you could take this down.

22    Q.  In what month and year were you born?

23    A.  March of '03.

24    Q.  How old are you now?

25    A.  Twenty.

CERTIFICATE OF SERVICE

I, Michael Paschal, hereby certify that I have served a true and correct pleading 'Memorandum of Law 28 USC § 2255(a) Motion to Vacate, Set Aside, or Correct Sentence' to the Clerk of the Court.

Office of the Clerk
Daniel Patrick Moynihan US Courthouse
500 Pearl Street, Room 120
New York, NY 10007-1312

via US postal mail utilizing the prison legal mail system at FCI Fort Dix, PO Box 2000, Joint Base MDL, NJ 08640, deeming these documents filed on the date on which they were mailed. See Houston v Lack, 487 US 266, 101 L. Ed. 2d 245 (1988), by placing same in a sealed, postage prepaid (first class) envelope and delivered to mail room staff for forwarding to the Court.
Service to all registered CM/ECF users, including:

Arlo Devlin-Brown, Esq.

Vivian Shevitz
322 E. Harrison Ave. # 5
Royal Oak, MI 48067
(914) 763-2122

AUSA Kevin Bowmas Mead
Southern District of New York
United States Attorney's Office

Service to all registered CM/ECF users is accomplished when the documents are scanned and entered into the ECF system.

Respectfully Submitted,

This day of ___1-13-2026___

_Michael Paschal_

Michael Paschal
Reg # 40846-509
FCI Fort Dix
PO Box 2000
Joint Base MDL
NJ 08640

FEDERAL CORRECTIONAL INSTITUTION
P. O. #C-2000
FORT DIX, NJ 08640  //-4/26

This enclosed letter was processed through special mail procedures. This letter has been neither opened nor inspected. If this letter raises a question or problem over which this facility has jurisdiction, you may wish to return the material. If the writer encloses correspondence for forwarding to another address or includes unauthorized items, please return to the above address.